UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Abdoulaye Toure,<br><br>               Plaintiff,<br><br>     v.<br><br>Port Authority of New York and New Jersey, Port Authority of New York and New Jersey Police Department, and Police Officer Chelsea Cassino,<br><br>               Defendants. | 21-cv-01645 (NRM) (ST)<br><br>**MEMORANDUM AND ORDER** |

NINA R. MORRISON, United States District Judge:

      Plaintiff Abdoulaye Toure owned a company called Safebet Consulting ("Safebet"), which helps police departments in West Africa develop crowd control protocols and riot protection. On November 12, 2019, Plaintiff was traveling from John F. Kennedy Airport ("JFK") in New York City to Conakry, Guinea on behalf of Safebet to introduce a particular type of electronic stun gun — the PhaZZer — to the Police Department of Guinea ("Guinea Police"). Prior to his departure, Plaintiff conducted a Google search to ensure that he could travel with the stun gun and learned that a federal district court had recently held New York's criminal possession of a weapon statute, CPL § 265.01(1), unconstitutional as applied to stun guns. Plaintiff then packed the PhaZZer, along with documentation that the PhaZZer's manufacturer had provided, in his luggage.

1

When Plaintiff arrived at JFK, he checked into his flight at the Air France counter and alerted airline personnel that there was a PhaZZer in the bag he intended to check. He provided documentation, but airline officials called the Port Authority of New York and New Jersey Police Department ("PAPD"). When two police officers arrived, Plaintiff provided them with the documentation and explained that a federal court had recently struck down CPL § 265.01(1) as applied to stun guns. However, PAPD officers rear-handcuffed and arrested Plaintiff and transported him from the terminal at JFK to the JFK Police Command and then to Queens Central Booking. During the drive to Queens Central Booking, officers did not fasten Plaintiff's seatbelt, causing him to bounce around the vehicle and become bruised. At multiple points during his time in custody, the police officers also handcuffed Plaintiff tightly, which caused him discomfort.

Based on these events, Plaintiff commenced the instant action against the Port Authority of New York and New Jersey ("PANYNJ"), the PAPD, and Officer Chelsea Cassino,[1] alleging excessive force and false arrest in violation of 42 U.S.C. § 1983 and state law claims of negligence, assault and battery, negligent infliction of emotional distress, and intentional infliction of emotional distress. Defendants now move for summary judgment on all of Plaintiff's claims.

For the reasons to follow, this Court grants Defendants' motion in part and denies it in part. The Court concludes that there is a genuine issue of material fact

---

[1] Plaintiff also brought claims against Air France and the City of New York, which have since been dismissed, as well as certain unnamed individual officers who have not been identified.

that precludes summary judgment as to Plaintiff's false arrest claim, and that Plaintiff abandoned his remaining claims.

## FACTUAL BACKGROUND

The Court views the following facts "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line*, 391 F.3d 77, 83 (2d Cir. 2004).

In November 2019, Plaintiff Abdoulaye Toure owned and was employed by a company called Safebet, which helps police departments and other entities in West Africa acquire equipment and implement training for riot de-escalation. Pl. Dep. at 11:21–12:6, 14:8–15:23, ECF No. 68-1, Ex. A.

In his capacity as a Safebet employee, Plaintiff was scheduled to fly to Conakry, Guinea on an Air France flight on November 12, 2019, to meet with the Guinea Police so that they could sample a particular type of stun gun — the PhaZZer — sold by PhaZZer Electronics, Inc. ("PhaZZer Electronics"). *Id.* at 27:14–19; Pl. Response to Def.'s 56.1 Statement ("Pl. 56.1 Response") at 3, ECF No. 70. PhaZZer Electronics had contracted with OE, a "consulting security firm" for which Safebet is the "broker." Pl. Dep. at 18:3–4, 33:20–22. OE, in turn, provided Safebet with a sample PhaZZer. *Id.* at 52:12–16. Plaintiff hoped to negotiate a contract for the Guinea Police to place a bulk order of PhaZZers, which was "anticipated to net [Safebet] a significant profit." *Id.* at 27:14–21; Pl. 56.1 Response at 3.

3

Plaintiff planned to bring the sample PhaZZer on his flight to Guinea in his checked bag. Pl. Dep. at 40:4–20, 45:18–46:9. In preparation for traveling with the PhaZZer, Plaintiff acquired two pieces of documentation from PhaZZer Electronics and OE: (1) a directive from the United States Department of Transportation, dated April 28, 2016, DOT Directive, ECF No. 68-6; and (2) a letter to Mr. Steven Abboud of PhaZZer Electronics from the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, dated August 29, 2011, ATF Letter, ECF No. 68-5. Pl. 56.1 Response at 4–6. Both documents seem to have the same purpose: differentiating the PhaZZer from a firearm. The DOT Directive states that "PhaZZer Cartridges" are "[n]ot regulated as a Hazard Class 1 Material." DOT Directive at 1. The ATF Letter explains that, because "all PhaZZer models . . . do not expel a projectile by the action of an explosive and do not incorporate the frame or receiver of a firearm, they are not 'firearms' as defined in the [Gun Control Act of 1968]." ATF Letter at 2. Neither document was addressed to nor referred to Plaintiff.

Plaintiff testified that, prior to departing for the airport, he also briefly researched the legality of flying with an electronic stun gun. He "[g]oogled . . . can you transport a PhaZZer gun in New York[?]" and learned, "[Y]es, you can because a

4

federal judge struck [down] PL § 265.01."[2]  Pl. Dep. at 54:17–20.[3]  Additionally, Plaintiff testified that he checked the Transportation Security Administration ("TSA") and Air France websites, which both indicated that electronic Taser stun guns were allowed on aircrafts, although neither discussed New York law specifically. *Id.* at 60:9–17, 63:2–8.  Plaintiff further testified that, prior to November 12, 2019, either he or another Safebet employee called Air France to confirm that Plaintiff would be permitted to bring the PhaZZer on the plane.  *Id.* at 100:2–20.  Plaintiff contends that Air France confirmed that he could bring the device on the aircraft.  *Id.*  Defendants, on the other hand, point to an Air France policy that "states that electrical weapons containing components with compressed gas and lithium batteries were forbidden on its aircraft."  Pl. 56.1 Response at 6.  Plaintiff did not "contact any police department . . . about the legality of bringing a PhaZZer . . . into the state of New York[.]"  Pl. Dep. at 57:11–15.

When Plaintiff arrived at JFK to check in for his Air France flight to Guinea, he was carrying two pieces of luggage: a larger suitcase containing the PhaZZer, which he planned to check, and a carry-on bag.  *Id.* at 46:23–47:7.  When he

---

[2] New York State CPL § 265.01 provides, in relevant part, "A person is guilty of criminal possession of a weapon in the fourth degree when: (1) He or she possesses any firearm, electronic dart gun, *electronic stun gun*, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slungshot, shirken, or 'Kung Fu star.'"  N.Y. Crim. Proc. Law § 265.01(1) (McKinney 2024) (emphasis added).

[3] Although Plaintiff testified to conducting this Google search during his deposition, he has not provided copies of the websites he viewed or other proof that the search was conducted (despite requests from defense counsel).  Def. Reply to Pl. Opp'n to Mot. for Summ. J. at 3, ECF No. 72.

5

approached Air France's counter to check in for the flight and check his luggage, there was a significant number of people — "more than ten" — checking in at the same time as him. *Id.* at 47:8–19.

As instructed by the Air France agent, Plaintiff placed the suitcase he planned to check on the scale. *Id.* at 49:2–7. The Air France agent tagged Plaintiff's bag, inspected his passport, handed him a paper ticket, and placed his suitcase on the conveyer belt. *Id.* at 49:6–13. At that point, Plaintiff "told [the agent] that [he had] a PhaZZer in [his] bag[,] . . . gave her the Bureau of Alcohol and Tobacco Firearm certificate . . . [and] gave her the DOT certificate." *Id.* at 49:12–16. The Air France agent then called her supervisor, to whom Plaintiff also showed the paperwork. *Id.* at 50:7–51:7. The supervisor "seemed confused," advised Plaintiff that he could not bring the PhaZZer on the plane, and then "decided to call [the] Port Authority [police] to sort it out." *Id.* at 51:7–15.

A few minutes later, two PAPD officers, Chelsea Cassino and Francis Floria, arrived at Air France counter. *Id.* at 65:8–11; Pl. 56.1 Response at 8–9. The officers asked Plaintiff if he had a gun, and he explained that he "had a PhaZZer," which the officers then asked to see. Pl. Dep. at 67:10–68:3. Plaintiff unzipped his suitcase and removed the PhaZZer, which was in its case. *Id.* at 69:25–71:25. Plaintiff testified that, upon seeing the PhaZZer, one officer "asked [Plaintiff] what [he] was doing with that . . . , where [he] was flying to and what . . . the purpose" was, *id.* at 72:8–11, and Plaintiff "told them exactly what it was for," "[e]xplained everything to them," and "showed [them] the paperwork and all the documentation," *id.* at 72:8–16. Moreover,

6

when one officer questioned the validity of the documents, Plaintiff advised him that the documents likely listed "phone numbers he could call" to confirm that Plaintiff was permitted to travel with the device. *Id.* at 72:15–16. Plaintiff then asked the officers "to call TSA 'cause TSA [would] probably explain to them that . . . [he] could transport [the PhaZZer] on the plane." *Id.* at 73:8–10.

Officer Cassino then called Sergeant Bernard Buckner, who arrived on the scene. Pl. 56.1 Response at 9. According to Plaintiff, Sergeant Buckner was "very aggressive," Pl. Dep. at 75:5, and when Plaintiff "calmly tried to explain" the situation, Sergeant Buckner cut Plaintiff off, *id.* at 75:5–9. Plaintiff, at this point with his wife on the phone, continued trying to explain the situation to Sergeant Buckner. *Id.* at 75:10–15.

Shortly thereafter, Sergeant Buckner "told Plaintiff that he was under arrest . . . [and Officer] Cassino made the arrest." Pl. 56.1 Response at 10. Plaintiff was handcuffed, arrested, and escorted out of the terminal, Pl. Dep. at 79:3–80:6, but does not remember which officer handcuffed him, Pl. 56.1 Response at 11. Officer Cassino charged him "with criminal possession of a weapon in the 4th degree in violation of [N.Y.] Penal Law § 265.01." *Id.* Officer Cassino later testified that at the time of Plaintiff's arrest, she was not "aware of any changes in the law regarding 265.01." Cassino Dep. at 36:19–22, ECF No. 68-2.

At some point during the initial arrest, Plaintiff advised the officers that his handcuffs were too tight, but the officers declined to adjust them. Pl. 56.1 Response at 11. PAPD officers brought Plaintiff from the JFK terminal where he was arrested

7

to a police vehicle parked outside. Some of the officers who were present at the Air France counter also entered the vehicle, although Plaintiff does not recall which officers specifically traveled in the vehicle with him. Pl. Dep. at 81:22–82:3.

Plaintiff was driven to the JFK Police Command, where officers fingerprinted him and placed him in a cell. *Id.* at 83:14–24. Plaintiff testified that PAPD officers questioned him in his cell, at which point he "was extremely cold and [his] body was shivering 'cause they took [his] sports coat and [his] scarf." *Id.* at 86:3–12. He did not request medical attention but did ask for a blanket, which he never received. *Id.* at 86:13–22. Plaintiff spent "a couple hours" in the cell at the Police Command, during which time he was not handcuffed. *Id.* at 85:7–16.

Later that same day, two officers, whose identities Plaintiff does not recall, came to Plaintiff's cell, handcuffed him, and brought him to another police vehicle. *Id.* at 87:8–24. Plaintiff testified that while he was being transported, he was "flying all over in the back of that paddy wagon, no seatbelt," and was shivering because it was "below freezing weather, extremely cold." *Id.* at 91:1–3,

The officers brought Plaintiff to Queens Central Booking, where he was held overnight. *Id.* at 92:13–22. He was arraigned late the next morning and released without bond. *Id.* at 93:2–11. The next day, Air France rebooked him, and he flew to Guinea. *Id.* at 94:2–16. Once in Guinea, Plaintiff "met with the Minister of Security and his team and [] told them what happened." *Id.* at 95:3–5. Plaintiff testified that, at that point, he tried to negotiate the contract for the sale of the PhaZZer with the Guinea Police, but the police department was "going to seek a different supplier"

8

because elections were coming up and "[t]hey did not have any more availability." *Id.* at 95:5–10.

Plaintiff alleges that he has experienced bruised wrists and shoulder pain as a result of his arrest. *Id.* at 106:22–107:4. He sought medical treatment at a clinic in Guinea and was advised that he "was under shock and stress but . . . didn't have anything broken." *Id.* at 97:17–19. The doctor "just suggested [that he] speak to a therapist" upon his return to the United States. *Id.* at 97:20–22. Plaintiff did not seek medical or mental health treatment in the United States. *Id.* at 98:2–4.

After his arrest, Plaintiff reports having experienced trouble sleeping for "a couple of months." *Id.* at 99:8–12. He also reports experiencing anxiety when he flies; "every time [he] come[s] to the airport, [he has] a small panic attack and always [is] thinking did [he] accidentally put something in [his] bag and double-check[s] things. [He has] missed flights over it[,] . . . it was a very traumatizing experience." *Id.* at 99:15–20.

Shortly after the incident, Plaintiff was informed that the charges against him had been dismissed. *Id.* at 96:3–7.

## PROCEDURAL HISTORY

On March 26, 2021, Plaintiff filed his complaint in this action against Air France; the City of New York; the PANYNJ; the PAPD; and Officer Chelsea Cassino and five unnamed defendants, all of whom were employed by PAPD. Compl., ECF No. 1. On July 13, 2021, Plaintiff voluntarily dismissed his claims against the City of New York, Pl. Notice of Voluntary Dismissal, ECF No. 15, and on July 14, 2021, Judge Hurley terminated the City of New York as a party in the suit, Order

9

Dismissing Parties dated July 14, 2021. On September 6, 2022, the Honorable Judge Gary R. Brown granted Air France's motion to dismiss. Def. Mot. to Dismiss, ECF No. 35; Order dated Sept. 6., 2022, ECF No. 52. Thus, the parties moving for summary judgment — PANYNJ, PAPD, and Officer Cassino — are the only defendants remaining in the case.

Plaintiff's complaint alleges, pursuant to 42 U.S.C. § 1983, that PANYNJ and individual defendants used excessive force during his arrest (Count II) and that PANYNJ falsely arrested him (Count III). Plaintiff also brings negligence, assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress claims against PANYNJ and individual defendants under New York State law (Counts I, IV, VI, and VII).[4] Finally, the complaint alleges a *Monell* claim against PANYNJ as a separate cause of action (Count V), which this Court interprets as Plaintiff's request to hold PANYNJ liable for the actions of its employees, in the event that individual defendants are found liable.

On December 12, 2022, Defendants filed a letter motion for a premotion conference in connection with their anticipated motion for summary judgment. Letter Mot. for PMC dated Dec. 12, 2022, ECF No. 57. Plaintiff opposed Defendants' letter motion on January 11, 2023. Opp'n to Letter Mot. for PMC, ECF No. 59. On May 26, 2023, the case was reassigned to the undersigned. Order dated May 26,

---

[4] Because "[a] police department is an administrative arm of the municipal corporation" and thus "does not have its own legal identity" and "cannot sue or be sued," *Baker v. Willett*, 42 F. Supp. 2d 192, 198 (N.D.N.Y. 1999), this Court construes all of Plaintiff's claims against the PAPD as claims against PANYNJ.

2023. The Court denied the request for a pre-motion conference as unnecessary on May 30, 2023. Order dated May 30, 2023.

Defendants filed a fully briefed motion for summary judgment on October 31, 2023. In their motion, Defendants argue that Officer Cassino is entitled to qualified immunity on Plaintiff's false arrest claim and that Plaintiff's other claims are legally insufficient. Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 69. Plaintiff's opposition only disputes Defendants' argument as to his false arrest claim; it does not address Defendants' arguments as to his remaining claims. Pl. Opp'n to Mot. for Summ. J. ("Pl. Opp."), ECF No. 71.

## **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material "when its resolution 'might affect the outcome of the suit under the governing law.'" *SCW W. LLC v. Westport Ins. Corp.*, 856 F. Supp. 2d 514, 521 (E.D.N.Y. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In considering a summary judgment motion, the Court "is required to view the record in the light most favorable to the party against which summary judgment is contemplated and to resolve all ambiguities and draw all factual inferences in favor of that party." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178 (2d Cir. 2008). "Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict in favor of the" non-moving party. *Id.*

**DISCUSSION**

Defendants argue that summary judgment is appropriate as to all of Plaintiff's claims: they contend that Officer Cassino is entitled to qualified immunity on Plaintiff's false arrest claim and that there is no genuine dispute as to any material fact with respect to the remainder of Plaintiff's claims. The Court addresses Plaintiff's claims in turn.

## I.     False Arrest Claim (Count III)

Plaintiff's complaint alleges false arrest against PANYNJ and PAPD rather than individual officers. However, this Court construes the false arrest claim as brought against Officer Cassino, the arresting officer. Defendants' motion for summary judgment and Plaintiff's opposition to this motion make evident that all parties assume that the false arrest claim is made against Officer Cassino. Indeed, because Defendants construed the claim this way — i.e., by arguing that Officer Cassino is entitled to qualified immunity on the false arrest claim — they had notice and will not be prejudiced by the Court resolving the motion based on the same presumption as to Plaintiff's false arrest claim.[5]

---

[5] This Court further grants Plaintiff leave to amend his complaint prior to trial under Rule 15(b) "to conform pleadings to the proof offered at summary judgment." *Rockland Exposition, Inc. v. All of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 336 n.44 (S.D.N.Y. 2012). When a Court decides "whether to allow amendment under Rule 15(b), the essential questions are whether the [] issues were [litigated] by the parties' express or implied consent and whether the defendant would be prejudiced by the implied amendment, i.e., whether [the defendant] had a fair opportunity to defend" himself. *Myers v. Moore*, 326 F.R.D. 50, 61 (S.D.N.Y. 2018) (alterations in original) (citations omitted). Here, Defendants granted their implied consent when they themselves, in their motion for summary judgment, construed Plaintiff's claims to be against PANYNJ rather than PAPD and Officer Cassino where applicable.

12

Plaintiff argues that his arrest for violating Penal Law § 265.01(1) constitutes a false arrest because in *Avitabile v. Beach*, 368 F. Supp. 3d 404, 421 (N.D.N.Y. 2019), the court deemed that law unconstitutional "as applied to 'electronic dart guns' and 'electronic stun guns.'" Defendants do not argue that Plaintiff has failed to create a triable issue of fact as to his false arrest claim. Rather, they argue that the Court should grant summary judgment on this claim because Officer Cassino is entitled to qualified immunity. Thus, the Court analyzes only whether Officer Cassino is entitled to qualified immunity on Plaintiff's false arrest claim.

Qualified immunity can shield police officers from civil liability under § 1983 "if either (1) their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable [for them] to believe that their acts did not violate these clearly established rights." *Cornejo v. Bell*, 592 F.3d 121, 128 (2d Cir. 2010) (alterations in original) (internal quotation marks omitted) (citations omitted). "When considering a claim of qualified immunity on a motion for summary judgment, the Court must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences against the movant." *Getlin v. Zoll*, 707 F. Supp. 2d 369, 378 (E.D.N.Y. 2010) (citing *Redd v. Wright*, 597 F.3d 532, 534–36 (2d Cir. 2010)).

---

Because Defendants construed the complaint in this way, they had the opportunity to defend themselves (which they did by, for example, arguing for qualified immunity on the false arrest claim).

### a. Violation of Constitutional Rights

It is "clearly established that an arrest under a statute that has been authoritatively held to be unconstitutional is ordinarily a constitutional violation." *Amore v. Novarro*, 624 F.3d 522, 531 (2d Cir. 2010) (holding that arresting officer "violated [arrestee plaintiff's] constitutional right . . . not to be arrested for activity made criminal by [statute] which had been held unconstitutional by the New York Court of Appeals"). Accordingly, viewing the evidence here in the light most favorable to Plaintiff, the Court concludes that Defendants are not entitled to summary judgment on the issue of whether Officer Cassino's conduct violated Plaintiff's clearly established constitutional right. Officer Cassino is thus not entitled to qualified immunity under the first prong of the inquiry.[6]

### b. Objective Reasonableness

Nevertheless, Officer Cassino may be entitled to qualified immunity if, as Defendants contend, it was "objectively reasonable" for her "to have believed that [§ 265.01] remained fully in force and that [the] arrest was therefore not a violation of [Plaintiff's] constitutional rights." *Amore*, 624 F.3d at 531.

Courts analyzing this question "focus[] on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct

---

[6] Defendants argue that *Avitabile* cannot establish a clearly established right for purposes of qualified immunity analysis because "a right is clearly established . . . 'only where Supreme Court and Second Circuit precedent' . . . has so determined." Def. Mot. at 18 (citing *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004)). However, the right at issue here is Plaintiff's Fourth Amendment right to be free from unconstitutional arrest, which was clearly established by binding appellate court precedent long before *Avitabile*. *See, e.g.*, *Amore*, 624 F.3d at 531.

14

would violate . . . constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). The objective reasonableness standard involves analyzing both "law and fact," *Lore v. City of Syracuse*, 670 F.3d 127, 162 (2d Cir. 2012) (citations omitted), and "requires examination of the information possessed by the officials at that time (without consideration of subjective intent)," *Amore*, 624 F.3d at 530–31.

To determine whether Officer Cassino is entitled to qualified immunity, then, the Court must determine whether a reasonable police officer — in her position and with the information she possessed — would have "believed that the statute in question remained fully in force and that his arrest was therefore not a violation of [Plaintiff's] constitutional rights." *Amore*, 624 F.3d at 532.

For guidance, this Court looks to the Second Circuit's decision in *Amore*, 624 F.3d 522, a case also involving a false arrest claim based on an on-the-books law that a court had previously held unconstitutional. The *Amore* plaintiff was arrested in Ithaca for violating a state loitering statute that was "then officially and unofficially published as currently effective law, [but] had been ruled unconstitutional by the New York Court of Appeals eighteen years before." *Id.* at 525–26. The Court inquired whether it was "objectively reasonable for . . . the arresting officer[] to have believed that the statute in question remained fully in force" by examining the information the arresting officer had at the time of arrest. *Id.* at 532.

15

The *Amore* Court noted that every Ithaca police officer was provided with a copy of New York's Penal Law and that the Ithaca Police Department "furnishe[d] each of its officers with yearly updates consisting of a stack of substitute pages reflecting new laws that have been enacted during the previous year, or deleting laws that [were] no longer in effect." *Id.* at 526. However, the yearly updates had not mentioned that the relevant statute had been held unconstitutional. *Id.* at 534. Moreover, while the officer had consulted his copy of the Penal Law prior to arresting the plaintiff, he remained unaware of the law's unconstitutionality because the statute "continued to be published in official versions of the New York Penal Law." *Id.* at 527, 533.

Based on these facts, the *Amore* Court found it to be "undisputed that: [the officer] did not know that [the statute] was unconstitutional; he had not received instruction or information on the constitutionality of the statute; and he was relying on an accurate, if unannotated, copy of the New York Penal Law when he arrested Amore — indeed, he was literally reading the Penal Law during the course of the arrest." *Id.* at 534. The evidence proffered — particularly that "the defendant acted deliberately and rationally in seeking to determine the then-valid . . . law" before arresting the plaintiff — led the Court to find that the arrest was not objectively unreasonable. *Id.* at 535.

However, as the Second Circuit noted a few years after the *Amore* decision, that case was highly fact specific, and "a limited exception" to the idea that courts "impute knowledge of case law to public officials." *Zalaski v. City of Hartford*, 723

16

F.3d 382, 391 (2d Cir. 2013) (citations omitted).  The Second Circuit emphasized that *Amore* was an "unusual case" because of the evidence that "the arresting officer there actually reviewed penal law text at the time he placed defendant under arrest." *Id.* (citing *Amore*, 624 F.3d at 534).

Plaintiff's case does not share the "unusual" facts present in *Amore*.  Like the Ithaca Police Department, the PAPD had numerous internal processes for disseminating change-in-law information to officers in the field.  However, whereas evidence in *Amore* demonstrated that the Ithaca Police Department had failed to update its staff on the relevant change in law, Defendants — as the movants who carry the burden of demonstrating Officer Cassino's entitlement to qualified immunity — point to no evidence in the record that defeats the presumption imputing knowledge of the law to its officers.  Officer Cassino testified that PAPD officers have training for "any major changes in the law" and "go back yearly for training, multiple times."  Cassino Dep. at 5:6–7:4.  Notably, she did not allege that the PAPD omitted information about the *Avitabile* decision's effect on CPL § 265.01(1) in the periodic training provided to its officers during the relevant time period.  Moreover, even if *Avitabile* was not covered during one of these formal training sessions, PAPD conveys more minor changes with "announcements [that] are made at roll call," *id.*, or by providing officers "a slip stating what the law change was from the Port Authority," Buckner Dep. at 12:7–18, ECF No. 68-3.  Ultimately, Defendants have pointed to no evidence that the *Avitabile* decision was not covered in one of these numerous

17

opportunities for PAPD officers to become aware of important changes in law — much less evidence sufficient to establish that this is an undisputed fact.

In their motion for summary judgment, Defendants broadly allege that the *Avitabile* "ruling had not been disseminated through the PAPD." Def.'s Mot. at 16–17. However, neither Officer Cassino nor Sergeant Buckner makes this statement — or any statement about information the PAPD may have disseminated about § 265.01(1) — at any point in the excerpt of the depositions or other exhibits provided to the Court in support of their motion. Nor do Defendants include the assertion that the change in law had not been disseminated through the PAPD in its statement of undisputed material facts under Fed. R. Civ. Proc. 56.1. *See* Defs.' 56.1 Statement, ECF No. 66.

Further, where the evidence in *Amore* demonstrated that the arresting officer made active efforts to gather information about the statute's constitutionality, there is no evidence here that Officer Cassino made any such attempts before she arrested Plaintiff for violating CPL § 265.01(1). Therefore, the "unusual" factors on which the Second Circuit's decision in *Amore* appeared to turn — the Ithaca Police Department's failures, and the officer's demonstrated diligence — do not appear to be present in this case.

Plaintiff "thought the police knew the law," Pl. Dep. at 57:10, and case law supports his contention that such an assumption is a fair one. Although police "are not expected to be lawyers or prosecutors," *Scarbrough v. Myles*, 245 F.3d 1299, 1303 n.8 (11th Cir. 2001); *see also Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir.

18

1998) ("The question is not what a lawyer would learn . . . researching case law, but what a reasonable person in a defendant's position should know."), the Second Circuit has made clear that "we ordinarily impute knowledge of the case law to public officials," *Amore*, 624 F.3d at 535.  Particularly in the context of Defendants' motion for summary judgment, in which Plaintiff must be afforded all favorable inferences from the record, Defendants have failed to meet their burden of showing that knowledge of the statute's unconstitutionality should not be imputed to Officer Cassino.

Accordingly, Officer Cassino is not entitled to qualified immunity.  The Court thus denies Defendants' motion for summary judgment as to the false arrest claim against Officer Cassino.

## II.     Remaining Claims (Counts I, II, and IV–VII)

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."  *Petrisch v. HSBC Bank USA, Inc.*, No. 7-cv-3303, 2013 WL 1316712, at *17 (E.D.N.Y. Mar. 28, 2013) (quoting *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)).

Here, Defendants moved for summary judgment on Plaintiff's claims of negligence (Count I), excessive force (Count II), assault, battery, and deprivation of liberty (Count IV), *Monell* (Count V), intentional infliction of emotional distress (Count VI), and negligent infliction of emotional distress (Count VII).  While Plaintiff's opposition brief cursorily states that the Court should deny Defendants' "[m]otion in all respects," the brief only responds to Defendants' arguments as to

19

Plaintiff's false arrest claim. Pl. Opp. at 13. Accordingly, Plaintiff abandoned his remaining claims by failing to address the merits of Defendants' motion for summary judgment as to those claims.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment as to Counts I, II, IV, V, VI, and VII and DENIES Defendants' motion as to Count III. This Court further grants Plaintiff leave to amend his complaint prior to trial under Rule 15(b) in order to allege his false arrest claim against Officer Cassino.

SO ORDERED.

      /s/ NRM
NINA R. MORRISON
United States District Judge

Dated: September 30, 2024
      Brooklyn, New York