UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ABDOULAYE TOURE,

                              Plaintiff,

                                                                        21 CV 01645 (NRM) (ST)

              -against-


AIR FRANCE, THE CITY OF NEW YORK, THE
PORT AUTHORITY OF NEW YORK AND NEW
JERSEY AND PORT AUTHORITY OF NEW YORK
AND NEW JERSEY POLICE DEPARTMENT; POLICE
OFFICER CHELSEA CASSINO, AND PORT
AUTHORITY POLICE OFFICERS 'JANE AND JOHN
DOE' #1 THROUGH #5,

                              Defendants.
----------------------------------------------------------------X




PLAINTIFF ABDOULAYE TOURE'S MEMORANDUM OF LAW IN OPPOSITION OF
DEFENDANT CHELSEA CASSINO MOTION FOR A DIRECTED VERDICT IN HER
FAVOR PURSUANT TO FED. R. CIV. P. 50 (b) AND FED. R. CIV. P. 59 (a) AND (e)
SETTING ASIDE OR REDUCING THE AWARD FOR LOST INCOME

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT……………………………………………………………..…7

ARGUMENT……………………………………………………………………………...…7
THE STANDARD FOR A RULE 50(b) MOTION……………………………………....…7
A. Motion for Judgment as a Matter of Law …………………………………………....……
B.  Motion for a New Trial …………………………………………………………...……..10

POINT I: DEFENDANT CHELSEA CASSINO DID NOT HAVE PROBABLE CAUSE TO ARREST PLAINTFF ABDOULAYE TOURE…………………………………….…..…..11

POINT II: DEFENDANT CHELSEA CASSINO IS NOT ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW……………………………………….……….…...13

POINT III: THE DAMAGES AWARDED PLAINTIFF ABDOULAYE TOURE SHOULD NOT BE SET ASIDE OR REDUCED AND A NEW TRIAL SHOULD NOT BE GRANTED UNDER FED. R. CIV. P. 59 (a) AND (e)…………………………………………………………16

# TABLE OF AUTHORITIES

**Cases**                                                                                                              **Page**

Anderson v. Creighton
   483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) .............................................14

Anderson v. Liberty Lobby, Inc.
   477 U.S. 242, 255 (1986) ...............................................................................................8

Amore v. Novarro
   624 F.3d 522 (2d Cir. 2010) ....................................................................................13, 15

Avitabile v. Beach
   368 F. Supp. 3d 404 (N.D.N.Y. 2019) ......................................................................11-12

Boutique Indus., Inc. v. NYSDHR,
   228 A.D.2d 171, 643 N.Y.S.2d 986, 986 (1996) ............................................................18

Brinegar v. United States,
   338 U.S. 160, 175–76 (1949) .......................................................................................12

Caldarola v. Calabrese,
   298 F.3d 156, 162 (2d Cir. 2002) .................................................................................11

Cruz v. Local Union No. 3 of the International Brotherhood of Electrical Workers,
   34 F.3d 1148, 1154 (2d Cir. 1994) .................................................................................8

DLC Mgmt. Corp. v. Town of Hyde Park,
   163 F.3d 124, 133 (2d Cir.1998) ..................................................................................10

Dunaway v. New York,
   442 U.S. 200, 208 n.9 (1979) .......................................................................................12

Fiacco v. City of Rensselaer,
   783 F.2d 319, 325 (2d Cir. 1986) ...................................................................................9

Figueroa v. Mazza,
   825 F.3d 89, 102 (C.A.2 (N.Y.), 2016) .........................................................................12

Galdieri–Ambrosini v. National Realty Development Corp.,
   136 F.3d 276, 289 (2d Cir. 1998) ...............................................................................7, 10

Gasperini v. Center for Humanities, Inc.,
   518 U.S. 415, 433, 116 S.Ct. 2211, 135 L.Ed.2d 659.................................................16-17

Gibeau v. Nellis,
    18 F.3d 107, 109 (2d Cir. 1994) ............................................................................8

Gonzalez v. City of Schenectady,
    728 F.3d 149, 160–61 (C.A.2 (N.Y.), 2013) .........................................................14

Haywood v. Koehler,
    78 F.3d 101, 105 (2d Cir. 1996) ............................................................................9

Harlow v. Fitzgerald,
    102 S.Ct. 2727, 2738, 457 U.S. 800, 818–19 (U.S.Dist.Col., 1982) .........................15-16

In re Allender, 2
    33 A.D.2d 153, 649 N.Y.S.2d 144, 145 (1996) .......................................................18

In re Buffalo Athletic Club,
    249 A.D.2d 986, 672 N.Y.S.2d 210, 211 (1998) .......................................................18

In re City of Fulton,
    221 A.D.2d 971, 633 N.Y.S.2d 914, 915 (1995) .......................................................18

In re Manhattan and Bronx Surface Transit Operating Auth.,
    220 A.D.2d 668, 632 N.Y.S.2d 642, 644 (1995) .......................................................18

In re New York City Transit Auth.,
    181 A.D.2d 891, 581 N.Y.S.2d 426, 428–29 (1992) ...................................................18

In re New York State Office of Mental Retardation and Developmental Disabilities,
    183 A.D.2d 943, 583 N.Y.S.2d 580, 582 (1992) .......................................................18

Jaegly v. Couch,
    439 F.3d 149, 154 (2d Cir. 2006) .......................................................................11, 13

Kerman v. City of New York,
    261 F.3d 229, 241 (2d Cir. 2001) ..........................................................................14

Kim v. Hurston,
    182 F.3d 113, 117 (2d Cir. 1999) ...........................................................................9

Kirsch v. Fleet Street, Ltd.,
    148 F.3d 149, 161 (2d Cir. 1998) .......................................................................8, 17

Lore v. City of Syracuse,
    670 F.3d 127, 176–77 (C.A.2 (N.Y.), 2012) .........................................................17, 19

Meacham v. Knolls Atomic Power Lab.,
    381 F.3d 56, (2d Cir. 2004) ...............................................................18-19

Moore v. Comesanas,
    32 F.3d 670, 673 (2d Cir. 1994) .............................................................12

Panetta v. Crowley,
    460 F.3d 388, 395 (2d Cir. 2006) ...........................................................12

Piesco v. Koch,
    12 F.3d 332, 343 (2d Cir. 1993) .............................................................12

O'Neill v. Krzeminski,
    839 F.2d 9, 13 (2d Cir.1988) .................................................................8-9

Ramos v. County of Suffolk,
    707 F.Supp.2d at 427, 2010 WL 1641454.................................................10

Reeves v. Sanderson Plumbing,
    530 U.S. 133, 150–51 (2000) ................................................................8-9

Rio Mar Rest. v. NYSDHR,
    270 A.D.2d 47, 704 N.Y.S.2d 230, 231 (2000) ........................................18

Singer v. Fulton County Sheriff,
    63 F.3d at 118–19................................................................................12

Sir Speedy, Inc. v. L & P Graphics, Inc.,
    957 F.2d 1033, 1039 (2d Cir. 1992) .........................................................7

Smith v. Lightning Bolt Productions, Inc.,
    861 F.2d 363, 367 (2d Cir. 1988) .............................................................9

Sorlucco v. New York City Police Dept.,
    971 F.2d 864, 875 (2d Cir.1992) ............................................................10

Shu–Tao Lin v. McDonnell Douglas Corp.,
    742 F.2d 45, 49 (2d Cir.1984) ..............  ...............................................17

Thorsen v. Cnty. of Nassau,
    722 F.Supp.2d 277, 286 (E.D.N.Y., 2010) ...............................................10

Tolbert v. Queens College,
    242 F.3d 58, 70–71 (2d Cir. 2001) ...........................................................9

Vasbinder v. Ambach,

926 F.2d 1333, 1339 (2d Cir. 1991) ....................................................................9

Weyant v. Okst,
101 F.3d 845, (2d Cir. 1996) .................................................................11, 13

Wong Sun v. United States,
371 U.S. 471(1963) ....................................................................................12

Young v. Cnty. of Fulton,
160 F.3d 899 (2d Cir.1998) ......................................................................14

Zellner v. Summerlin,
494 F.3d 344, (2d Cir. 2007) ............................................................9, 11, 16

**Statutes**

N.Y. C.P.L.R. § 5501(c).........................................................................17, 19
New York City Administrative Code § 10-135 .............................................13
New York Penal Law § 265.01...........................................................................13

**Rules**

Fed. R. Civ. P. 50(a)(1) .............................................................................9
Fed. R. Civ. P. 50(a)(2) ...........................................................................10
Fed. R. Civ. P. 50(b) ....................................................................................7
Fed. R. Civ. P. 59(a) and (e) ................................................................7, 16

## PRELIMINARY STATEMENT

Plaintiff Abdoulaye Toure submits this memorandum of law in support of his opposition to Defendant Chelsea Cassino's motion pursuant to Fed. R. Civ. P. 50(b) to set aside the jury verdict and enter judgment in her favor as a matter of law, or for a new trial, and her motion pursuant to Fed. R. Civ. P. 59(a) and (e) for a new trial or to set aside the award for emotional pain and suffering as well as lost income, or remittitur with respect to these awards. Plaintiff respectfully submits that Defendant's post-trial motions amount to an impermissible re-litigation of issues that were squarely presented to, and decided by, the jury after a full and fair trial. The jury's verdict rested on a robust evidentiary record, including testimony and documentary evidence, which established that Defendant lacked probable cause to arrest Plaintiff and that the damages awarded were supported by competent evidence.

## ARGUMENT
## THE STANDARD FOR A RULE 50(b) MOTION

A. **Motion for Judgment as a Matter of Law**

The standard governing decisions of, and appeals from decisions of, motions for judgment as a matter of law under Fed. R. Civ. P. 50 ("JMOL") is well established. See generally *Galdieri–Ambrosini v. National Realty Development Corp*., 136 F.3d 276, 289 (2d Cir. 1998) (same standard governs in district court and on appeal). JMOL is inappropriate unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in his favor. See, e.g., id.; *Sir Speedy, Inc. v. L & P Graphics, Inc*., 957 F.2d 1033, 1039 (2d Cir. 1992); *Vasbinder v. Ambach*, 926 F.2d 1333, 1339 (2d Cir. 1991). In assessing such a motion, the court is not allowed to weigh the credibility of witnesses or consider the weight of the evidence. See, e.g., *id*. at 1340. JMOL should not be granted unless

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or

> (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair-minded [persons] could not arrive at a verdict against [it].

*Cruz v. Local Union No. 3 of the International Brotherhood of Electrical Workers*, 34 F.3d 1148, 1154 (2d Cir. 1994) ("*Cruz v. Local Union No. 3*") (internal quotation marks omitted); *see Gibeau v. Nellis*, 18 F.3d 107, 109 (2d Cir. 1994). This exacting standard exists because Rule 50(b) motions are not a vehicle for a disappointed litigant to substitute the court's judgment for that of the jury, particularly where, as here, the trial presented conflicting testimony and credibility determinations that are the exclusive province of the factfinder. *Kirsch v. Fleet Street, Ltd*., 148 F.3d 149, 161 (2d Cir. 1998)

In considering a motion for judgment as a matter of law, the district court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves v. Sanderson Plumbing,* 530 U.S. 133, 150–51 (2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)) (emphases in original). Thus, a court may grant a motion for judgment as a matter of law "only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party." *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993). In ruling on such a motion, the court must bear in mind that the jury is free to believe part and disbelieve

8

part of any witness's testimony. See, e.g., *Fiacco v. City of Rensselaer*, 783 F.2d 319, 325 (2d Cir. 1986); see also *Haywood v. Koehler*, 78 F.3d 101, 105 (2d Cir. 1996). Courts applying this standard have repeatedly cautioned that a Rule 50(b) movant faces a "particularly heavy burden" when the verdict rests on credibility determinations — because the jury, not the court, had the opportunity to observe demeanor, assess consistency, and weigh competing accounts. *Zellner v. Summerlin*, 494 F.3d 344, 370–71 (2d Cir. 2007)

In ruling on a motion for JMOL, the trial court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. *Smith v. Lightning Bolt Productions*, Inc., 861 F.2d 363, 367 (2d Cir. 1988); see also *Kim v. Hurston*, 182 F.3d 113, 117 (2d Cir. 1999); *Piesco v. Koch,* 12 F.3d 332, 343 (2d Cir. 1993). In making its evaluation, the court should "review all of the evidence in the record," *Reeves v. Sanderson Plumbing*, 530 U.S. at 150–51, but it must disregard all evidence favorable to the moving party that the jury is not required to believe.

This is particularly important here because Defendant's motion seeks to reframe the trial record by selectively relying on her own testimony and ignoring contradictory evidence — an approach the Rule 50(b) standard does not permit. *Tolbert v. Queens College*, 242 F.3d 58, 70–71 (2d Cir. 2001)

Rule 50(a) provides that a court may grant a motion for judgment as a matter of law — i.e., a directed verdict — if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). A party may move under Rule 50(a) "at any time

before the case is submitted to the jury." The moving party "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2).

Under Rule 50(b), a party may also "file a renewed motion for judgment as a matter of law" after trial. The grounds in a Rule 50(b) motion are "limited to those grounds that were specifically raised in the prior [Rule 50(a) motion]." *Galdieri–Ambrosini*, 136 F.3d at 286; Cruz, 34 F.3d at 1155. Defendant's Rule 50(b) arguments here go well beyond the scope of any properly preserved Rule 50(a) motion at trial, providing yet another basis to deny the motion outright.

B**. Motion for a New Trial**

Federal Rule of Civil Procedure 59 permits the court to grant a new trial on all or some of the issues. "Generally, the grant of a new trial under Rule 59 is warranted only if the district judge is 'convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.' " *Ramos v. County of Suffolk*, 707 F.Supp.2d at 427, 2010 WL 1641454, at 5 (quoting *Sorlucco v. New York City Police Dept*., 971 F.2d 864, 875 (2d Cir.1992); see also *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir.1998). "In comparison to a Rule 50 motion, the Second Circuit has held that the standard for a Rule 59 motion is less onerous for the moving party in two ways: first, 'unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict.' Second, in deciding a Rule 59 motion 'a trial judge is free to weigh the evidence [herself] and need not view it in the light most favorable to the verdict winner.' " *Ramos v. County of Suffolk*, 707 F.Supp.2d at 428, 2010 WL 1641454, at 6 (quoting *DLC Mgmt. Corp.*, 163 F.3d at 134). *Thorsen v. Cnty. of Nassau*, 722 F.Supp.2d 277, 286 (E.D.N.Y., 2010)

Here, after a full and fair trial, the Jury found that Officer Cassino lacked probable cause to arrest Mr. Toure on November 12th, 2019, either under New York Penal Law 265.01, or under

New York Administrative § Code 10-135. Furthermore, Officer Cassino, would not be entitled to qualified immunity since the right to possess a stun gun in the State of New York was clearly established on November 12th, 2019, the date of Plaintiff Abdoulaye Toure's arrest. Officer Cassino had no reasonable basis for believing that the New York statute, Penal Law 265.01 was in effect as it had been declared unconstitutional by a New York Federal District Judge several months prior to the date of the Plaintiff's arrest.

## POINT I
## DEFENDANT CHELSEA CASSINO DID NOT HAVE PROBABLE CAUSE TO ARREST PLAINTIFF ABDOULAYE TOURE

As the Second Circuit has instructed, "a claim for false arrest turns only on whether probable cause existed to arrest a defendant … it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006); see also *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest."). "Probable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007). In determining the existence of probable cause, "courts must consider those facts available to the officer at the time of the arrest and immediately before it." *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002).

Here, the trial record established that Officer Cassino was informed by Plaintiff — at the time of the stop — that possession of a stun gun was lawful under federal court precedent, specifically *Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019). (tr. 6/12/25 at 49)This

11

information, coupled with her lack of any contrary legal authority, defeated probable cause as a matter of law. Officer Cassino was not free to purposely ignore the information presented to her by the Plaintiff prior to his arrest that New York PL § 265.01 as it pertains to stun guns was unconstitutional. As the Second Circuit has previously held: "Samuel is correct in noting that an officer making a probable-cause determination is not at liberty to ignore evidence tending to exculpate the suspect, see *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006), and that the officers were accordingly not entitled to disregard the information from Romero or their knowledge of Saenz's earlier photos. *Figueroa v. Mazza*, 825 F.3d 89, 102 (C.A.2 (N.Y.), 2016) *Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019) (binding in N.D.N.Y., persuasive in E.D.N.Y.)

In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. See, e.g., *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979); *Wong Sun v. United States*, 371 U.S. 471, 479 (1963); *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949). The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, see, e.g., *Singer v. Fulton County Sheriff*, 63 F.3d at 118–19, or may require a trial if the facts are in dispute, see, e.g., *Moore v. Comesanas*, 32 F.3d 670, 673 (2d Cir. 1994).

In the instant case, the jury heard – and was entitled to credit – testimony that Plaintiff was carrying the stun gun in compliance with the law, that it was in its original packaging, and that he was forthright with Officer Cassino about its presence. *(Tr. 6/12/25 at 43)* The officer's decision to arrest despite this exculpatory information violated the principle that officers are not free to

disregard evidence negating probable cause. See *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006). Moreover, Officer Cassino's reliance on New York Penal Law § 265.01(1) was unreasonable because — as she conceded at trial — she was unaware of the federal decision declaring the statute unconstitutional in relevant part. *(Tr. 6/13/25 at 132:1—133:5)* This lack of legal awareness, however, cannot supply probable cause where the law was clearly established. See *Amore v. Novarro*, 624 F.3d 522, 536–37 (2d Cir. 2010)(officer not entitled to rely on plainly inapplicable or invalid statutory provision).]

*Weyant v. Okst*, 101 F.3d 845, 852–53 (2d Cir. 1996) makes clear that the common law tort of false arrest — a species of false imprisonment — does not require the plaintiff to show favorable termination of proceedings. Rather, the elements are: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." The jury was correctly instructed on these elements, and its verdict reflects a factual finding that Plaintiff's confinement was not privileged because probable cause was absent. Defendant's post-trial arguments cannot displace that factual determination.

*Jaegly v. Couch*, 439 F.3d 149, 151–52 (2d Cir. 2006) confirms that a plaintiff need not demonstrate that probable cause was lacking for every charge, only that the arrest itself lacked probable cause. The trial evidence showed that Officer Cassino approached Plaintiff not because of any reasonable suspicion of criminal activity, but as part of a mistaken and overreaching enforcement action targeting the mere possession of a stun gun — conduct which, under Avitabile and related authority, was constitutionally protected.

Importantly, Defendant's reliance on the New York City Administrative Code § 10-135 was similarly misplaced. As with Penal Law § 265.01(1), the Administrative Code's restrictions

on electronic weapons could not be enforced in contravention of controlling federal precedent. *Amore v. Novarro*, 624 F.3d at 536–37(rejecting qualified immunity where statutory basis for arrest was invalid under clearly established law). The jury's rejection of probable cause is also supported by Defendant's own testimony in which she admitted she did not investigate Plaintiff's assertion that possession was lawful, did not contact a supervisor for legal guidance, and proceeded with the arrest without corroborating that a violation had in fact occurred. *(Tr. 6/13/25 at 132:10-133:5)* This abdication of the duty to reasonably investigate further undermines any claim of probable cause. See *Kerman v. City of New York*, 261 F.3d 229, 241 (2d Cir. 2001).]

Accordingly, under both federal and state law standards, the verdict that Defendant lacked probable cause was not only supported by the evidence — it was compelled by it. Because the existence of probable cause was the central dispute in this claim, and because the jury resolved that dispute in Plaintiff's favor based on substantial evidence, Defendant's Rule 50(b) motion must be denied.

<div align="center">

**POINT II**
**DEFENDANT CHELSEA CASSINO IS NOT ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW**

</div>

Defendants–Appellees are not liable under § 1983 unless the right at issue was clearly established, meaning that "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "In deciding whether a right was clearly established, we ask: (1) Was the law defined with reasonable clarity? (2) Had the Supreme Court or the Second Circuit affirmed the rule? and (3) Would a reasonable defendant have understood from the existing law that the conduct was unlawful?" *Young v. Cnty. of Fulton*, 160 F.3d 899, 903

(2d Cir.1998). The answer to all three is no. *Gonzalez v. City of Schenectady*, 728 F.3d 149, 160–61 (C.A.2 (N.Y.), 2013)

If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors. *Harlow v. Fitzgerald*, 102 S.Ct. 2727, 2738, 457 U.S. 800, 818–19 (U.S.Dist.Col., 1982)

In the instant case, each of these factors was satisfied as of November 12, 2019 — the date of Plaintiff's arrest. The federal court decision in *Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019), had already declared New York's statutory prohibition on stun guns unconstitutional, providing clear notice to law enforcement officers statewide. Additionally, the Second Circuit's jurisprudence, including *Amore v. Novarro*, 624 F.3d 522 (2d Cir. 2010) made plain that reliance on a statute invalidated by controlling authority cannot support immunity. *Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019) (binding in N.D.N.Y., persuasive in E.D.N.Y.)

*Gonzalez v. City of Schenectady*, 728 F.3d 149, 160–61 (2d Cir. 2013) instructs that if the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing her conduct. Officer Cassino conceded she had not reviewed Avitabile and did not seek clarification before arresting Plaintiff. [cite to transcript] Qualified immunity does not protect such deliberate ignorance of controlling law. *Amore v. Novarro*, 624 F.3d at 536–37 (officer not entitled to immunity where legal standard was clearly established and violated). This decision was binding precedent in the Northern District

15

of New York and persuasive in the Eastern District, and Cassino admitted under oath she had no reason to doubt its applicability.

*Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982) recognizes a narrow "extraordinary circumstances" exception, allowing immunity where the official neither knew nor should have known of the relevant legal standard. This exception cannot apply here. Even if Officer Cassino was subjectively unaware of Avitabile, the decision had been issued months before the arrest, was binding on New York law enforcement, and addressed the precise conduct at issue. A reasonable officer would have known that arresting Plaintiff under § 265.01(1) was unlawful. The jury's verdict reflects a determination that no reasonable officer, confronted with the same facts, could have believed there was probable cause to arrest Plaintiff. That finding also forecloses qualified immunity, as the same factual disputes resolved against Defendant necessarily resolve the immunity question. See *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007).] Accordingly, Defendant is not entitled to qualified immunity, and her motion should be denied. This decision was binding precedent in the Northern District of New York and persuasive in the Eastern District, and Cassino admitted under oath she had no reason to doubt its applicability.

## POINT III
## THE DAMAGES AWARDED PLAINTIFF ABDOULAYE TOURE SHOULD NOT BE SET ASIDE OR REDUCED AND A NEW TRIAL SHOULD NOT BE GRANTED UNDER FED. R. CIV. P. 59(a) AND (e)

It is well established that the trial judge enjoys "discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence," and that "[t]his discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433 (1996).

A conditional order of remittitur, requiring a plaintiff to choose either a new trial or a reduced verdict, may be granted where, inter alia, "the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error." *Shu–Tao Lin v. McDonnell Douglas Corp*., 742 F.2d 45, 49 (2d Cir.1984) (internal quotation marks omitted); see *Kirsch v. Fleet Street, Ltd.,* 148 F.3d at 165. "Where there is no particular discernable error, we have generally held that a jury's damage award may not be set aside as excessive unless 'the award is so high as to shock the judicial conscience and constitute a denial of justice.' " *Id.* (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir.1988) (other internal quotation marks omitted). Under New York law, which is pertinent to the extent that Lore was found entitled to recover under the HRL, see, e.g., *Gasperini*, 518 U.S. at 418–19, 116 S.Ct. 2211, an award is deemed excessive "if it deviates materially from what would be reasonable compensation," N.Y. C.P.L.R. § 5501(c). *Lore v. City of Syracuse*, 670 F.3d 127, 176–77 (C.A.2 (N.Y.), 2012)

It is well established that the trial judge enjoys "discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence," and that "[t]his discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Gasperini v. Center for Humanities, Inc*., 518 U.S. 415, 433, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) (internal quotation marks omitted)

The verdict here does not approach that demanding standard. The jury's economic damages award of $110,000 was supported by Plaintiff's testimony of lost business income. *(Tr. 6/13/15 at 322:1 through 326:25).*

Neither cases arising under federal law nor those arising under state law provide a clear line as to whether an award of $150,000 for emotional distress on the basis of a trial record such as that created in the present case deviates so materially from what would be reasonable compensation as to shock the judicial conscience. This Court has, however, affirmed awards of $125,000 each to plaintiffs for emotional distress resulting from age discrimination where the evidence of emotional distress consisted only of "testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress," as well as awards of $175,000 each where in addition there were "either physical sequelae"—i.e., secondary physical results or consequences—"or professional treatment," *Meacham v. Knolls Atomic Power Laboratory*, 381 F.3d 56, 77 (2d Cir.2004) ("Meacham "), vacated and remanded for further consideration on other grounds, 544 U.S. 957, 125 S.Ct. 1731, 161 L.Ed.2d 596 (2005); see id. at 77–78. In *Meacham*, in which the emotional distress damages were awarded under the HRL, we rejected the defendant's contention that those damage awards, for "garden variety emotional distress claims," "should have been reduced to between $5,000 and $30,000," id. at 77. We observed that New York cases vary widely in the amount of damages awarded for mental anguish. Many do reduce awards to $30,000 or below. See, e.g., *In re Buffalo Athletic Club*, 249 A.D.2d 986, 672 N.Y.S.2d 210, 211 (1998); *In re Manhattan and Bronx Surface Transit Operating Auth.*, 220 A.D.2d 668, 632 N.Y.S.2d 642, 644 (1995); *In re New York State Office of Mental Retardation and Developmental Disabilities*, 183 A.D.2d 943, 583 N.Y.S.2d 580, 582 (1992); *In re City of Fulton*, 221 A.D.2d 971, 633 N.Y.S.2d 914, 915 (1995). However, other cases uphold awards of more than $100,000 without discussion of protracted suffering, truly egregious conduct, or medical treatment. See, e.g., *Rio Mar Rest. v. NYSDHR*, 270 A.D.2d 47, 704 N.Y.S.2d 230, 231 (2000); *In re Allender*, 233 A.D.2d 153, 649 N.Y.S.2d 144, 145 (1996); *Boutique Indus., Inc. v. NYSDHR*, 228 A.D.2d 171,

643 N.Y.S.2d 986, 986 (1996). For truly egregious conduct with severe and verified results on a complainant's mental and physical health, courts have upheld awards far in excess of the amounts upheld here. See, e.g., *In re New York City Transit Auth.*, 181 A.D.2d 891, 581 N.Y.S.2d 426, 428–29 (1992). In addition, the passage of time since the cited cases were decided could reasonably support higher verdicts. When confronted with the range of mental anguish verdicts approved under New York law, we do not find the verdicts in this case to deviate substantially from verdicts awarded under similar circumstances. *Meacham*, 381 F.3d at 78 (emphases added). *Lore v. City of Syracuse*, 670 F.3d 127, 177–78 (C.A.2 (N.Y.), 2012)

Under New York law, an award is deemed excessive "if it deviates materially from what would be reasonable compensation," N.Y. C.P.L.R. § 5501(c). Federal courts applying this standard have affirmed verdicts at or above the amounts awarded here for comparable "garden variety" emotional distress claims. See *Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56, 77-78 (2d Cir. 2004).

The jury's $90,000 award for emotional distress was well within the range upheld in similar cases, particularly given Plaintiff's credible testimony about the humiliation, stress, and disruption caused by his wrongful arrest, as corroborated by other witnesses. *(Tr. 6/12/25 at 80:24-82:9)* This was not a nominal or speculative injury – it was a direct and foreseeable consequence of Defendant's unlawful conduct.

Defendant's suggestion that the awards should be reduced rests on an impermissible reweighing of evidence and credibility. As with her probable cause arguments, she invites the Court to substitute its view for the jury's – something Rule 59 does not allow absent a miscarriage of justice.

Neither the economic nor emotional distress awards deviate materially from what would be reasonable compensation in light of the evidence presented at trial. Because the damages awards are firmly grounded in the trial record and do not "shock the conscience," there is no basis for remittitur or a new trial on damages. The Court should deny Defendant's Rule 59(a) and (e) motions in their entirety.

Dated: New York, New York
       August 15, 2025

<div style="margin-left:40%">

Respectfully submitted,
THOMPSON LAW, P.C.

   /s/ Walter John Thompson
By: Walter John Thompson
Attorney for the Plaintiff
Abdoulaye Toure
565 Fifth Avenue, Suite 721
New York, New York 10017
(646) 670-1672

</div>

To:    Kathleen Gill Miller
       Brian Hodgkinson
       Attorneys for the Defendant
       Chelsea Cassino
       4 World Trade Center/
       150 Greenwich St., 24th Fl.,
       New York, NY 10007
       Via email: kmiller@panynj.gov
       Via ECF

## EXHIBIT LIST

Exhibit 1 – Plaintiff Trial Testimony (June 12, 2025)
Exhibit 2 – Plaintiff Cross Examination (June 13, 2025)
Exhibit 3 – Officer Cassino Direct Examination (June 13, 2025)
Exhibit 4 – Officer Cassino Cross Examination (June 13, 2025)
Exhibit 5 – Trial Verdict Sheet

1

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - - X
 3                                  :
                                    :
 4   ABDOULAYE TOURE,               : 21-CV-01645-NRM
                                    :
 5              Plaintiff,          :
                                    : United States Courthouse
 6        -against-                 : Brooklyn, New York
                                    :
 7                                  :
                                    : Thursday, June 12, 2025
 8                                  : 10:00 a.m.
     PORT AUTHORITY, et al,         :
 9                                  :
                Defendant.          :
10                                  :
                                    :
11   - - - - - - - - - - - - - - - X
12
           TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
13           BEFORE THE HONORABLE NINA R. MORRISON
               UNITED STATES DISTRICT COURT JUDGE
14
15                  A P P E A R A N C E S:
16   For the Plaintiff:    THOMPSON LAW, P.C.
                           565 Fifth Avenue, Suite 721
17                         New York, New York 10017
                       BY: WALTER J. THOMPSON, ESQ.
18
     For the Defendant:    PORT AUTHORITY LAW DEPARTMENT
19                         4 World Trade Center
                            150 Greenwich Street, 24th Floor
20                         New York, New York 10007
                       BY:  KATHLEEN G. MILLER, ESQ.
21                          BRIAN P. HODGKINSON, ESQ.
22
     Court Reporter:  Nicole J. Sesta, RMR, CRR
23                     Official Court Reporter
                       E-mail:  NSestaRMR@gmail.com
24
     Proceedings recorded by computerized stenography.  Transcript
25   produced by Computer-aided Transcription.
```

Exhibit 1                    NJS  OCR  RPR  RMR  CRR

Proceedings                                                    10

1   plan on getting through Mr. Toure this morning.  We'll see

2   where we are, and then we can take Sergeant Buckner either

3   after Mr. Toure or after Mr. and Mrs. Toure, depending on how

4   long they take.  Let's bring in the jury.

5                (Jury present.)

6                THE COURT:  Good morning, jurors.  Thank you for

7   being here on time.  My apologies for starting a few minutes

8   after 10:00.  I had a couple of legal issues that I needed to

9   take up with the lawyers, and I was having a tech issue that I

10  won't concern you with.  We're ready to proceed with

11  plaintiff's case.  Mr. Thompson, please call your first

12  witness.

13               MR. THOMPSON:  The plaintiff calls Mr. Abdoulaye

14  Toure.

15               THE COURT:  Mr. Toure, you can come right up here.

16  Just stand up there on the witness box.  We'll get you sworn

17  and then you can have a seat.

18               (Witness sworn.)

19               THE COURTROOM DEPUTY:  State and spell your name for

20  the record.

21               THE WITNESS:  Abdoulaye Toure.

22               THE COURT:  Have a seat and into the microphone

23  spell it.

24               THE WITNESS:  A-B-D-O-U-L-A-Y-E, is the first name

25  and last name is T-O-U-R-E.

Proceedings                                                    11

1           THE COURT:  Mr. Thompson, you can proceed.

2           MR. THOMPSON:  Good morning, everyone.  Good

3    morning.

4

5           (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Toure - Direct - Mr. Thompson                    12

1    **ABDOULAYE TOURE**,

2         called as a witness by the Plaintiff, having been first

3         duly sworn/affirmed by the Courtroom Deputy, was examined

4         and testified as follows:

5    DIRECT EXAMINATION

6    BY MR. THOMPSON:

7    Q    Good morning, Mr. Toure.  How are you feeling this

8    morning?

9    A    I'm feeling fine.  Good morning.

10   Q    Mr. Toure, as you are aware, we're here because of this

11   case that you brought.  We selected the jury yesterday and you

12   were here for that.  Now we're going to ask you questions

13   about your case and you get to tell your story.

14            Mr. Toure, let's start with a little bit of

15   background information.  Please tell me -- you've already

16   given us your name.  Where do you live?

17   A    I live in Atlanta, Georgia.

18   Q    How long have you have lived in Atlanta, Georgia?

19   A    I've lived in Atlanta for 15 years.

20   Q    Where did you live prior to that?

21   A    I went to school in Texas, Dallas.  University of Texas,

22   it's like between Dallas and Fort Worth.

23   Q    And prior to that?

24   A    Prior to that, I was in Staten Island.

25   Q    Staten Island, New York?

Toure - Direct - Mr. Thompson                    13

1   A    Yes.

2   Q    Where, if you don't mind me asking, where were you born?

3   A    I was born in Conakry, Guinea.  The country is Guinea and

4   the city is Conakry.

5   Q    And at what point in your life did you come over here to

6   the United States?

7   A    I think I was 9 or 10 years old when I moved to the U.S.

8   Q    And you came with your family?

9   A    Yes.

10  Q    Mother, father, sisters, brothers?

11  A    Yes.

12  Q    How many of each?

13  A    I'm the youngest.  I have two sisters and three brothers.

14  Q    And since you came over here, I'm sorry, again, you were

15  about 7 or 8; is that correct?

16  A    A little bit older, 9, 10.

17  Q    At some point after that, so you weren't born here.  At

18  some point after that did you become a naturalized American

19  citizen?

20  A    Yes, I did.

21  Q    And you're currently a naturalized American citizen?

22  A    Yes.

23  Q    Are you married?

24  A    Yes, I'm married.

25  Q    Who is your wife?

1  A    Kelli Toure.

2  Q    What does she do?

3  A    She used to be -- she worked for the OIG.  She was a

4  therapist at the VA, and then she went from that to the OIG.

5  It's a government agency where they do like oversight for

6  Congress.

7  Q    Is that the Office of the Inspector General?  Is that

8  what OIG is?

9  A    Office of the Inspector General, correct.

10 Q    Do you have any children?

11 A    Yes, I have a son.

12 Q    How old?

13 A    He's three years old, Boubacar Toure.  We call him Cari.

14 Q    Tell us, please, what do you do for a living.

15 A    My main company is Safe Bet Express.  I'm a broker, a

16 business broker, for different governments.  We sell

17 non-lethal weapon for crowd control.  We do training, police,

18 military.  Anything involving like training the police and the

19 military.  That's basically the main business, but I also have

20 a company called Clean Squeakers.  It's a sanitizing box that

21 I sell, and I recently starting getting into real estate

22 investment.

23 Q    In 2019, though, you had this company, Safe Bet?

24 A    Yes.

25 Q    Tell me more about the type of items that you provide for

Toure - Direct - Mr. Thompson                    15

1   sale.

2   A    We provide like IFAK, which are medical kits.  So if

3   somebody is injured, the police officer or a soldier during

4   training, we sell them IFAKs and train them how to use it

5   properly, so patch them up to go to the hospital.  We sell

6   boots.  We sell ponchos during rainy season.  We sell drones.

7   We sell long-range acoustic systems.  It's a little bit more

8   complicated for civilians, but it's just devices that assist

9   the police and the military into their day-to-day functioning.

10  But we do only non-lethal equipment.

11  Q    When you say a long-range acoustic system, is that a

12  loudspeaker system for dispersing crowds?

13  A    Correct.

14  Q    As part of this items of sale, do you also sell tasers?

15  A    Yes.  We were in the process of selling tasers, when --

16  yes.

17  Q    Do you sell any guns, ammunition, anything like that?

18  A    No, absolutely not.

19  Q    So no arms of any type?

20  A    No arms.

21  Q    Do you sell tear gas?

22  A    No.

23  Q    Very good.  Thank you.  Were you working at the time of

24  this incident in 2019?

25  A    Yes.

Toure - Direct - Mr. Thompson                    16

1   Q    Had you ever, before November 12, 2019, been arrested?

2   A    No.

3   Q    Have you ever had any negative run-ins with the police

4   prior to 2019?

5   A    No.  I've been pulled over once or twice when I was in

6   Texas in college, regular kid stuff.  That wasn't really fun,

7   but nothing really outstanding that I can remember.

8   Q    In those instances, were you given a traffic ticket?

9   A    Warnings mostly, if I remember correctly.

10  Q    Tell us what it was like to engage with the officers at

11  that time when you were pulled over?

12  A    When I was pulled over in Texas, I mean I was a little

13  bit younger.  It was always nerve-wracking for me to be pulled

14  over by the police.  I didn't know what was going to happen.

15  You see the stories, and you have a certain anxiety when the

16  police pulls you over.

17          So always taught to be respectful and deescalating

18  these situations, but the anxiety was always there when I got

19  pulled over.  But I probably got pulled over once or twice,

20  and I got a warning once for speeding like five miles over the

21  speed limit.  The other time was probably the seatbelt or

22  something like that.

23  Q    And during your -- when the officer pulled you over and

24  he came over to the car, what was the conversation like?  Tell

25  us what it was like to talk to the officer and how he talked

1  to you.

2  A    It was pretty respectful.  It was like how are you doing,

3  fine, where are you going.  I told him where I was going.  Did

4  you realize you were speeding?  No, I didn't.  That's why I

5  pulled you over.  Okay.  Driver's license, give my driver's

6  license, all the information, hang tight, and then I'll talk

7  to you in a minute.

8         Go back to the car, check, make sure everything is

9  okay, come back, give me the license back.  If I get a ticket,

10 I get a ticket, but I think I got a warning that one time.  I

11 didn't get a ticket.  It was a pretty normal interaction.

12 Q    So nothing out of the ordinary happened, aside from you

13 being nervous being pulled over?

14 A    Exactly.

15 Q    Would you describe it as a reasonable conversation?

16 A    Yes.

17 Q    And during those conversations with those officers, you

18 can take one at a time or both, they were polite?

19 A    We're talking about prior?

20 Q    The officers in Texas.

21 A    Yes, yes, they were pretty polite, for the most part.

22 Q    Did they ask you questions?

23 A    One time they did but it wasn't anything extraordinary.

24 Could have been a little bit aggressive, but I don't think it

25 was anything like really, really extra out of the ordinary.

Toure - Direct - Mr. Thompson                    18

1  Q     You testified earlier where are you going, what's your

2  purpose, stuff like that?

3  A     Exactly.

4  Q     And at that time you answered all their questions?

5  A     Yes.

6  Q     And then you moved on peacefully with your day?

7  A     Absolutely.

8  Q     Before we get to the actual date of November 12, 2019, on

9  November 12, 2019 you were traveling for business; is that

10 correct?

11 A     Yes, sir.

12 Q     Tell us a little bit about this business trip.  What was

13 it about?  How did it come about?  Tell us what happened.

14 A     Okay.  Prior to this trip I had been in Guinea maybe

15 three or four times within a four, five months period.  So we

16 were training them on how to use the long-range acoustic

17 devices.

18        The reason why we were training them is there was an

19 election coming up, and unfortunately the police didn't have

20 adequate equipment to be able to deal with the crowd.  So they

21 came to us and asked us what else can we provide them.

22 Because, unfortunately, some people were getting killed

23 because they was using actual weapons against protestors when

24 the police was scared.

25        So Martin, my business partner, and I, Martin is a

Toure - Direct - Mr. Thompson                    19

1   special force with the British Army.  He was a consulting

2   company in Dubai.  We started a conversation about the taser

3   gun.  So we were going to provide taser guns and also provide

4   training on how to properly use it.  So instead of officers

5   using guns during protests, they could use taser guns to

6   subdue some of the people that were causing trouble.

7            So we went back and forth.  They were very

8   interested.  We send them the invoice.  We had an agreement.

9   They told us all right, we need now to see the sample and then

10  we'll go ahead and proceed with the purchase.  We're like all

11  right.  So I came back to the U.S.

12  Q    We'll get to that.  I want to hear a little bit more

13  about the initial conversations from who was it in Guinea that

14  reached out to you?  You said somebody reached out to you

15  regarding seeking a solution, correct?

16  A    Yes.  It's Colonel Keita.  He's the director of the

17  police for the rioting department.  He's the one who reached

18  out to me.

19  Q    And he specifically described the problem that they were

20  having in terms of crowd control and why they were seeking a

21  different solution?

22  A    Yes, because we also had saw them already.  The

23  long-range acoustic devices system, that was working really

24  well for them that they were happy about because it decreased

25  a lot of issues they were having.  They also wanted more

Toure - Direct - Mr. Thompson                    20

1    solutions.  So that's why we had that conversation.

2    Q    Was this one conversation or several conversations?

3    A    Several conversations.

4    Q    Approximately, how many months before November 12, 2019

5    did this conversation start?

6    A    Specifically for the taser, I've done business with them

7    for years prior to that.  But for the taser, probably four,

8    five months, like lead up to us doing the deal, the

9    conversation about four or five months prior.

10   Q    And prior to that first conversation about the taser, you

11   mentioned there had been an incident and people had been

12   injured?

13   A    Yes.  There was an incident.  There was a riot going on

14   because of political unrest.  And the police and the rioters,

15   they confronted each other and, unfortunately, some people

16   died and the national community reprimanded Guinea for that.

17   So they were looking for solutions for that not to repeat

18   itself.  The problem was lack of equipment and lack of proper

19   training for the police.  So that's where myself and a couple

20   of people came in to help with that.

21   Q    So over the next four months or five months until

22   November 12th, how many of these conversations did you have

23   regarding let's be specific about the tasers?

24   A    We had a lot of conversations.  I couldn't tell you

25   exactly because it was a whole lot of conversations.  Every

1   time we talked about the other training, other equipment,

2   every time we went there we took time to discuss what that

3   meant because the police didn't have any tasers.  So they had

4   no idea how to use it and the training and the time that it

5   take to get it to them, how would we get it to them.  And so

6   we had a long conversation.  So I don't remember the specific

7   amount of time, but I know it was quite a bit.

8   Q    Would you say more than 10 conversations?

9   A    Yes.

10          MS. MILLER:  Objection.

11          THE COURT:  Sustained.  Let me ask you to avoid the

12   leading.

13          MR. THOMPSON:  Thank you very much.

14          THE COURT:  You can elicit that in a different way.

15   BY MR. THOMPSON:

16   Q    Can you estimate how many conversations you had over the

17   four months about selling tasers to this department?

18   A    More than ten.

19   Q    And you said that those conversations were lengthy and

20   detailed, correct?

21   A    Yes.

22   Q    And had your conversations moved along from an initial

23   inquiry to proposing a solution to something else?

24   A    Yes.  Because the way business works, and West Africa in

25   general, you build relationship first.  After you build the

Toure - Direct - Mr. Thompson                    22

1   relationship, they give you a contract for whatever they need.

2   Once you execute that contract and they like the way you work,

3   now you've built the relationship and it's more trust.

4           So you guys can go back and forth with different

5   details, and then once you agreed usually that's a binding

6   agreement.  That's a binding contract there to where you can

7   move forward with whatever.

8   Q    I'm going to ask you a little bit more about that in a

9   second.  Before then, so had you executed -- had you -- this

10  was a longstanding relationship, correct?

11  A    Yes, very long.

12  Q    And you made other sales to this department?

13  A    Yes.

14  Q    And had those sales gone smoothly and been to completion?

15  A    Yes, they have.

16  Q    Did that lead you to believe one way or the other what

17  would happen with this sale?

18          MS. MILLER:  Objection.

19          THE COURT:  Sustained as to form.

20  Q    Based on your experience, did that give you an

21  expectation for this sale?

22  A    Yes, I was pretty confident about the sale.

23  Q    When you say were you confident about the sale, can you

24  tell us exactly what was discussed in terms of the tasers?

25  A    Yes.  As mentioned before, this was a big issue for them

Toure - Direct - Mr. Thompson                    23

1   because the national community was watching, first.  Also,

2   more important than that, they didn't want any more tragedies

3   because everybody was really upset about it, even on the

4   police side.

5           So it was something that was very -- they were very

6   interested in a deal.  So we had a bunch of conversations back

7   and forth.  We showed them the videos of what they were able

8   to do.  We kind of give them a preview of the actual training

9   we were going to do.  So we were pretty confident that this

10  was going to result in a contract.

11  Q    So aside from your level of confidence, did you talk

12  about specifics for delivery?

13  A    Yes.  We talked about the amount of tasers they wanted

14  and obviously tasers have cartridges.  We discussed the

15  logistics on how to replenish the cartridges every three or

16  four months.  We talked about the logistics.

17          Because if you export a lot of tasers, obviously you

18  can't just put it in like a plane because of the volume and

19  all the batteries.  So we were going to transport it by sea.

20  So we were advanced into the conversations of all the prior

21  deals.  This was the pattern; the logistic part, the interest,

22  the videos, and then sample and then the deal.

23  Q    So did you get as far as quantity and price?

24  A    Yes.  We sent them an invoice.

25  Q    And then was there any steps that were required before

Toure - Direct - Mr. Thompson                    24

1   the actual final signature on the contract?

2   A    Just us coming in and showing them the sample, them using

3   it, and that's it.  After that, we were going to sign the

4   contract.

5   Q    And that was the purpose of this trip on 2019?

6   A    Yes, sir.

7   Q    And they were expecting you to come with this sample?

8   A    Yes, sir.

9   Q    Since you've been in this business for a while, were you

10  concerned about flying with a stun gun or taser?

11  A    I wasn't at first because, obviously, everything that I

12  purchased to go with samples wise, I always make sure I know

13  if I can take it with me, what are the legality and

14  everything.  I never owned a taser, so I didn't know much

15  about tasers.

16        But once it was like, once they mailed me the taser

17  from Florida, I received the taser, then I started doing my

18  research.  I got the ATF document.  I checked with the ATF to

19  make sure I could transport it.  I checked with TSA.

20        I Googled to see if it was legal because I was

21  flying out of Atlanta coming into New York.  I had a meeting

22  in New York and seeing family, and then from New York, Paris.

23  So I wanted to make sure I know the law in the south and here

24  when it comes to weapons are very different.

25        So I Googled to make sure it was legal here.  That's

Toure - Direct - Mr. Thompson                          25

1   when I saw that there was a case where it was made legal for

2   you to carry a taser.  I called Air France to make sure.  They

3   told me yes, I could.  They told me where to check it out on

4   their web site.

5           I called Delta from Atlanta to New York.  So I did

6   all the research.  I was just being safe, but I wasn't scared

7   because I never thought I would get arrested.

8   Q    So you just said you called Delta.  So the first leg of

9   your trip was from Delta to New York?

10  A    From Atlanta to New York, correct.

11  Q    That was November 11, 2019, the day before?

12  A    Yes, the day before.

13  Q    Did you have the taser with you at the time?

14  A    Yes.  And the way I did it, because I was only in

15  New York for one night.  And also, when I called Air France

16  they referred me to the site and told me I could take it.

17  They showed me how to pack it, pack the taser, because you

18  have to put it in like -- it can't be loaded.  You have to

19  have it in the case.  So I did all that.  And then I locked

20  that suitcase.

21          So when I flew from Atlanta to New York, when I got

22  to New York, I never opened that suitcase because I had the

23  taser in there.  That suitcase was in the hotel.  I had a

24  different suitcase for me to be able to change, and things

25  like that.

Toure - Direct - Mr. Thompson                    26

1  Q    So you had one case that had the taser in it?

2  A    One suitcase that had the taser in it that I've never

3  opened.

4  Q    Was it in the suitcase in its own case, is that what --

5  A    It was in a case and then that case was in the suitcase.

6  Q    Did you take any steps to make sure that it was safe for

7  travel, for flying?

8            MS. MILLER:  Objection.

9            THE COURT:  Sustained.  Let me ask you to try to

10 keep your questions open-ended.  I know you're trying to move

11 things along.

12           MR. THOMPSON:  Thank you, Your Honor.

13 Q    So you traveled -- the prior day you traveled from

14 Atlanta to New York with this equipment in your bag, correct?

15 A    Correct.

16 Q    And tell us what happened when you got to New York.

17 A    So --

18 Q    The first night, November 11th.

19 A    When I got to New York I landed in JFK, I forgot what

20 time.  I took an Uber to the hotel, checked in, left my bags

21 up there, changed, met up with a business partner of mine for

22 dinner, and then went back upstairs, went to sleep.  That's

23 it.

24 Q    And then what happened on November 12th?  Walk us through

25 your day, please.

Toure - Direct - Mr. Thompson                    27

1   A    So I woke up in the morning.  I think my flight was a

2   little bit later, probably 9:00.  So I just made a couple of

3   calls, called my wife, called my mom and family members and

4   things like that.  A couple of business calls.

5        I didn't eat breakfast.  I remember that because I

6   wanted to get to the airport earlier to go work in the lounge.

7   So it was just a regular day for me, just waking up and doing

8   the normal things, and then heading over to the airport.

9   Q    So you said you made some calls?

10  A    Yes, yes.  I called my wife.  I called some of my family

11  and some business partners.

12  Q    At this point I would like to show you a couple of

13  things, if that is okay.

14  A    Of course.

15       MR. THOMPSON:  Your Honor, does the Court have any

16  preference?  I did do some poster boards, but we also have

17  them to publish them on the screen.  Is it better for the jury

18  to see them on the screen?

19       THE COURT:  Probably better on the screen.  You're

20  welcome to use either.  Jurors, you should have individuals.

21  Once the exhibits come up, you'll have individual screens

22  there and it should show on the big screen, as well.

23       MR. THOMPSON:  Your Honor, right now I'd like to

24  enter for identification Plaintiff's Exhibit 9.

25       THE COURT:  Okay.

Toure - Direct - Mr. Thompson                    28

1   BY MR. THOMPSON:

2   Q    Mr. Toure, do you recognize the exhibit that's on the

3   screen there?

4   A    Yes, sir.

5   Q    Can you tell us what it is?

6   A    It's the Air France policies for carrying tasers.

7   Q    And is this what you saw when you did your research on

8   whether or not you could take a taser on the airline?

9   A    Yes.  This and a phone call with Air France directly

10  confirming.

11  Q    Okay.  So you saw this first.  Is this a true and

12  accurate depiction of what you saw when you looked on the web

13  site that day, that printout?

14  A    Yes.  I called them and they referred me to the site, as

15  well.

16          MR. THOMPSON:  Your Honor, I would like to move --

17          THE COURT:  These have been pre-admitted per our

18  earlier discussions.  Exhibit 9 is in evidence, Jurors.  So

19  this is an exhibit in evidence.  Whatever weight you choose to

20  give or not give the evidence in the exhibit is up to you, but

21  it's now part of the evidence in this case.

22          MR. THOMPSON:  Now I can move --

23          MS. MILLER:  Is this being offered in evidence?

24          THE COURT:  Yes.  I'll discuss this with you later,

25  but we have -- all of the ones in the JPTO to which there were

Toure - Direct - Mr. Thompson                    29

1    no objections or which I ruled on the objections are

2    pre-admitted.  This, I've confirmed, is one of those.

3    BY MR. THOMPSON:

4    Q    Thank you.  Mr. Toure, you said this is what you saw when

5    you went to the Air France web site?

6    A    Correct.

7    Q    And that was after a communication with Air France?

8    A    Correct.

9    Q    So tell me, again, you previously called them?

10   A    Yes.

11   Q    And they directed you to their web site?

12   A    Yes.

13   Q    On this list here, you see what it says here on the

14   bottom?  On the bottom right, can you see what it says there,

15   sir?

16   A    On the compressed air?

17   Q    The right-hand column at the very bottom, three bullet

18   points.  It says what, sir?

19   A    That you can put it in the hold, not in the cabin.

20   Q    And then --

21   A    No prior approval needed.  I'm sorry.

22   Q    Thank you.  And then looking to the top left, what do you

23   see there on the top of the list?

24   A    Stun weapons, including cattle prods and ballistic energy

25   systems.

Toure - Direct - Mr. Thompson                          30

1  Q     You entered the web site and this is the list you saw

2  after being directed by an Air France employee?

3  A     Correct.

4  Q     I'm showing you what has been entered as Exhibit 10.  Can

5  you see this on the screen?  Can you see this clearly?

6  A     Yes.

7  Q     Can you tell us what this is?

8  A     This is from the TSA saying that you can have stun guns

9  in your checked luggage.

10 Q     And on the top there you see where it says carry on bags,

11 no?

12 A     Yes, same thing as Air France.

13 Q     Right there on top of the paragraph it says what?

14 A     On top of the tasers, stun guns, and electroshock

15 weapons.

16 Q     And what did that lead you to believe after you read

17 this?

18 A     I believed that it was okay, legal for me to have it in a

19 checked bag.

20 Q     I'm now showing you Exhibit 11.  Sir, can you see on the

21 screen what this is?

22 A     Yes.

23 Q     Is it also on the screen in front of you?

24 A     Yes.

25 Q     Whichever is easier to read for you.  Can you tell us

Toure - Direct - Mr. Thompson                    31

1  what this is?

2  A    This is the from the U.S. Department of Transportation,

3  the classification of the tasers.

4  Q    And was this -- did you obtain this letter at some point?

5  A    Yes.  I obtained that from the supplier in Florida.

6  Q    What do you mean by that, you obtained it from the

7  supplier?

8  A    When I spoke with them, he was the company that was going

9  to supply us the tasers.  So I told him that I was going to

10 Guinea and I needed the sample, but I wanted to make sure that

11 it was legal.  So when he mailed the samples, he mailed this

12 letter with it to show the classification of the actual

13 tasers.

14 Q    So this was information provided to you pursuant to your

15 request?

16 A    Yes.

17 Q    And you said you had a conversation with the actual

18 manufacturer or your supplier?

19 A    My supplier, yes.

20 Q    So how would you classify yourself in the chain of the

21 sale?

22 A    In the chain of the sale, I'm a broker.  Obviously I

23 don't manufacture a lot of the equipment we sell.  Just like

24 in the U.S. government here, the government can go directly

25 buy through suppliers.  They have contractors that bid for

1    contracts.  So I'm kind of like in the same up there, I bid

2    for contract.  I'm the middle guy.

3    Q    So you said you're a broker.

4    A    Yes.

5    Q    Tell us what a broker means, being a broker means?

6    A    A broker means there's a need from a government.  There's

7    a need for boots.  Sometimes they do a tender and then you

8    apply for the tender.  Once you're in the tender, you find a

9    supplier.  You negotiate the price, you buy from the supplier,

10   you sell to the government.  So that's where you establish

11   yourself as the middleman, as the broker.

12   Q    Do you need any special licensing to be a broker?

13   A    No, not in Guinea.  Not in the U.S. either, unless you're

14   selling actual weapons and things that are deemed needing

15   licenses and things like that.  But for most equipment that we

16   sell that are not lethal, you don't need any special license

17   for that.

18   Q    Do I understand correctly, if you were selling lethal

19   weapons or ammunition or arms then you would need licensing?

20   A    Yes, definitely.  It's a long process.  You have to apply

21   through ATF.  You have a whole lot of stuff, a whole lot of

22   steps before you get that, if you get it.

23   Q    Was that never the focus of your business?

24   A    No.  We only deal with non-lethal weapons.

25   Q    Is there a specific reason you only deal with non-lethal?

Toure - Direct - Mr. Thompson                    33

1   A    It's just a conscience thing.  I didn't want to be part

2   of making money on anything that would hurt somebody else.  I

3   just -- it's just my own personal morals.

4              MR. THOMPSON:  One second, Your Honor.

5   Q    Mr. Toure, I'm now putting on the screen what we've

6   identified as Exhibit 6.  Do you recognize this document?

7   A    Yes.  Do you mind moving it down a little?

8   Q    Do you recognize this document?

9   A    Yes, sir.

10  Q    Can you tell us who it's from?

11  A    The Bureau of Alcohol Tobacco and Firearms, ATF.

12  Q    It looks like it's under the U.S. Department of Justice;

13  is that correct?

14  A    Yes.

15  Q    Was this a letter that you had in your possession?

16  A    Yes.

17  Q    How did it come to be in your possession?

18  A    From the supplier, from our supplier.

19  Q    Tell me a little bit more.

20  A    So the same process.  When I was ready to receive the

21  sample, I told them to send me all the documentation just in

22  case I was asked the legality of transporting taser guns.

23  This was one of the letters that was part of the package.

24  Q    Can you recall, without reading it, what the sum and

25  substance of this letter is?

Toure - Direct - Mr. Thompson                    34

1  A    I have to read it a little bit because it kind of goes

2  hand in hand with TSA and them.  I know one of the letters was

3  just a classification of like projectile, like what do they

4  consider firearm and when it's not considered a firearm then

5  it's legal for you to have.  The other one talks specifically

6  about like tasers themselves.  So unless I read them, that

7  will be difficult for me.

8  Q    I'll ask you to read a little section of this, not the

9  whole thing.  If you go down to the fourth paragraph there,

10 can you read that paragraph?

11 A    The one that says any weapon?

12 Q    Yes.  You can read it to yourself.  No.  "As indicated".

13 A    Read it to myself.

14         (Pause.)

15 A    Okay.

16         (Continued on next page.)

17

18

19

20

21

22

23

24

25

A. Toure - direct - Thompson                    35

1  BY MR. THOMPSON:   (Continuing)

2  Q    So does that refresh your recollection as to what this

3  exhibit is about?

4  A    Yes.

5  Q    So can you tell the jury, please, what this letter is

6  regarding?

7  A    This letter was basically the government not classifying

8  tasers as a firearm because it doesn't issue projectiles.

9  There's like a prong attached to it so they classified it as a

10 firearm.

11 Q    When you say shoot a projectile, does that mean bullets?

12 A    Yes, bullets.  From my understanding, the weapons is

13 anything that is, from the ATF, that shoots a projectile free

14 from the actual unit itself.

15 Q    Okay.  And then you said that you, how this letter came

16 into your possession was that the supplier sent it to you?

17 A    Yes, sir.

18 Q    Did they send it at the same time they sent the other

19 letter?

20 A    Yes.

21 Q    Did you have those with you on November 12th?

22 A    Yes, sir.

23 Q    And why did you have those with you on November 12th?

24 A    Just being safe.  I like to, you know, I like to be safe

25 just to make sure that if I was asked any questions because I

A. Toure - direct - Thompson                    36

1  was also flying through Paris.  Usually when you go through

2  Paris, you don't go through customs because you just a

3  connecting flight, but just in case, you know, they have some

4  issues with the stuff in there, I had something to show them.

5  Q    Okay.  And so had you done any research on what it would

6  take to go through Paris?

7  A    Yes.

8  Q    And what did you find about Paris?

9  A    Paris had no issue since I wasn't, I wasn't technically

10  staying in Paris.  I was just through transit so I wasn't on

11  French soil.  I was through transit through concrete, so all

12  my research showed that I didn't need anything because I

13  wasn't going into Paris.

14  Q    But you did research on each leg of your trip?

15  A    I did research everything, correct.

16  Q    I have one more exhibit to show you now before we move

17  on.

18        As you testified earlier, the trip was to make a

19  sale of these tasers, correct?

20  A    Correct.

21  Q    You said you had come pretty far in these negotiations?

22  A    Correct.

23  Q    I'm going to put up now what is called Exhibit 3.

24        Mr. Toure, do you recognize the document that I've

25  just put on the screen?

A. Toure - direct - Thompson                    37

1    A    Yes.

2    Q    Can you tell what this document is?

3    A    It's an invoice.

4    Q    Okay.  And an invoice for who?

5    A    It's an invoice for the, to me for the Guinea government

6    because my business partner, OE Consultants, he, Johns Martin,

7    that's how he usually struck to the deals.  If the deals -- we

8    partnered in the deals so he works with the supplier and the

9    logistic and everything else and then I close the sale.  So

10   this was the invoice that he sent Safe Bet.

11   Q    So this is the invoice that went to your company?

12   A    Yes.

13   Q    For you to purchase the items?

14   A    For me to purchase the item and then invoice the

15   government.

16   Q    And then you would invoice the government thereafter?

17   A    Correct.

18   Q    The amounts on here of items, up top, I see one Phazzer,

19   is that correct, sir?

20   A    No.

21   Q    One hundred?

22   A    One hundred.  The other one is the number of columns.

23   Q    Okay.  And so in the quantities here, how do those

24   numbers come to be there?

25   A    It's negotiation, talking to them in Guinea, them letting

A. Toure - direct - Thompson                    38

1  us know how many they wanted to start with, and things like

2  that, yes.

3  Q    So this is the amounts that they told you?

4  A    Yes, this is the amount they told me to invoice them for.

5  Q    They wanted to purchase?

6  A    Correct.

7          MS. MILLER:  Your Honor, I have an objection and I'd

8  like a sidebar.

9          THE COURT:  Sure.

10          (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (The following occurred at sidebar.)

2            MS. MILLER:  This document was the subject of my

3    motion.  It was my understanding it would not be used as an

4    exhibit.  Unfortunately, it went up on the screen before

5    anybody could stop it.

6            THE COURT:  Yes.

7            MS. MILLER:  So now --

8            THE COURT:  I had the same question.

9            So this was something now -- I had left the door

10   open for you to lay a foundation, but my understanding was,

11   and I thought this was clear from the pretrial, that you were

12   going to lay that foundation outside the presence of the jury

13   because at our pretrial conference, you had no answer to my

14   question about the reliability of this document given the date

15   and you wanted to get additional information from your client.

16           I did not anticipate you would do that in front of

17   the jury or you would put it up on the screen because this is

18   the one exhibit on the list that was not pre-admitted because

19   there was an objection prior to the trial that I had

20   sustained.  So I think we need to take this down and I need to

21   tell the jury to disregard this exhibit.

22           MR. THOMPSON:  Okay.

23           THE COURT:  I had thought, since I didn't hear an

24   objection from defense counsel for the first three questions,

25   that perhaps you all had worked something out from this.  Now

Sidebar                                                              40

1    that I know you haven't, I think the remedy --

2           MS. MILLER:  Well, at this point, when I see it up

3    on the screen and, you know, once it went up and once the jury

4    saw it, I think that I'm going to have to be able to

5    cross-examine the witness on it because, you know, they're

6    making notes and they've made notes about this.

7           THE COURT:  Okay.  So we can do one of two things.

8           So jurors are generally presumed to follow

9    instructions so I can take it down and have them disregard it.

10   Certainly, if you think the proper remedy at this point is

11   simply to have it come in for what it's worth and tell the

12   jury that they can give whatever weight they choose to give it

13   or not and then you can cross him on when it was dated and the

14   foundation and all that, I think that's fine, but I will leave

15   it to you because you currently have an objection.

16          MS. MILLER:  Yes.  I mean, the thing is once it went

17   up and they've seen it, it just, it's, like, an instruction to

18   disregard it, you know, I find that very hard with a jury,

19   telling them to disregard things.

20          THE COURT:  Let's just not get into a long

21   conversation because we have a jury waiting.

22          So you let me know what you'd like me to do.  We can

23   take it down, tell them to disregard it and it will not be in

24   evidence, or you can cross about whatever issues you want to

25   cross about regarding the date it was created, whether it is

1    or is not reliable, but I think I need to have an answer right

2    now so we can address it in a timely manner.

3            So you let me know what you'd like to do.

4            MS. MILLER:  Yes.  At this point, I think I just as

5    soon cross because I feel like an instruction to disregard is

6    something that jurors really aren't accustomed to and can't

7    really get it out of their head because they've seen it.

8            THE COURT:  All right.

9            MR. HODGKINSON:  Maybe a curative instruction.

10           MR. THOMPSON:  If I may say, it was my fumble so not

11   really, what I'm saying like this was going to amounts of

12   damages.  We didn't get to totals on this.  So if we pull it

13   down and then we put it in later as evidence of damages, then

14   the jury probably will disregard it, but if you want to cross,

15   I'm going to stand aside because it's my fumble.

16           THE COURT:  Okay.

17           MR. THOMPSON:  And it was unintentional.  I'm sorry.

18   Just fog of war.

19           THE COURT:  Why don't do this.  Why don't we take it

20   down now and we'll move on to a different area.  You have some

21   time to think about it, we'll have a break, and you can let me

22   know how you want to proceed.

23           MS. MILLER:  Okay.

24           MR. THOMPSON:  Thank you, Your Honor.

25           (Sidebar conference ends.)

A. Toure - direct - Thompson                      42

1          (In open court.)

2          THE COURT:  Mr. Thompson, let me have you take that

3     off the screen real quick.

4          Members of the jury, this particular document you

5     were just shown in not yet in evidence.  I have some

6     additional conferring with the parties to do about it so at

7     this time, that document is not in evidence and I'm going to

8     have Mr. Thompson for now move on to a different area.

9          You may proceed.

10         MR. THOMPSON:  Thank you very much.

11         I'm going to put up Exhibit 1.  It's a photograph of

12    the taser.

13         THE COURT:  Yes, you may.

14    BY MR. THOMPSON:

15    Q    Mr. Toure, do you recognize what this is a photograph of?

16    A    Yes, sir.

17    Q    Can you tell the jury what it is?

18    A    It's the box, what the taser and the cartridge is.  The

19    case.  I'm sorry.

20    Q    The case?

21    A    Yes.

22    Q    And I'm not sure if this is the exact one you had.

23    A    Yes, it is.

24    Q    Can you tell if it was?

25    A    Yes, it was.

A. Toure - direct - Thompson                    43

1      THE COURT:  Mr. Thompson, I'm going to ask you to
2  keep the mic close to you so if you lean closer to the
3  exhibit, just move the mic.
4      MR. THOMPSON:  Thank you.
5      THE COURT:  Sure.
6  Q    So this is the one you had when you were traveling?
7  A    Yes.
8  Q    The photograph of the one you had?
9  A    Yes.  It's a little dark but I think that's the one.
10  Q    I know it's a little dark but even though it's a little
11  dark, is it possible that you can walk us generally through
12  what you see in the case there?
13  A    Yes.
14  Q    In the center, is that --
15  A    Yes.  In the center, you have the taser.  On the left,
16  you have the cartridges.  And then on the right, you have the
17  charging cord.
18  Q    Okay.  So the items on the bottom of the screen which
19  would be the left of the box, is that what you're saying?
20  A    Yes, the left, the metal ones, the silver cartridges that
21  are left.  It looks silver, I think, because of the picture.
22  And then you have the taser in the middle and you have the
23  charger on the right-hand side.
24  Q    Okay.  And the cartridges, in addition to the ones
25  alongside the taser, were there any in the weapon, contained

A. Toure - direct - Thompson                                      44

1    in the stun gun at this point?

2    A    No.  You're not allowed to do that when you're traveling.

3    You can't have anything loaded.

4    Q    And is this the way that you were instructed on how to

5    pack it for travel?

6    A    Correct.

7    Q    What is the item on the bottom there that looks silver or

8    whitish?  I can't quite tell what that is.

9    A    I don't think it's an item.  I think it's just the white

10   part of when you close the -- it's the handle.

11   Q    It's the handle?

12   A    It's the handle of the case.

13   Q    And what is the case -- so when the case closes, that's

14   what somebody grabs?

15   A    Yes.  It's a plastic case with padding.  And then once

16   you clip it, you have that handle.  So I think that white part

17   there is the handle if I can see correct.

18   Q    Thank you.

19        And just lastly, and this was what was packaged in

20   your luggage on that night of November 2019?

21   A    Yes, correct.

22   Q    So now I want to get to the actual day of 2019.  We

23   already talked about you were traveling to the airport.

24        Please tell me, tell me what happened once you

25   arrived at the airport.

A. Toure - direct - Thompson                    45

1  A     So once I arrived at the airport, I came a little early

2  because, as I say, I wanted to eat and go sit in the lounge

3  and do a little bit of work.  So they weren't people.  They

4  had just opened a counter.  So I proceeded to the Air France

5  check-in counter.  I already checked on my phone so I already

6  checked in.  I just had to drop off my bags and proceed in.

7  Q     Before you approached the counter, did you do anything

8  else?

9  A     No, I didn't do anything else.

10 Q     Did you make any phone calls?

11 A     I might have been talking to my wife.  We talk all the

12 time so I don't know, but most likely I was on the phone with

13 her on my way there and probably still carrying a conversation

14 as I walked toward -- actually, I was talking to her on the

15 phone because I did remember telling her that I'm going to go

16 get my bags checked in and I had the documentation.  Like, Oh,

17 let me find out where the documentation is to let them know.

18        So I checked in online through my phone and came to

19 drop off the bags with the lady.  She took my bags, put them

20 on the belt, and then I volunteered.  I told her, Hey, by the

21 way, just to let you know, I have a taser in my suitcase and

22 this is the, the paperwork for it.

23        She didn't even look at the paperwork.  She said, A

24 taser?  I said, Yes, a taser gun.  She said, You have a gun?

25 She thought I had a gun.  No, I said, not a gun, it's a taser.

A. Toure - direct - Thompson                                    46

1    She didn't know what to do.

2    Q    What happened next when she didn't know what to do?

3    A    When she didn't know what to do, she called the police.

4    Q    Did she speak to anybody else before calling the police?

5    A    No, she didn't speak to anybody else.  I think there was

6    a -- she did, if I remember correctly, because there was

7    another guy, her colleague who was standing to the left, and

8    then she told them that I had a gun in my suitcase and I

9    corrected her.  I said no, ma'am, it's not a gun.  It's a

10   taser.  So at that point, she didn't know what to do so she

11   called the police.

12   Q    Did you say anything else to her before she called the

13   police?

14   A    Yes.  I was trying to tell her that it's legal and I did

15   the research, I called Air France, I can have it in there, and

16   I was trying to get her to call TSA instead the police, TSA to

17   confirm.  She said no, they told him to call so she's just

18   going to call the police.

19   Q    About how long did that conversation last?

20   A    Not very long.  Probably two, three minutes --

21   Q    Okay.

22   A    -- after she heard about the taser.

23   Q    And how did you respond when you asked her to call

24   another agency?

25   A    She was, she, she, she -- she said no, she said, she'll

A. Toure - direct - Thompson                              47

1    call, like, I don't know if the protocol is to call the

2    police, the Port Authority, but she didn't, she wasn't willing

3    to call TSA.  She rather call the Port Authority.

4    Q    And did you hear her make a phone call?

5    A    I don't remember hearing her make the phone call.

6    Q    Tell us what happened next.

7    A    So I was, like, that's fine.  So I stood there, I waited,

8    and he still had my bags on the belt ready go on the plane.

9    So I stood there.  She called and then two officers came and

10   when the officers came, you know, we started talking.  They

11   were like, sir, you have a gun?  I said, No, it's not a gun,

12   it's a taser.

13   Q    Okay.  I'm going to go step by step.

14        So you said how many officers arrived?

15   A    In the beginning, two officers arrived.

16   Q    And can you describe those officers?

17   A    Yes.  I believe it's the lady to my right there and

18   another officer.  I don't remember their names but another

19   male officer.

20   Q    A male and a female officer?

21   A    A male and a female arrived, correct.

22   Q    And did you come to learn the name of that female officer

23   at any point?

24   A    Throughout the, the depositions and things like that,

25   yes.

A. Toure - direct - Thompson                    48

1   Q    But prior to that, that night, did she have

2   identification on?  Did she have a name tag?

3   A    She probably did.  I didn't pay any attention.

4   Q    What was she wearing?

5   A    She was a wearing police uniform.

6   Q    And the gentleman with her, what was he wearing?

7   A    Police uniform as well.

8   Q    And when they came, did they identify themselves in any

9   way?

10  A    I don't remember but I knew they were police officers the

11  way they were dressed and I knew that the lady had called the

12  police so I know it was police.  I don't remember if they

13  identified themselves or not.

14  Q    Okay.  And can you tell us approximately where were you

15  standing in relation to the counter and the check-in and all

16  of that at that point?

17  A    I was standing right by the counter.  So I was just

18  waiting for him to come so I can explain so I was standing

19  right by the counter.

20  Q    How long between the phone call and when they all came?

21  A    I don't remember but it wasn't that long.  Probably, I'm

22  not sure.  Maybe five minutes.

23  Q    Okay.  And during that time, did you do anything?

24  A    I was with my wife on the phone.  I was telling her,

25  like, wow, they said they're going to call the cops, I don't

A. Toure - direct - Thompson                    49

1   know why.

2   Q    Okay.  So please tell me what it was like when the

3   officers arrived.

4   A    When the officers arrived, at first, I mean the -- I

5   thought I was going to explain to them, they was going to

6   check the documents, worst case, confiscate and let me go.

7            So when they came, they were like, Oh, you have a

8   gun in the suitcase.  I said:  No, it's not a gun, it's a

9   taser.  I have all the documents.

10            I even had my work badge that I showed them.  I

11  tried to explain.  They had a nonchalant attitude about it, a

12  little bit like, yes, whatever, what is this paperwork.  So I

13  explained to them that --

14  Q    So -- I'm sorry to interrupt you again.  So you're saying

15  that you had paperwork that you showed them?

16  A    Yes.  I had the ATF documents, the TSA documents.

17  Q    Those are the documents that we had on the screen a few

18  minutes ago?

19  A    Yes, sir.

20  Q    And you had those in your person?

21  A    Yes.

22  Q    Okay.  And you tried to show those to the officers?

23  A    Yes, I tried to show it to the officers.

24            They -- the male officer told me:  How do I know you

25  just didn't print this?  Like, how do I know this is real?

A. Toure - direct - Thompson                50

1          I said:  You can verify, you can call TSA, you have

2    TSA at the airport and ATF.  I'm sure there's a number that

3    you can call to verify.

4    Q    Did you say anything else to them at that time?

5    A    Yes.  I was just explaining to them that I did all the

6    research, I'm allowed to have it, but they weren't, like,

7    cooperating in a manner to, you know, listen or resolve

8    whatever situation was going on.

9    Q    Did they ask you questions other than you have a gun in

10   your suitcase?

11   A    Yes, they asked me a few questions.  They asked me where

12   I was coming from, where I was going, and a few questions.  I

13   don't remember the exact questions but they asked a few

14   questions that I answered.

15   Q    Okay.  And you said that you explained to them that you

16   did the research and it was okay to have it.  What do you mean

17   by that?

18   A    I told them that not only I had all the documentation, I

19   called Air France, and then I looked up that you can have, you

20   can carry that on your person in New York, you can have it.

21   And I also told them I didn't open that bag.  It wasn't like

22   something that was threatening to somebody, I was walking

23   around New York City with a taser on me.

24          I tried to be reasonable, explained to them it was a

25   business trip.  I told them this is a sample that I'm taking

A. Toure - direct - Thompson                              51

1   overseas, you know, to sell.  I didn't open the suitcase.  I

2   wasn't carrying it around the City.  I even let them see, I

3   had the letter, I was doing a lot of explanation.

4   Q    And if you recall, tell me a little bit more about how

5   you explained to them the research that you did and what you

6   found?

7   A    We didn't go too much into the research.  They didn't

8   seem that interested at first.  You know, it's almost like

9   listening in one ear and listening to something else and

10  talking among themselves.

11        So I didn't go into the detail with the research.  I

12  just told them that I researched everything at that point.

13  That's before my wife cited the actual case law that was

14  struck because I seen the case law, but I didn't write it

15  down, I didn't remember it because I had no idea this

16  situation would happen, but I had my wife on the phone.

17        So she told me:  Hey, tell them the actual law that

18  made it legal, 262.1, I believe, that the federal judge struck

19  and made it illegal to arrest people.

20        And when I told them that, I remember one officer

21  saying, Well, that's not going to take effect until next year,

22  until January.

23  Q    Do you recall which officer said that to you?

24  A    I believe it was the -- I'm not sure, but I think it was

25  the black male officer, the third one that came after, their

A. Toure - direct - Thompson                      52

1    superior.

2    Q    All right.  We'll get to him in a minute, the first two.

3         Did either of them -- did you inform them of this

4    and did they respond?

5    A    Yes, I informed them, I informed them of everything.  I

6    think they called him.  He must have been around.

7    Q    Okay.  Approximately how long did this initial encounter

8    with the two officers take?

9    A    I, I don't know because I was in the midst of trying to

10   explain and trying to let them know that I was allowed to have

11   this or I don't recall exactly how long it took.

12   Q    Okay.  And what was your manner and how were you talking

13   to them?

14   A    Respectfully.  Respectfully.  You know, I, by nature, I

15   was brought up not to, you know, have any, any bad interaction

16   with the police.  So it was just, you know, respectful

17   conversation explaining things.  You know, I didn't raise my

18   voice.  I wasn't upset.  I didn't do anything threatening or

19   even complain about anything.  I was just trying to explain to

20   them that I was allowed to have this.

21   Q    And at this point with the first two officers, were you

22   still near the counter?

23   A    Yes, we were still near the counter.  At that point, they

24   asked my bags to be brought and then they had told me to open

25   a bag, so I opened the bag and then they told me to open where

A. Toure - direct - Thompson                                      53

1    the taser was.  So I opened it to show him everything.

2    Q    Okay.  And did you say earlier that you attempted to show

3    him the paperwork too?

4    A    I showed him the paperwork.  They picked up the

5    paperwork.

6    Q    Okay.  So what happened next?

7    A    So next, this was, this was, like, an embarrassing

8    situation for me.  I never been in this situation before.  So

9    now I'm standing here with police officers, people are

10   starting to come, looking at me like a criminal, so I'm

11   embarrassed.

12              I'm, like, What do we do?  I'm talking to my wife on

13   the phone.  Like, so she tells me just let them know -- she

14   texts me all the information that I showed them on the phone.

15   I said federal judge struck the law down.  And I remember the

16   first response from the officers, one of the officers were,

17   like, It doesn't take effect until January.  Then the

18   second --

19   Q    When he told you that, what do you think he meant by

20   that?

21   A    He meant that some way, somehow, he was aware of the law

22   but he didn't think that the law was in effect until January.

23   That's when I told him, No, specifically it says starting

24   immediately, the decision.

25   Q    You were gesturing to something?

A. Toure - direct - Thompson                                              54

1          THE COURT:  Hold on one second.

2          (Announcement interruption.)

3          THE COURT:  Okay.  Ladies and gentlemen, I did

4    receive a message earlier that they're investigating something

5    in the lobby.

6          We are in a secure courtroom right here so we're

7    fine to remain here.  If that changes and I get a different

8    alert, I'll let you know, but as long as we stay on this

9    floor, we'll be complying with the order.

10          We're going to take a morning break in just a little

11   bit and you can go back to the jury room but just don't go

12   down to the lobby at that time.  This happens from time to

13   time in this building.  As far as I understand, it's nothing

14   to worry about at this juncture.

15          Okay.  You may proceed.

16          THE WITNESS:  Excuse me.  My wife is outside.  Is

17   she okay?

18          THE COURT:  Yes, she's fine out there.

19          Maybe a person on your staff can let her know that

20   she's okay to sit outside and not to go to the lobby.

21          MS. MILLER:  Judge, I have two witnesses too.

22          THE COURT:  We'll just have -- is it okay if

23   plaintiff's paralegal tells them all or does she know?

24          You can go tell them.  We'll take a break for a

25   second.

A. Toure - direct - Thompson                     55

1           MS. MILLER:  I'll be right back.

2           (Pause.)

3           THE COURT:  All right.  Are you ready to proceed?

4           MR. THOMPSON:  Yes, I am.

5    BY MR. THOMPSON:

6    Q    You said you were gesturing to something?

7    A    Yes.  Yes.  The paperwork.  I showed them the paperwork.

8    They physically picked up the paperwork and that's what when

9    of them told me this could have been something made up and

10   just printed out.

11   Q    I think you were also saying you were gesturing to

12   something --

13          MS. MILLER:  Objection.

14          THE COURT:  Yes.  Sustained.

15   Q    Mr. Toure, I'm now going to show you what's accepted into

16   evidence as Exhibit 12 which is the screenshot we discussed

17   earlier?

18          THE COURT:  Yes.

19   Q    Mr. Toure, you recognize -- this is Plaintiff's

20   Exhibit No. 12.

21          Do you recognize what this is an image of?

22   A    Yes.

23   Q    All right.  Can you tell us what it is?

24   A    That's my wife and I texting because at that point, I

25   told her that -- I think I called her back and let me talk to

A. Toure - direct - Thompson                          56

1  the officers so for a brief period of time, those are the text

2  messages she sent me.

3  Q    So I see at the top of the, the top of the screenshot

4  here, there's a letter?

5  A    Yes.

6  Q    A?

7  A    You mean the link where the judge says New York stun gun

8  ban.

9  Q    No.

10         THE COURT:  Mr. Thompson, you can use a pen or your

11  finger to point to it.

12 Q    Here at the very top.  (Indicating.)

13 A    Yes.

14 Q    What is that?

15 A    That's my initial, my initial.

16 Q    And by that initial, do you recognize it's a screenshot

17 of your own phone?

18 A    Screenshot of my wife's phone.

19 Q    Of your wife's phone?

20 A    Okay.

21 Q    And did this mirror what was on your phone at the time?

22 A    Yes, sir.

23 Q    You recall that?

24 A    Of course.

25 Q    And then down below here there's a link.  Can you tell us

A. Toure - direct - Thompson                              57

1    what that is?

2    A    Yes.  It's the actual federal case that the judge stroke,

3    had stricken down, making it unconstitutional for people to be

4    arrested because of tasers because -- that's the actual case.

5    I know about it but I didn't know the actual case number so

6    she sent me that to show them.

7    Q    So are you telling us that this screenshot here --

8         THE COURT:  Let me stop you there as to form.  Can

9    you rephrase that, please?

10        MR. THOMPSON:  Yes, Your Honor.

11   Q    Can you tell me, to the right of that picture, is there a

12   time there?  It's kind of small.

13   A    Yes, 7:08.

14   Q    And so is that approximately -- do you recall the time

15   that the, that you were being arrested?

16   A    Yes, it was some, some time around there.  I mean at this

17   point in the time, I stopped looking at the watch and just

18   trying to --

19   Q    Okay.  So I want to go back now to what was occurring.

20        So at this point, the two officers were with you,

21   you tried to make explanations and then at some point, a third

22   officer arrived?

23   A    Yes.

24   Q    Can you tell us -- can you describe him to us, please?

25   A    He was a black male with a mohawk, not that tall,

A. Toure - direct - Thompson                               58

1    probably average height, but the distinctive description was

2    the mohawk that he had.

3    Q    And when he arrived, did he identify himself to you?

4    A    No, he didn't.  I don't think he did, no.

5    Q    Okay.  When he arrived, did he speak to you?

6    A    He didn't speak to me at first.  I spoke to him.  He came

7    in, you know, really aggressive compared to the first two

8    officers.

9    Q    What do you mean by this?

10   A    I mean he came in at -- the first two officers weren't

11   aggressive.  They were, you know, a little dismissive but they

12   weren't aggressive.  When he came in, it was the tone of

13   voice, you know, the look that he gives you as if you

14   committed a crime or something or you're guilty of something.

15   It was, it was definitely a very tense situation compared to

16   the first two officers.

17   Q    And you said that he didn't speak to you at first?

18   A    At first, he didn't.

19   Q    At first, he didn't?

20   A    He didn't at first.  I engaged him.

21   Q    Tell me what you said, what you heard?

22   A    He was talking to these colleagues about what the

23   situation was and I remember thinking, like, this is now going

24   to be a problem because of the energy that was, that he

25   brought.  It was more like coming in, like, yeah, this

A. Toure - direct - Thompson                    59

1    criminal guy, what are we doing type of situation.

2              I tried to show him the paperwork.  When I explained

3    it first, he was more than dismissive.  He was, like, I don't

4    want to hear it type of situation.

5    Q    So when you say you tried to show him the paperwork at

6    first, were you standing still near the counter?

7    A    Yes, we were, a little bit further to the side because I

8    think people were checking in at that time.

9    Q    Okay.  And they arrived at that location where the three

10   of you originally were?

11   A    Yes.  And I believe they had the paperwork at that time.

12   They were holding the paperwork and my phone.

13   Q    Tell me what you said to him?

14   A    So, at first, I tried to explain.  He gave me, like, I

15   don't want you to talk.  So he talked to his colleagues.  And

16   then that's when I told him, I said, Sir, my wife texted me

17   this.  And then I don't know if it was him or another officer,

18   because they went from it's not taking effect until next year.

19   When I told him the judge is taking effect now, it went from

20   that, to that's federal, yes, that's federal, that's not New

21   York City, we operate differently.

22              And I remember thinking I thought federal trumps

23   state law, and I remember telling them that.  But I think the

24   more I was explaining, the more he got mad and he was, like,

25   just book him.

A. Toure - direct - Thompson                    60

1   Q    Did he ask you any questions before he gave that command?

2   A    No.  He didn't, he didn't ask me.  They were telling him

3   what was going on.  I was trying to engage and talk to him

4   but, you know, I got the cold shoulder.  He was focusing on

5   them and he was just, just book him.

6   Q    Okay.  Do you recall if he looked at the device at all?

7   A    He looked at it because they showed him everything.  I

8   think he was their superior, I believe.  I'm not sure.  But

9   they showed him the stuff.  They explained things to him.  I

10  couldn't quite make exactly what they were talking about.  And

11  they seemed confused a little bit and that's why I kept

12  insisting, like, if you call or if you make, call TSA or you

13  call anybody on this document or even the law, you are going

14  to find out that, you know, I have the right to have this.

15  Q    And what did they say in response to that?

16  A    Oh, they weren't -- who, the two officers?

17  Q    Start with the first two and then we'll say the third

18  one.

19  A    I don't recall the exact statement but he was almost as

20  if I was making up things, like this documentation is not

21  real, the case that I'm citing is not in effect.

22  Q    At any point before the sergeant, I'm sorry, the other

23  officer -- first, did he have insignia on to identify who he

24  was?  Rank or name?

25  A    I'm sure.  I think -- he was very distinct, distinctive

A. Toure - direct - Thompson                                61

1  looking from the other two officers.  I don't know if he had,
2  like, a bulletproof vest on, but he came in very militarized,
3  very aggressive looking.  I don't know.  I'm sure he had a
4  badge but, at that point, and I wasn't paying attention to
5  that identification.  I know he was one of the colleagues.
6  Q    Okay.  And then at the point where he -- prior to the
7  moment when he said book him -- that's your testimony,
8  correct?
9  A    Yes.
10       MS. MILLER:  Objection.
11       THE COURT:  Overruled.
12       MR. THOMPSON:  Okay.
13 Q    So prior to you heard that statement being made, did you
14 observe or see any of the officers making phone calls?
15 A    No.
16 Q    Did you see or observe them consulting each other?
17 A    Yes.  They were consulting each other but I didn't see
18 any phone call.
19 Q    Okay.  And then after he said those words, what then
20 happened?
21 A    I told my wife I'm going to jail and then she started
22 crying and I said, No, it will be fine.  They put the cuffs on
23 me and then I remember telling them the cuffs were like
24 really, really tight.  It was very embarrassing, you know, in
25 front of all of these people.  It was something I felt, like,

A. Toure - direct - Thompson                                    62

1    I didn't -- I wasn't guilty of committing any crime.  So they

2    threw the cuffs on me and put me in the back of their car.

3    Q    Do you recall which officer put handcuffs on you?

4    A    I don't remember at that point.

5    Q    Okay.  At the point that they put handcuffs on you, what

6    happened to your phone?

7    A    They told me that I needed to get off the phone.

8    Q    And did you follow those instructions?

9    A    Absolutely.

10            MR. THOMPSON:  Okay.  Your Honor, in terms of a

11   morning break, this may be a good time.

12            THE COURT:  Okay.

13            All right.  So jurors, we'll take our morning break

14   now for 15 minutes.  So we're going to have Freddie escort you

15   out to the area of the jury room and we'll let you know when

16   we're ready to resume in about 15 minutes.

17            Thank you, all.

18            (Jury exits.)

19            THE COURT:  Okay.  The jurors have left the

20   courtroom.

21            So I just wanted to update everybody.  They're still

22   doing the lobby investigation so they asked that everybody

23   remain on this floor.  You're free to use the restroom,

24   Witnesses can remain in the hallway but just don't go

25   downstairs at this time.

A. Toure - direct - Thompson                    63

1          MS. MILLER:  The court officer told me it was okay
2    to be on the floor but not the first floor.
3          THE COURT:  Right.  Correct.  Yes, exactly.  So that
4    is what I'm hearing as well.
5          And Mr. Toure, let me just advise you that now that
6    you're on the stand, you can't discuss your testimony with
7    anyone, not your wife, not your lawyer, until all the
8    examination is done but, of course, you can speak with your
9    wife about anything not related to your testimony.
10          THE WITNESS:  Understood.
11          THE COURT:  We'll see you all back here in a little
12    less than 15 minutes.  Thank you.
13          MR. THOMPSON:  Thank you.
14          THE COURT:  Let me just ask, when would the parties
15    like me to read the stipulation about Abdoulaye?  I can do it
16    after the direct is done.  I can do it during the testimony.
17          Do you just want to advise me, Mr. Thompson, when
18    you're ready?  I didn't want to interrupt your flow.
19          MR. THOMPSON:  I think we can either do it right
20    before we continue his direct or after I finish the direct.
21    Either one of those would be a good time.
22          THE COURT:  Okay.  Think about it.  Let me know.  I
23    don't have a preference.  It's your decision.
24          Thank you.
25          (Continued on next page.)

*Proceedings*                                                                    64

1                          (In open court.)

2                THE COURTROOM DEPUTY:  All rise.

3                (Judge NINA R. MORRISON entered the courtroom.)

4                THE COURT:  Okay.  Mr. Toure, you can come back up

5    here.

6                And let's bring in the jurors.

7                Mr. Thompson, when would you like me to read in

8    stipulation?

9                MR. THOMPSON:  In a minute, Your Honor, but I'd like

10   to request a sidebar.

11               THE COURT:  Hey, Freddie, can you hold off for one

12   sec?  We need a sidebar.

13               The jury is not here.  Can we just do it in open

14   court?

15               MR. THOMPSON:  We can do it just here.

16               Your Honor, I don't want to -- my client came in

17   after --

18               THE COURT:  Hold on one second.  If this is

19   something about Mr. Toure's testimony, I don't think we should

20   talk --

21               MR. THOMPSON:  It's not about his testimony.

22               THE COURT:  Okay.

23               MR. THOMPSON:  It's about what he overheard in the

24   hall.

25               THE COURT:  Okay.

*Proceedings*                                                            65

1          MR. THOMPSON:  He heard opposing counsel and the

2    defendant talking to the other witnesses and telling them what

3    he was testifying to.

4          THE COURT:  Okay.

5          Counsel.

6          MS. MILLER:  I did mention that -- I was kidding.  I

7    said:  You're a bad guy, to the sergeant, you know.  You

8    didn't listen to him.  I didn't really tell him.

9          THE COURT:  I mean I don't think there's any --

10   okay, go ahead.  Tell me.

11         MS. MILLER:  That's the gist of what I said to him.

12         THE COURT:  Okay.  All right.  I mean we do

13   sequester the witnesses, other than parties, for a reason, so

14   that their testimony isn't influenced.

15         It sounds like this is -- your representation is a

16   broad characterization of the tenor of the testimony, but I

17   think out of an abundance of caution it is best not to convey

18   even your own impressions of a witness's testimony to someone

19   who is about to testify.

20         Is counsel asking me to take any other action at

21   this juncture?

22         MR. THOMPSON:  Not at this time, but I mean the

23   description I heard was a little more specific than that.  It

24   was that:  He said that you refused to look at the document.

25         MS. MILLER:  I didn't say that.  That's not what I

*Proceedings*                                                                 66

1   said.

2              MR. THOMPSON:  Okay.  I'm willing to believe you.

3              THE COURT:  Okay.  So, we'll just leave it there for

4   now.

5              MR. THOMPSON:  We'll leave it there.

6              THE COURT:  Okay.

7              MS. MILLER:  I said that you were a bad guy, that

8   you, you know, didn't listen to him.  You know, just general

9   stuff.  You're a bad guy.

10             THE COURT:  Okay.  All right.  Let's refrain from

11  that going forward given anything about he said encroaches on

12  the reasons why we sequester the witnesses in the first place.

13             All right, thanks.  We'll bring in the jury now.

14             MR. THOMPSON:  Thank you.

15             THE COURT:  Thanks.

16             MS. MILLER:  We haven't made a decision about what

17  we're doing about the exhibit that was shown to the jury.

18             THE COURT:  Okay.

19             MS. MILLER:  But it was left up there for the entire

20  time that we were doing the sidebar.

21             THE COURT:  I know.  Okay, but I mean part of it

22  was -- hold on one second.

23             Let's get the jurors.  You can go ahead and get the

24  jurors.  We need to bring them in.

25             I went back and looked at the realtime and,

*Proceedings*                                                                 67

 1  obviously, putting it up there in the first place was

 2  plaintiff's counsel's error.  So I'm not putting that on you,

 3  Ms. Miller, but we had about ten questions and answers before

 4  you objected and asked for the sidebar.  And at that point I

 5  could have taken it, it was my suggestion to take it down at

 6  that moment.  We could have taken it down earlier.

 7          I think at this point, again, as I said, I'm going

 8  to leave it to you as to what remedy you want.  If you'd like

 9  to have it not be in evidence and have the jury disregard it

10  and I can instruct the jury that they saw an exhibit that was

11  improperly shown to them, that it's not in evidence, we can do

12  that.  And if they -- if you want to just leave it in, since

13  it was up for some period of time and cross examine him on it

14  and we can have it admitted, we can do that.

15          So, I'll leave it to you.

16          So, do you want to let me know before the cross

17  begins?

18          MS. MILLER:  I'd like to hear the rest of the

19  direct --

20          THE COURT:  Okay.

21          MS. MILLER:  -- and make a decision --

22          THE COURT:  Okay, that's fine.

23          MS. MILLER:  -- when I've heard the rest of the

24  direct.

25          (Jury enters.)

1     THE COURT:  Okay.  You can all be seated.  Thank you

2 for your patience.  I hope you had a good break.

3     And we'll now proceed when you're ready,

4 Mr. Thompson.

5     MR. THOMPSON:  Thank you, Your Honor.

6 EXAMINATION CONTINUES

7 BY MR. THOMPSON:

8 Q    Mr. Toure, I believe when we left off that we were

9 talking about the one officer directed the others to handcuff

10 you, correct?

11 A    Correct.

12 Q    Okay.  Tell me what happened immediately following that.

13 A    I got off the phone with my wife, then they cuffed me and

14 they put me in the back of their SUV.  And I asked them to

15 loosen up the cuffs a little bit.  It was a little too tight.

16     MS. MILLER:  Objection.

17     THE COURT:  Sustained.  I think this is an area

18 we're not getting into for purposes of this trial.

19     MR. THOMPSON:  Okay.

20     THE COURT:  The cuffing.  The fact that he was

21 cuffed, but not the nature of the cuffing.

22     MR. THOMPSON:  Yeah, we're not trying to elicit that

23 testimony.

24     THE COURT:  I understand.

25 BY MR. THOMPSON:

1    Q    So just tell me what happened next.  Where did they take

2    you?  What happened?

3    A    I believe they took me to the Port Authority jail at

4    first and booked me in there.

5    Q    Okay.  And then while you were in the Port Authority

6    jail, did anybody ask you any questions?

7    A    They let me make a phone call.  I called my wife.

8          And then I remember at some point, I'm not sure who

9    he was, some other officer came in and asked me if I knew

10   anybody in New York.  He said:  You don't seem like a bad guy,

11   so we're gonna let you go if you have an address in New York.

12   Because I thought I was actually going to be released, so I

13   think I gave them my uncle's address in Staten Island.

14   Q    Do you recall who that officer was, was it one -- any of

15   the three that --

16   A    It was somebody completely different.

17   Q    Okay.

18   A    Yeah.

19   Q    Did you notice anything special about him, insignia,

20   name, rank?

21   A    No.

22   Q    No, okay.

23          Okay.  So, then what happened next to you?

24   A    Then after that, like I said, I thought I was gonna go

25   home.  I thought I was gonna be released.  I stayed there a

1   little bit longer.

2          As the judge said, I'm not gonna get into details of

3   what happened, but it was just -- just me there, and then they

4   transferred me from --

5          THE COURT:  Just to clarify, it's fine for you to

6   talk about what happened in jail.  The only issue that's not

7   part of this trial is the nature of the handcuffing.  So

8   you're welcome to answer your lawyer's questions about what

9   happened after you got to the jail.

10          MR. THOMPSON:  Thank you, Your Honor.

11   BY MR. THOMPSON:

12   Q    Okay.

13   A    Okay.  So -- so, when they took me there I was going to

14   Africa, so obviously I had a T-shirt and a sports coat.  They

15   took my sports coat and my -- and my -- and my scarf.  And a

16   lot of the conversation was me telling them to give me a

17   jacket or something because I was really cold.  So that became

18   a big part --

19          MS. MILLER:  Objection.

20   A    -- of the conversation.

21          THE COURT:  Overruled.

22   A    So that became a big part of the conversation back and

23   forth, them trying to figure out to get me something.

24   Q    Okay.  And, again, were these the officers, the arresting

25   officers?

1   A    This -- I'm not sure.  I think it was probably the --

2   the -- the white male and another officer.  I think.  Because

3   from the cell I could see where they were sitting doing paper

4   work.

5   Q    Okay.

6   A    Because they did ask me a couple of questions when they

7   were filling out their paper work.

8   Q    Do you recall what they asked you when they were filling

9   out the paper work?

10  A    I -- I don't -- I don't remember.

11       I found it a little bit unusual.  They were at the

12  station asking me questions to kinda like help them fill out

13  the paper work.  I don't remember the actual questions.  The

14  only reason I remembered it because it seemed a little bit

15  unusual.

16  Q    Why do you say it seemed unusual to you?

17  A    In general, when you -- from what I imagine, what I've

18  seen, when you are locked up, you don't have any interactions

19  like that with the police while they're doing their own

20  report.  So, it just felt something out of the ordinary.

21  Q    To be clear, you've never been in that position before,

22  correct?

23  A    No.  I had never been in that position before.

24  Q    So, tell us what happened next.

25  A    So, I was there.  When the officer told me to give him

1  the address, I believe I made a phone call because they had --

2  they had a phone in the cell.  I believe I called my wife to

3  call my uncle to get his address because I didn't know it by

4  heart.  And then I think I give the address, and then I just

5  sat in there and just waited.  And to my surprise, they told

6  me that they were gonna send me to Queens Central Booking.

7  Q    Okay.  And was that that night or was that --

8  A    It was that night.

9  Q    Okay.  And were you at some point transported that night?

10 A    Yes, sir.

11 Q    Okay.  Tell us about that.

12 A    I remember it was -- it was in November, it was really

13 cold.  They gave me -- they gave me my sports coat, not my

14 scarf.  They put me in the back of the paddy -- the wagon, and

15 there was another inmate in there.  It took them quite a while

16 to come back to transport us.  I just remember I was really

17 cold.

18         And -- and then on the route to Queens Central

19 Booking, I remember just bracing myself because I wasn't --

20 they didn't put a seatbelt.  So every bump I was like -- you

21 know, I was handcuffed, but no seatbelt.  So that was

22 something distinctive that I remember, being very cold and

23 trying to hold myself straight to the thing.

24         And I got to Queens.  They did the fingerprint.  And

25 they put me in a cell.

1   Q    So at some point that evening or night you arrived in

2   Queens Booking?

3   A    Yes, that night; correct.

4   Q    Okay.  And then you said you were fingerprinted?

5   A    I think so.  I don't remember.

6   Q    Do you recall if they did anything else when they were

7   processing you?

8   A    No.  It was pretty, it was pretty forward.  They just, I

9   think, did the fingerprint.  They put -- put me in the cell,

10  the first cell with a lot of people.

11  Q    And did you see a judge that night?

12  A    No.

13  Q    No?

14  A    They told me that I was gonna see the judge that night

15  and leave, but there was so many people that I think the judge

16  ended up leaving at some point.  So they said that, you know,

17  we'll see the judge in the morning.

18            (Pause for technical difficulties.)

19            THE COURT:  You may proceed.

20            MR. THOMPSON:  Thank you, Your Honor.

21  BY MR. THOMPSON:

22  Q    So, how long did you end up staying in booking?

23  A    Say that again.

24  Q    How long did you end up staying in booking?

25  A    You mean in jail?

1   Q    Yeah, in jail.

2   A    Till -- till the next day.  I think I forgot.  I think I

3   left around maybe 11, 12.

4   Q    Okay.  So at some point did you -- were you presented to

5   a judge?

6   A    I didn't see a judge.  They brought -- I don't know if it

7   was a prosecutor or a public defender that came and talked to

8   me.

9          They asked me, they were like:  Listen, we willing

10  to get rid of the charge if you take disorderly conduct.  I

11  believe something like that.

12         I was like:  But I wasn't disorderly conduct.  I

13  didn't do....

14         So after that, they just put me in a different cell.

15  I didn't know the process.  They put me in a different cell,

16  gave me some paper work, and then they came and called me and

17  they told me I was free to go.  And with the paper work, with

18  the charges, but I didn't see a judge.

19  Q    Was there any point that you were walked into a courtroom

20  and asked how you pled to the charge?

21  A    I -- I didn't walk in a courtroom, but a lot of the

22  information is like -- I don't remember.  It was so much going

23  on, so many people.

24         I think we were in a cell where we were talking to

25  the judge over the phone, I believe, something like that.  I'm

1    not sure, but I know I didn't walk in a courtroom.  But I

2    think we talked to a judge over the phone.

3    Q    And so, do you think that judge asked you for a plea?

4              THE COURT:  I'm going to strike that question.

5              MR. THOMPSON:  Sorry.  Withdrawn.  All right.  Thank

6    you.

7    BY MR. THOMPSON:

8    Q    So, approximately when were you released?

9    A    Again, I'm not sure 'cause the whole thing was -- was a

10   lot going on, but probably between 11 and 1:00 p.m.

11   Q    That day?

12   A    Yeah.  It was early, either like late morning or early

13   afternoon.

14   Q    Okay.  Tell us what you did after that.

15   A    After I was released, I found someone that was standing

16   there.  I think I gave them some money for me to use the

17   phone.  So I called my wife.  I told her to call Uncle Lou —

18   because I didn't know Uncle Lou number by heart — and tell

19   Uncle Lou to come get me, that I was released.  And so he came

20   and got me.

21              Then I went to I think where they keep the evidence.

22   I don't know if it was Port Authority -- yeah, I think it was

23   Port Authority, to get -- because they had my passports.  They

24   had, you know, a couple of my belongings.  So I went and got

25   that.

*A. Touré - direct - Thompson*                          76

1          And then after that I went to Air France so they

2     could rebook me for the -- for the -- for the next -- for the

3     next day flight.  So, I did the rebooking at the airport, and

4     then I just booked the hotel and just went to sleep.

5     Q    Do you recall if you retrieved your sample?

6     A    No.  I was -- I still don't have the sample.  I was not

7     given the sample back.

8     Q    It was confiscated?

9     A    I -- they didn't tell me, but they didn't give it back.

10    They gave me my other belongings, but not the -- not the

11    sample, so....

12    Q    Okay.

13         THE COURT:  Just for clarity of the record, can you

14    elicit what you mean by "the sample"?

15         MR. THOMPSON:  Okay.

16    Q    By the sample:

17         MR. THOMPSON:  I was trying to be general.

18         THE COURT:  You can ask a general question.

19         MR. THOMPSON:  Okay.

20    BY MR. THOMPSON:

21    Q    So, at any point did you retrieve the taser?

22    A    No, I didn't.

23    Q    Did they tell you it had been confiscated?

24    A    They didn't tell me, but they didn't give it to me so I

25    assume it was.

1   Q    Okay.  You rebooked your flight to Air France, so then

2   you were able to travel then?

3   A    Yeah.

4   Q    You booked your, rebooked your flight on Air France and

5   then you were able to travel?

6   A    12, 13 -- yeah, the 14th, because I think I was arrested

7   the 12th, I got out the 13th, and I traveled the 14th.

8   Q    Okay.  Did there come a point where you had to retain

9   counsel?

10  A    Yes, for the specific charge.

11  Q    Okay.  And do you know what happened to that charge?

12  A    I retained counsel.  I was given the name of this law

13  firm that I hired, and they told me the case was dismissed,

14  like if I -- if I -- like, I was in Atlanta.  So they told me

15  that, I'm not really familiar with like legal terms, like

16  there was a way for them to dismiss the case if I didn't want

17  to -- I said, okay, that's fine.

18  Q    So if I'm understanding you correctly, you hired private

19  counsel and you had to pay them?

20  A    Yes.

21  Q    Okay.  And they took care of the case?

22  A    They took care of case for me, correct.

23  Q    And at some point they came to tell you that the case was

24  dismissed?

25  A    Yes.  They called me.  I was in an office in Atlanta.

1    They told me that day when they called me that day that they

2    were gonna get the case dismissed.

3    Q    Do you recall how long that was after your arrest?

4    A    No.  I don't recall.  I don't recall how long after the

5    arrest.  I don't remember.

6    Q    Do you generally have an idea if it was --

7    A    I don't remember.

8    Q    Okay.  All right.

9         So, when you flew back, when you rebooked your

10   flight, were you able to complete the business?

11   A    No.  So I was supposed to arrive in Conakry on the 13th,

12   and my business partner Martin was coming in on the -- on the

13   13th, as well, from Dubai.

14        He got there, but I didn't come in till the 15th.

15   Because the way the travel is from -- from JFK to Charles de

16   Gaulle is seven, eight hours.  Then with the -- with the

17   different time zones, you spend about five hours at the

18   airport, so you come in the following day.  So, if you leave

19   here on a Monday, you're not gonna arrive in Conakry till

20   Tuesday.

21        So when I left here on the 14th, I didn't make it

22   there till the 15th.  So I didn't get there the same day, and

23   at that point the meeting was done.  Martin was leaving like a

24   day or two after.

25        So, no.  I wasn't able to.

1  Q    Did you have any further conversations with the person
2  you were negotiating --
3           THE COURT:  Hold on one second.
4           You can say if you did or didn't have further
5  conversations, but don't describe or say what anybody said to
6  you in those conversations.
7           THE WITNESS:  Okay.
8           THE COURT:  So just answer the first question, which
9  is did you have any further conversations after you arrived.
10          THE WITNESS:  Okay.
11 BY MR. THOMPSON:
12 Q    Did you have any further conversations with the person
13 you were negotiating the transaction with?
14 A    Yes.
15 Q    Okay.  At some point did you -- were you able to complete
16 the sale?
17 A    No.
18 Q    No.  And at some point did you learn a reason why you
19 were not able to complete the sale?
20 A    Yes.
21 Q    Can you tell us what that was?
22 A    Yes.  We missed the meeting with the General Keita, and
23 at that point they had a lot going on and we had to reschedule
24 another meeting.  And the logistics just weren't working and
25 he ended up going with a different supply.  Because with these

1  things, you have a lot of people just waiting to supply

2  different equipment.  So they just ended up going -- because I

3  had to fly back to the U.S., you have local suppliers, you

4  have suppliers all over.  So, no.

5  Q    So why didn't they just reschedule your appointment?

6  A    The -- the -- the -- the logistic didn't allow for it.

7  You know, you usually have like one or two chances when it's

8  something urgent like that, they have Plan A, Plan B and Plan

9  C.

10       And also, you know, I had to tell them what

11  happened.  So, that could have been also a negative point.

12  Q    What do you mean when you say "something urgent like

13  that"?

14  A    They -- they -- they needed like different equipment.  So

15  they were ordering different equipment from other people.

16       So, my assumption was I didn't bring the sample.

17  The time to get another sample, would have shipped out, and

18  they knew I had gotten arrested.  So maybe they thought you

19  can't bring the sample from the U.S.  You know, they don't

20  know the laws here.

21  Q    Okay.

22  A    So I think that's -- that's what made the deal fall

23  apart.

24  Q    I just have a few more questions for you, Mr. Toure.

25       Can you tell me how this has affected your life,

1  this incident?

2  A    It was -- it was very embarrassing, first.

3         Second, it's every time I fly, it's -- it's

4  nerve-racking, even though I triple check everything.

5         Even when I don't have anything, when I'm going

6  through either Customs or regular security checkpoint checking

7  in, I'm like nervous.  And I was never like that before, but,

8  you know, it's -- it's -- it wasn't a good experience at all.

9  Q    When you say "nervous," can you tell us like just a

10  little nervous or what do you mean?

11  A    I get -- I get anxiety when I'm traveling just thinking

12  did I -- like did my son accidentally put a toy gun or

13  something, or did I leave something in my -- in my suitcase?

14  Or, you know, it's just -- it's just, you know, those

15  unreasonable thoughts you get when that type of situation

16  happen, you know, so....

17  Q    So what?

18  A    So it's a lot of anxiety when I'm traveling.

19  Q    Are you telling us you're afraid this could happen again?

20  A    Not necessarily afraid, like in a conscious way, but

21  subconsciously I'm -- I get anxious .  You know, I'm not

22  afraid of it -- it happening, but subconsciously I get anxiety

23  about the situation.

24  Q    And does that continue to this day?

25  A    Yes.

1  Q    Okay.  How has this affected your work and your family?

2  A    It's -- you know, it was very tough for my wife,

3  especially her.  It was -- she was very distraught, you know.

4        And same thing with her, every time I travel she

5  asks me a hundred-million questions, you know.  You okay?  You

6  make sure X, Y, Z?

7        You know, things that are not even related to --

8  to -- to -- to any equipments [sic], anything, she just wants

9  to make sure that I'm safe, so....

10        MR. THOMPSON:  One moment, please.

11        (Pause.)

12        MR. THOMPSON:  Mr. Toure, thank you.  I have no

13  further questions for you at this time.

14        THE WITNESS:  Thank you.

15        THE COURT:  Okay.  Cross-examination.

16        Oh, actually, sorry.  Let me read the stipulation

17  into the record.  Sorry.

18        So, Jurors, this is a stipulated fact related to one

19  area that Mr. Toure testified regarding, which is at issue in

20  this case.

21        Stipulated facts are evidence, but again whatever

22  weight you choose to give or not give this stipulation is up

23  to you.

24        On March 22nd, 2019, approximately eight months

25  before Mr. Toure was arrested, a federal judge in the Northern

*A. Toure - cross - Miller*                                          83

1    District of New York issued a written ruling in a case called

2    Avitabile versus Beach.  In that ruling, the federal court

3    found that New York State Penal Law Section 265.01, subsection 1,

4    which had made it a crime for any person to possess an

5    electronic dart gun or an electronic stun gun in the State of

6    New York violated the Second Amendment to the United States

7    Constitution and was, therefore, unconstitutional.

8            All right.  Ms. Miller, you may proceed when you're

9    ready.

10   CROSS-EXAMINATION

11   BY MS. MILLER:

12   Q    Good afternoon, Mr. Toure.

13   A    Good afternoon, ma'am.

14   Q    I'm going to be asking you some questions about the

15   testimony that you just gave.

16           First, I'd like to ask you some questions about the

17   Phazzer taser electronic stun gun that you carried into

18   New York from Georgia on November 11th, and then carried to

19   JFK Airport on November 12th, 2019.

20           A taser stun gun, the Phazzer taser was a stun gun,

21   correct?

22   A    I believe so.

23   Q    And the Phazzer taser stun gun shoots an electric

24   current, is that correct?

25   A    I believe so.

*A. Toure - cross - Miller*                                    84

Q    And the electric current is supposed to strike somebody, somebody's body, the targeted person's body, and it causes them to lose control of their movements, correct?

A    Something like that, yes.

Q    So the purpose of the taser electronic stun gun is to cause somebody to become disabled while they're still standing, correct?

A    That's not --

        MR. THOMPSON:  Objection to the term "disabled."

Q    Well, it causes them to lose control of their movements, right?

A    Temporarily, from what I read.

Q    And that's a form of paralysis, right?

A    I never heard paralysis used.

Q    But if you can't control your movements, that means that you can't walk away?

        MR. THOMPSON:  Objection.  The witness is not a doctor.

Q    Right?

        THE COURT:  Hold on a second.  I don't need a speaking objection.

        MR. THOMPSON:  Okay.  Objection.

        Mr. Toure, unless I sustain an objection, you can answer the question, but only to the extent you know.

        So if you don't know the answer to something, you

*A. Toure - cross - Miller*                                          85

1   can say you don't know.

2              If you do know or you have an understanding of

3   something, you can answer.

4              Okay?

5              THE WITNESS:  Okay.

6              THE COURT:  All right.

7              Go ahead, Ms. Miller.

8   BY MS. MILLER:

9   Q    Mr. Toure --

10  A    Yes.

11  Q    -- if somebody shoots the electric charge at you and hits

12  your body, you can't walk away, right, for seconds you are

13  unable to control your movement, correct?

14             MR. THOMPSON:  Objection.

15  A    There are some people that walk away from because they're

16  small charges.  We've seen even through the demo, there's a

17  lot of people that walk away from that.  It's not everybody it

18  incapacitates temporarily.

19  Q    The Phazzer taser stun gun that you were carrying to sell

20  to the police in Conakry, Guinea, sent an electric charge that

21  was designed to cause the target to become unable to control

22  their movements, correct?

23  A    Temporarily, correct.

24  Q    Okay.  And you also had cartridges -- let's just look at

25  your exhibit.

1          (Exhibit published.)

2          MS. MILLER:  Here we go.

3    Q    There are several cartridges in your case, right?

4    A    Correct.

5    Q    One of the cartridges, you put it in the stun gun, which

6    is right here in the middle, you put the cartridge in the stun

7    gun and you shoot it at the target and it sends out this

8    electric charge that causes the movement -- you can't control

9    your movements, right?

10         MR. THOMPSON:  Objection.  I'm un clear if she's

11   talking about --

12         THE COURT:  No, no, I don't need a speaking

13   objection.  I'm thinking.

14         Sustained as to form.

15   BY MS. MILLER:

16   Q    Does one of the charges, one of the cartridges when you

17   put it in the stun gun and shoot the stun gun at the targeted

18   person, does that particular cartridge send out an electric

19   charge?

20   A    Yes.

21   Q    And that electric charge is designed to do what we just

22   discussed, that is, cause the person not to be able to control

23   their movements, right?

24   A    You could put it that way, yes.

25   Q    Okay.  And another one of the cartridges had gas in it,

1    is that right?

2    A    Yes, a load of pepper.

3    Q    And you put that cartridge in the gun and you shoot the

4    gun at the person, and that gas is supposed to go in the

5    targeted person's face, right?

6    A    Not face, no.  You don't shoot at their face.

7    Q    All right.  Well --

8         THE COURT:  Just let him finish his answer.

9    A    The police -- the police uses it here, too.  It's almost

10   like -- like a mace, but you shoot mace from a distance.

11   Q    But the Phazzer taser stun gun has gas cartridges,

12   correct?

13   A    Some of them do, correct.

14   Q    And the gas cartridges are to go in the gun and shoot the

15   targeted person in the face, correct?

16   A    Not in the face, ma'am.

17   Q    And that -- let me just go back.

18        Do you remember giving sworn testimony, sir, on

19   June 22nd -- I mean June 8th of 2022 --

20        THE COURT:  Do you have a copy for me?

21   Q    -- a deposition?

22        THE COURT:  Counsel, did you bring a hard copy for

23   me as we discussed?

24        (Pause.)

25        THE COURT:  Okay.  You can proceed.

*A. Touré - cross - Miller*                                           88

1    BY MS. MILLER:

2    Q    And do you recall that you took an oath at that

3    deposition to tell the truth, just the same as if you were in

4    a court of law, right?

5    A    Yes.

6    Q    And do you recall --

7              THE COURT:  Just tell me the page before you proceed

8    with the question.

9    Q    -- being asked --

10             THE COURT:  Just tell me the page, so I can look at

11   it before you proceed with the question.

12             MS. MILLER:  Page 64.  I was incorporating that in

13   my question in just a minute.

14             THE COURT:  I know, but just before -- my practice

15   is to give it a look --

16             MS. MILLER:  Okay.

17             THE COURT:  -- before you ask the question.

18             MS. MILLER:  Okay.

19             THE COURT:  So just tell me what page you're going

20   to, so counsel and I can follow.

21             MS. MILLER:  Page 64 of your deposition.

22             THE COURT:  Okay.

23   BY MS. MILLER:

24   Q    Beginning at line 4, do you recall being asked the

25   following questions and giving the following answers:

1          Question:  Okay.  When you fire it, what happens?

2    What is discharged, if anything, from this Phazzer taser

3    electric gun?

4          Answer:  --

5          THE COURT:  Just let me ask you to read it slowly

6    and carefully because there were a couple words you changed

7    inadvertently.

8          MS. MILLER:  Did I?

9          THE COURT:  Yes.

10          MS. MILLER:  Okay.

11   BY MS. MILLER:

12   Q    When you fire it, what happens?  What is discharged, if

13   anything, from this Phazzer electric stun gun?

14          Answer:  There are different cartridges.  Some

15   cartridges have -- they don't have any -- any projectile, it's

16   just like gas.  Somebody is close to you.  Some of them have a

17   prong that --

18          Question:  What --

19          Answer:  A prong, prongs, like electric prongs.

20          Question:  Okay.  When the electric prong whatever

21   strikes somebody, what happens to the person it strikes?

22          Answer:  It incapacitates the person.

23          Question:  They can't move?

24          Answer:  They can move, but they don't have good

25   control of their movement temporarily for a few seconds.

*A. Toure - cross - Miller*                                          90

1          Question:  With the gas cartridge, does it knock

2   them down?

3          Answer:  No.  It's, basically, spraying taser in

4   somebody's face without being close.

5          Question:  --

6          THE COURT:  Let's just stop there because I think

7   for the purpose you were offering it, that's the relevant

8   portion, and probably more than you needed.

9          MS. MILLER:  I think there's one more question that

10  goes --

11         THE COURT:  I've ruled.  Let's move on to a question

12  of this witness rather than reading in the deposition

13  testimony.

14  BY MS. MILLER:

15  Q    Does it affect their being able to breathe?

16         THE COURT:  Ms. Miller -- oh, go ahead, I'm sorry.

17  I didn't realize you weren't reading.

18         Go ahead.

19  A    Yeah, like -- like mace, yes.

20  Q    So it's uncomfortable for them to breathe when they've

21  been sprayed with the gas in the face, right?

22  A    Yes.

23  Q    In fact, haven't people been known to die from being shot

24  with a taser stun gun?

25  A    I -- I've seen reports depending on, you know, are the --

1   the -- the different police departments and how long they used

2   it and the type of suspect they use it on.  I've seen reports.

3   Q    In fact, a taser electronic stun gun being shot at your

4   chest can cause you to have a cardiac arrest and kill you,

5   right?

6   A    If improperly used, yes.  A lot of things could kill you,

7   including tasers, but they're not meant for that purpose if --

8   if you have the training and you train the people to do it

9   properly.

10  Q    So, the stun gun, we can agree, could be a lethal weapon?

11  A    A fork could be a lethal weapon, of course.

12  Q    Have you ever been shot with a electronic stun gun?

13  A    No.

14       MR. THOMPSON:  Objection.

15  Q    It's painful, isn't it?

16       MR. THOMPSON:  Objection.

17  A    I don't know, I haven't been shot.

18  Q    Mr. Toure, you were very experienced in doing business in

19  Guinea, weren't you?

20  A    Yeah -- yes.

21  Q    I believe at your deposition I asked you a bit of your

22  history.

23       You were in the diamond business for six to seven

24  years involving travel to Guinea, Liberia and Sierra Leone,

25  correct?

*A. Toure - cross - Miller*                                              92

1    A    Yeah, Guinea mostly.

2    Q    And you also had citizenship in Guinea, correct?

3    A    Yes.

4    Q    And you have a home there?

5    A    Yes.

6    Q    And then you -- after you were in the diamond business,

7    you had a fuel company business called Black Gold, right?

8    A    I'd say they still have it.  It's still part of Black

9    Gold.

10   Q    And your company provided fuel mainly to the police of

11   Conakry, correct?

12   A    No, not mainly.  Mainly to a mining company.  We do

13   their -- it's called bunkering.  It's like fuel to the ships,

14   but we do sell to the police and the military as well.

15            THE COURT:  Can you spell -- what was that word you

16   said, bunkering?

17            THE WITNESS:  Yes, it's bunkering,

18   B-U-N-K-E-R-I-N-G.

19            THE COURT:  Okay, thank you.

20   BY MS. MILLER:

21   Q    One of your -- one of the customers that you had for your

22   fuel business was the Conakry police, correct?

23   A    We -- we -- we had a --

24   Q    Yes or no.

25            THE COURT:  No, no, just let him answer.

1          Go ahead.

2          MS. MILLER:  This is -- Your Honor, may I have a

3    little --

4          THE COURT:  He wasn't going on very long, just let

5    him get a sentence out and then you can get your next

6    question.  We're not in any rush.

7          Go ahead.

8    A    We had 'em for a very short period of time as clients.

9    Q    The company that you formed to sell the Phazzer taser

10   electronic stun gun to the police was called Safe Bet

11   Consulting, right?

12   A    Correct, but just a minor correction.  Safe Bet Express

13   LC was the company formed.  It was a non-emergency medical

14   transport, and then that turned into Safe Bet Consulting,

15   correct.

16   Q    So my question to you is that Safe Bet Consulting was a

17   company formed by you in 2016 to sell tasers and other types

18   of equipment used -- for use by the police in Conakry,

19   correct?

20   A    No, not correct.  That wasn't the purpose in the

21   beginning of forming.  It wasn't tasers specifically, it was

22   just various equipments [sic], but it wasn't formed for

23   tasers.

24   Q    All right.  I draw your attention -- I'm going to ask you

25   if on page 19 you were asked the following question --

1           THE COURT:  Give me just a second, please.

2           MS. MILLER:  Page 19, line 12.

3           THE COURT:  Okay.  Hold on one second, please.

4           (Pause.)

5           THE COURT:  Okay.  I don't have --

6           MS. MILLER:  Line 12.

7           THE COURT:  Hold on one second.  Just lines 12

8    through 16?

9           How much of this do you intend to read?  Because I

10   don't see it as necessarily within the scope of the last few

11   questions and answers.

12          What lines are you looking to read?

13          MS. MILLER:  I'm beginning on line 12.

14          THE COURT:  I know, but continuing through where?

15          MS. MILLER:  I'm going to read through line 6 on

16   page 20.

17          THE COURT:  Okay.  Based on my recollection of those

18   answers, I don't think this is proper impeachment.  So let me

19   have you lay a further foundation before we start reading in

20   long sections of the deposition testimony.

21   BY MS. MILLER:

22   Q    Was Safe Bet Consulting formed to sell equipment to the

23   military police and private entities?

24   A    Safe Bet Consulting d/b/a Safe Bet Express LC is the one

25   incorporated.  Safe Bet Consulting is a d/b/a of Safe Bet

1  Express LC.

2  Q    So, Safe Bet Consulting was formed in 2016 to sell

3  equipment to the police and the military, correct?

4  A    And private also, but I don't recall the 2016, those

5  dates.  I don't remember, frankly, when.

6  Q    And was Safe Bet Consulting formed to sell this type of

7  equipment to the police and the military police to aid them in

8  controlling riots in Guinea?

9  A    It wasn't just to control riots.  We sold ponchos for the

10  rain.  We sold boots, right, rain boots.  We sold medical

11  equipment.  So, it wasn't just for crowd control.

12  Q    I just asked you, my question to you is like a yes or no.

13  A    So no, I'm sorry.

14  Q    It was not formed to sell equipment to the military

15  police and police to control riots?

16  A    No, not riots only.

17         MS. MILLER:  Then I'd like to go back to page 19.

18         THE COURT:  I think he just said "not riots only."

19  I think first he gave a longer answer.  Then you directed him

20  to give a yes or no, he gave you a no.

21         But if there are additional things you want to

22  elicit, you can ask him.

23         MS. MILLER:  Well, he answered no.  Am I not --

24         THE COURT:  I heard the testimony.  Let's lay a

25  different foundation.  This is not proper impeachment.

1          And I don't think these are disputed facts.  I think

2    there just may be some misunderstanding from the witness as to

3    what you're asking him about.  So you may just have to reask

4    it to get those answers.

5    BY MS. MILLER:

6    Q    Mr. Toure, had you formed contacts with the police

7    department in Conakry while you were in the business of

8    selling fuel?

9    A    Yes.

10   Q    And was one of those contacts that you had the Minister

11   of Security in Guinea, Albert Camara?

12   A    Can you repeat that question?

13   Q    Was one of the contacts that you formed in Guinea that

14   you were gonna use -- I don't know the exact wording of the

15   last one -- but was one of the contacts that you formed in

16   Guinea the Minister of Security, Albert Camara?

17   A    Not originally, no.  Later, yes.

18   Q    I didn't ask you originally.

19          I just said was one of the contacts that you formed

20   Albert Camara?

21   A    One of the contact, yes.

22   Q    Okay.

23          THE WITNESS:  Can I explain that, Judge?

24          THE COURT:  Hold on one second.

25          So the answer is yes, he was one of the contacts you

1   eventually formed?

2          THE WITNESS:  I met him before he was that.  He was

3   the Minister of Education.

4          THE COURT:  Okay.

5          THE WITNESS:  So we had a relationship before he

6   became Minister of Security.

7          THE COURT:  Okay.  That's responsive to the

8   question.

9          Go ahead, Ms. Miller.

10  BY MS. MILLER:

11  Q    Was he the Minister of Security?

12  A    Afterwards, yes.

13  Q    Was he the Minister of Security in 2019?

14  A    I'm not sure 'cause he -- he wasn't in his post.  He was

15  the Minister of Education, then he became Minister of Security

16  very shortly.  So, I don't know if that's the timeframe.

17  Q    And was the Minister of Security in charge of all the

18  police departments throughout Guinea?

19  A    Yes, ma'am.

20  Q    And were you also in contact with a Mr. Keita, who was

21  the Director of Special Intervention for riots?

22  A    Yes.

23  Q    And were you also an honorary advisor to the first lady

24  of Guinea?

25  A    Yes.

1   Q    And was doing business with the police selling them

2   weapons, was that all about relationships and connections as

3   opposed to your background?

4   A    I wasn't selling weapons, ma'am.

5   Q    I'm sorry?

6   A    I wasn't selling weapons.  I was selling equipment.

7   Q    You do not believe that an electronic stun gun is a

8   weapon?

9   A    No.

10  Q    Have you ever reviewed the laws of New York?

11  A    Yes.

12  Q    Have you seen statutes that specify that a taser, a

13  weapon -- an electronic stun gun is a weapon?

14  A    I'm -- I'm not sure, but from my understanding they

15  weren't considered a weapon.  And the question asking if I was

16  selling weapon make it seem like I'm like an arms dealer

17  selling weapons, but I wasn't selling weapons.

18  Q    Well, you said you'd done a lot of research on this.

19        In that research, didn't it disclose the fact that a

20  taser was a weapon?

21  A    I -- I saw different classification.  I don't -- it could

22  have been a weapon, but, you know, maybe in a different

23  context the way I'm -- like, the question seem like guns and

24  grenades when you're talking about weapon, not like knives and

25  tasers.

1   Q    Mr. Toure, you and your partner, you've described your

2   partner Martin, had previously sold LRADs to the Conakry

3   police, right?

4   A    Correct.

5   Q    And an LRAD is a long range accoustical device, right?

6   A    Correct.

7   Q    And an LRAD sends out a beam, a loud noise, correct?

8   A    Correct.

9   Q    And that beam is -- was intended to be used by the

10  Conakry police to control riots, right?

11  A    Not the beam, the communication part of it.  I can

12  explain, if you want me to.

13  Q    Well, the beam -- I believe you testified --

14         THE COURT:  Hold on.  Go ahead, sorry.  My

15  apologies.

16  BY MS. MILLER:

17  Q    I believe you testified on direct that it was to control

18  crowds.

19         Do you remember that testimony?

20  A    The communication part of it, yes, not the beam part of

21  it.  I can explain, if you want me to.

22  Q    But it does emit a loud -- a loud beam that can cause

23  deafness, right?

24  A    I doesn't cause deafness, but it is part -- it's --

25  it's -- it's an uncomfortable sound.  It is part of the

1  application of the LRAD, but it's not the main part.

2  Q    So one of the things that the LRAD that you sold to the

3  police does is it emits this loud beam of sound, correct?

4  A    It does, correct.

5  Q    And the reason that the Conakry police were buying these

6  LRADs from you was to control the riots, right?

7  A    Yes.  For the communication purposes, correct.

8  Q    You also sold drones, correct?

9  A    We -- we -- we sold -- I don't remember, but it was --

10 Q    Yes or no.

11 A    It wasn't a big amount.  Yes.  Yes, we did.

12 Q    Incidentally, did you possess a gun permit in Georgia

13 where you lived?

14 A    I have a gun permit in Georgia.

15 Q    Did you possess one on November --

16       THE COURT:  I think he was trying to answer your

17 question.

18       So, hold on one second.  Ms. Miller, sometimes with

19 less-experienced witnesses they don't always understand what

20 you're asking.  So just give him a chance to answer, and you

21 can always do a follow-up if it wasn't responsive.

22       MS. MILLER:  Thank you, Your Honor.

23       THE COURT:  Go ahead.  Just start again.

24 BY MS. MILLER:

25 Q    Did you possess a gun permit in Georgia in November of

*A. Touré - cross - Miller*                                    101

1  2019?

2  A    I have a gun permit.  I -- I don't know if I had it then.

3  I'm -- I might have or I probably had it right after.  I don't

4  remember.

5  Q    All right.  Going to page 60.

6           THE COURT:  Hold on one second.  Can I see counsel

7  at sidebar, briefly?

8           (Sidebar held on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                                102

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4          THE COURT:  I hesitate to interrupt your

5    examination, but just in the interest of making sure that I'm

6    doing my job of managing the jury's time, I'm not sure that I

7    understand the relevancy of all of these details about his

8    business, other weapons he sold.

9          This is not something that was known to Officer

10   Cassino at the time.  I don't know what this has to do with

11   the false arrest claim when he had a gun permit in Georgia.

12         What does this have to do with the issues the jury

13   has to decide?

14         MS. MILLER:  It has to do with the fact that he was

15   a very sophisticated businessman.  He had sold weapons before.

16   I believe he -- I am gonna elicit further testimony that when

17   he sold the LRAD, he shipped it.  And this time he decides to

18   take a taser stun gun on a trip to New York City.

19         THE COURT:  So, what does that have to do with the

20   false arrest charge, to the reasonableness of her belief that

21   he committed a crime?

22         MS. MILLER:  Because he's put in all this evidence,

23   Your Honor, that he did all this research, that he -- he

24   checked in the TSA.  He did all of this background, which is a

25   way of saying that I am a good citizen, I didn't do anything

1    wrong.  I had -- I should have been able to carry this weapon.

2    I believed I could carry this weapon.

3           But, in fact, I think I should be able to counter

4    that impression that he's given to the jury by showing he was

5    a very sophisticated businessman and he knew that these were

6    weapons that could be extremely harmful.  And he could have

7    shipped it, but he decided to run the risk of bringing it to

8    New York City without ever having checked with local law

9    enforcement.

10          THE COURT:  Okay.  And I'd like --

11          MS. MILLER:  And I think I should be --

12          THE COURT:  Hold on.  Hold on.  Hold on.

13          I'm going to direct you to focus your examination on

14   a prior history of shipping the weapons.

15          On redirect counsel can always elicit, if he wants

16   to, why he chose not to ship the weapon, why he chose to carry

17   it for purposes of this meeting.

18          But I don't want any further long testimony about

19   the nature of other things that he sold in Guinea, whether

20   those things were dangerous, whether they hurt people.  That's

21   inappropriate for purposes of what the jury has to decide.

22          But given that there was some direct testimony about

23   the nature of his business, I've allowed you a lot of leeway

24   to get into other things, but we're done with that now.

25          So just on the shipping issue versus carrying it,

*Sidebar* 104

1    you can inquire as to that.

2            MS. MILLER:  Okay.

3            THE COURT:  Okay.  Thank you.

4            (Sidebar discussion concluded, proceedings

5    continued.)

6

7            (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION

2    BY MS. MILLER:   (Continued.)

3            THE COURT:  So the last question is withdrawn.  You

4    may proceed, Ms. Miller.

5    BY MS. MILLER:

6    Q    The LRAD you previously sold to the police in Conakry,

7    Guinea, you shipped those, correct?

8    A    Correct.

9    Q    And you shipped the sample to Conakry, Guinea too,

10   correct?

11   A    Correct.

12   Q    And in this case, you decided that you were going to

13   bring the Phazzer taser electronic stun gun with you from to

14   Georgia to the City of New York, correct?

15   A    Correct.  The LRADs were very heavy, 200 pounds.

16   Q    What you brought with you to show that you lawfully

17   possessed this weapon were two documents that your counsel

18   previously introduced.  One of them is Exhibit 11.  It's a

19   document from the bureau of alcohol -- I'm sorry.  It's a

20   document from U.S. Department of Transportation dated

21   April 28, 2016.  Do you see that?

22   A    Yes, ma'am.

23   Q    This document simply says that a taser is not a hazard

24   Class 1 material, correct?

25   A    Correct.

Toure - Cross - Ms. Miller                    106

1          MR. THOMPSON:  Your Honor --

2          THE COURT:  Hold on one second.  Is that an

3    objection?

4          MR. THOMPSON:  Yes.  I think counsel misspoke.  I

5    don't think I used this exhibit previously.

6          THE COURT:  Which exhibit number is this?

7          MR. THOMPSON:  11.

8          MS. MILLER:  Did I misidentify it?

9          THE COURT:  Yes.

10         MS. MILLER:  It's Exhibit 11.

11         THE COURT:  Exhibit 11, I think, has not yet been

12   previously used.

13         MR. THOMPSON:  He didn't testify to this exhibit

14   earlier.

15         THE COURT:  All right.  I think previously the one

16   that was used there was a DOJ letter that was Exhibit 6; is

17   that correct?

18         MS. MILLER:  I'm sorry.  Exhibit 6 and 11 I thought

19   were in.

20         THE COURT:  Okay.  Ms. Miller, you're free to use 11

21   if you want to offer it but you need to lay a foundation for

22   it and see if the witness is familiar.

23         MS. MILLER:  I have Exhibit 11 was the third one

24   introduced, U.S. Department of Transportation document.

25         THE COURT:  That seems to be confirmed in my notes,

1    as well.

2                MR. THOMPSON:  You're right.  I have it in the pile.

3                THE COURT:  Let's go back to 11.  Mr. Toure, if at

4    any time you need to see a full copy, you can request it and

5    someone will give you a hard copy.   Counsel is free to

6    inquire with what's on the screen.  Go ahead.

7    BY MS. MILLER:

8    Q    Mr. Toure, this document is not addressed to you, is it?

9    Your name doesn't appear anywhere on it?

10   A    No.

11   Q    It's dated three years before your trip to the New York

12   with the electronic stun gun, correct?

13   A    Correct.

14   Q    And it has nothing to do with who lawfully possesses the

15   electronic stun gun, correct?

16   A    Say that again.

17   Q    This document has nothing to do with lawful possession of

18   an electronic stun gun, correct?

19   A    I believe it did.

20   Q    And what about this says that someone can lawfully

21   possess an electronic stun gun?

22   A    It weren't exactly said here, but on the not regulate as

23   hazard Class 1 material, that compares to what I read in Air

24   France with the regulations in Air France and flying.  That

25   document was important for that.  It was one document that

1   made the -- not be in the regulated as a hazard.  When you

2   look at the airline policy, it was co-related that way for me,

3   at least.

4   Q    But this had to do with shipping, right?

5   A    I believe shipping and airplane as well, air, air

6   transportation.

7   Q    It didn't say anything about carrying an electronic

8   electronic stun gun, does it?

9   A    Carrying on your person, no.

10  Q    Thank you.  And the other document you brought with you

11  to New York, Exhibit 6, to show I guess to the airlines, was

12  the document from the Bureau of Alcohol Tobacco Firearms and

13  Explosives, and that's a letter to Mr. Steven Abboud, right?

14  A    Yes, ma'am.

15  Q    Your name doesn't appear anywhere on it, correct?

16  A    No.

17  Q    And this is a letter dated August 29, 2011, correct?

18  A    Correct.

19  Q    That was eight years before your trip, correct?

20  A    Yes, it's my supplier.

21  Q    Looking at the last paragraph on this page, the last

22  sentence, it says, we also advise that you consult with local

23  law enforcement authorities to make certain there are no

24  restrictions based on state laws or local ordinances that

25  could impact your manufacturing and sales activities.

Toure - Cross - Ms. Miller                     109

1             Do you see that?

2   A    Yes, ma'am.

3   Q    Did you consult the New York City Police Department

4   before you traveled to New York with that electronic stun

5   gun --

6   A    I wasn't --

7             THE COURT:  Let her finish the question.

8             THE WITNESS:  Sorry.

9   Q    Before you traveled to New York with the electronic stun

10  gun?

11  A    I didn't because I wasn't manufacturing or selling.  So I

12  didn't find it necessary for me.  I thought that was --

13  Q    Did you attempt to contact the Port Authority Police to

14  find out if you could travel to JFK with an electronic stun

15  gun?

16  A    Not the Port Authority, no.  I thought TSA was the people

17  in charge.

18            THE COURT:  Mr. Toure, just so you know, after

19  cross-examination is done your lawyer has a chance to ask

20  additional questions to elaborate on any answer.  If you can't

21  answer something with yes or no, you can.  If you think you

22  need ask for clarification or give some additional

23  explanation, you can.  But I just want you to know there will

24  be an additional chance for you to explain, if necessary.  Go

25  ahead, Ms. Miller.

1   Q    You also testified that you did a Google search, correct?

2   A    Correct.

3   Q    And that you learned that a federal judge had held that

4   Penal Law Section 265.01 sub one was unconstitutional; is that

5   correct?

6   A    I didn't know the actual penal law, but I know that a

7   judge had stricken down the New York law that was in

8   existence.

9   Q    You never brought that Google search to New York with

10  you, did you?

11  A    No, I didn't.  I had it on my phone after my wife sent it

12  to me and I showed it to the officers.

13  Q    Are you telling this jury that the Google search you're

14  talking about is the text that your wife sent to you?

15  A    If I could explain.

16  Q    I'm just asking if you are saying that the Google search

17  that you testified to is the same as the text that your wife

18  sent to you, yes or no?

19          THE COURT:  If the search or the result of the

20  search?  What are you asking him?  I'm confused by the

21  question, as well.

22          MS. MILLER:  Maybe I should do my question over.

23          THE COURT:  That might be helpful.

24  Q    You testified you did a Google search, correct?

25  A    Correct.

Toure - Cross - Ms. Miller                    111

1   Q     Did you do that Google search before you came to

2   New York?

3   A     Yes, ma'am.

4   Q     And you didn't bring that Google search with you,

5   correct?

6   A     No.

7   Q     And that Google search contained what?

8   A     The Google search that I did in Atlanta before I got

9   here, it was the same ruling but just it was an article on

10  saying that now in New York you can carry that.  You can't be

11  arrested for Phazzer.

12  Q     So the Google search you did was virtually identical to

13  the text that your wife sent to you?

14  A     My wife sent me the ruling.  The Google search was an

15  article.  My wife sent me a ruling with the 262-1 penal code

16  to show the actual law.

17  Q     In the search that you did there was no actual decision,

18  correct?

19  A     There was a decision.  It was an article.  Somebody had

20  written an article about the decision.

21  Q     So you Googled an article about a decision; is that

22  right?

23  A     Correct.

24  Q     And you didn't bring that article with you to New York?

25  A     I didn't.

1  Q    And you don't know what the name of the decision was,

2  correct?

3  A    At that time I didn't, but my wife sent it to me after.

4  Q    And you didn't bring the decision with you?

5           THE COURT:  Let's move on.  I think we've gone over

6  this.

7  Q    Do you know if the federal judge's decision stated that a

8  particular statute was unconstitutional?

9           THE COURT:  Does he know now or did he know in

10 November 2019?

11          MS. MILLER:  I'm trying to find out what it is that

12 he is testifying he understood from the article.

13          THE COURT:  I just wanted to fix the time frame

14 about what he understood from the article back at the time of

15 the event or now.  That was the only clarification I wanted

16 you to make.

17 Q    At the time of the event when you were coming to

18 New York, did you know the name of the decision?

19 A    I didn't know the name of the -- I didn't know the name

20 of the decision, no.

21 Q    Had you ever seen a copy of the decision?

22 A    Before I came to New York?

23 Q    Yes.

24 A    No.  I don't remember if it was an article.  I don't

25 remember that, no.

Toure - Cross - Ms. Miller                    113

1   Q    So you relied on a Google search article.  Do you know

2   who the publisher of that particular article was?

3   A    I forgot.  I remember it was a pretty reputable some law

4   journal or something that I've seen in the past.

5   Q    What was the name of that law journal?

6              THE COURT:  I think he just said he doesn't

7   remember.  Let's move on, please.  We've been doing this area

8   for a while.

9   Q    When you said you've seen it in the past, were you

10  researching on a particular legal web site like Westlaw or

11  Lexis?

12  A    I don't remember what I was researching, but I'm familiar

13  because I read a lot of different articles and news about new

14  laws, new rulings, stuff like that.  I remember them being

15  very reputable.  So when I read that specific decision, you

16  know, I thought I could trust them.

17  Q    I thought you said you didn't read the decision.

18             THE COURT:  Ms. Miller, we're done with this area,

19  please.  I've advised you a few times.  Let's move on.

20  Q    When you arrived in New York, you went and stayed at a

21  hotel with the electronic stun gun, correct?

22  A    Yes, ma'am.

23  Q    And then you went to the airport with the electronic stun

24  gun, correct?

25  A    Yes, ma'am.

Toure - Cross - Ms. Miller                    114

1   Q    And when you went to check it in in the checked luggage

2   at Air France, the ticket agent took your luggage and then you

3   informed her that you had the Phazzer taser electronic stun

4   gun in the luggage, right?

5   A    Yes, ma'am.

6   Q    And somebody else came and asked you about it?

7   A    Not at first.  It was just her.

8   Q    You said there were two ticket agents at the counter at

9   Air France, correct?

10  A    Yes, but the other guy wasn't at the counter.  He was

11  standing on the side.

12  Q    Did the ticket agent, or one of the two ticket agents,

13  tell you that you couldn't check an electronic stun gun in

14  their checked luggage?

15  A    No, she didn't say that.

16  Q    Going to page 90.

17          THE COURT:  Just a second.

18  Q    Line 17.  Do you recall --

19          THE COURT:  Ms. Miller, hold on.  Just one second.

20  What line did you say?

21          MS. MILLER:  At the end of the testimony would be

22  the top at 91, line one.

23          THE COURT:  What line were you starting on on

24  page 90?

25          MS. MILLER:  17.

1       THE COURT: You can proceed.

2    BY MS. MILLER:

3    Q    Do you recall being asked and answering the following

4    question.

5           Question:  Now, after the supervisor came and spoke

6    to you, what did he tell you he was going to do?

7           Answer:  I asked him to check out his site.  He told

8    me that I couldn't transport that on the plane.  I told him

9    that it was to check out the TSA and also the Air France that

10   I looked up before I flew, that it actually allows me to get

11   that and he was confused.  After a while he said let me call

12   the police, the Port Authority.  I told him to call the TSA.

13          THE COURT:  Hold on.  I think you misread that last

14   part there.  I just want to be sure if you're reading that

15   back it's accurate.  Line 25.

16   Q    So he told you you couldn't --

17          THE COURT:  Hold on.  You can keep reading and

18   finish the answer.  Just read where you said I told him to

19   call the TSA.  It should say I asked him to call the TSA.

20          MS. MILLER:  He called the Port Authority instead of

21   the TSA.

22          THE COURT:  Just start again, "after a while he

23   said" so the complete answer is in there.

24          MS. MILLER:  Where do you want me to start?

25          THE COURT:  Line 24, "after a while he said".

1  Q    After a while he said, let me just call the police, the

2  Port Authority.  I asked him to call the TSA.  He called the

3  Port Authority instead of the TSA.

4           THE COURT:  Yes.

5  Q    Does that refresh your recollection, sir, that the ticket

6  agent told you before he called the police that you couldn't

7  check the taser on the plane?

8  A    Yes.  I also mentioned he was confused.  So he wasn't

9  very clear that he knew, so he decided just to call a higher

10  authority to make the decision.  He was confused.  I said that

11  in my deposition.

12  Q    My question to you, sir, is does it refresh your

13  recollection that he told you you couldn't check the taser in

14  your checked luggage on the plane?

15  A    That was part of the conversation, correct.

16  Q    Thank you.  Now when you told the checked agent that you

17  had a Phazzer or taser stun gun in your luggage, was that

18  because you knew the luggage was going to be scanned before it

19  went on the plane and they would see something that looked

20  like a gun?

21  A    That wasn't a thought in my mind.  It actually was my

22  wife's idea because originally, it's like okay if nothing

23  comes up we did all the research, everything is legal.  It's

24  fine.  My wife suggested that I show it in Atlanta and I

25  showed it in New York, as well, so they know I have a taser in

Toure - Cross - Ms. Miller                    117

1   my checked bag.

2   Q    Now, you said the Port Authority police were called and

3   two officers arrived, correct?

4   A    That's right.

5   Q    One was a male and one was a female, correct?

6   A    Yes, ma'am.

7   Q    And the female was Chelsea Cassino, correct?

8   A    I believe so.  It's been a long time.  I believe so.

9   Q    And the two officers were both in uniform?

10  A    I believe so.

11  Q    And they had identity on them that said Port Authority

12  Police, correct?

13  A    I believe so.

14  Q    And you were asked by one of the officers if you had a

15  gun, correct?

16  A    Correct.

17  Q    And you responded that you had a Phazzer, correct?

18  A    Correct.

19  Q    And did the officers ask you to open the suitcase?

20  A    Yes, they did.

21  Q    And did you open it?

22  A    Yes, I did.

23  Q    And how did you go about opening it?

24  A    I just put it on the floor and opened it.

25  Q    Was there a latch?

Toure - Cross - Ms. Miller                    118

1    A    On the --

2    Q    Did you flip a latch in order to open it?

3    A    The suitcase or the taser carrying case?

4    Q    The taser was in another suitcase, correct?

5    A    It was in another suitcase, yes.  I had a lock on the

6    suitcase.  I took the lock off the suitcase, I opened it, I

7    retrieved the box that the taser was in, and I opened it for

8    them.

9    Q    And inside was the taser and the cartridges, correct?

10   A    Correct.

11   Q    And after the officer, Chelsea Cassino, saw the stun gun

12   and cartridges, did she summon a supervisor?

13   A    Not right away.

14   Q    What happened next?

15   A    They asked me what I was doing with it and that's when I

16   explained to them, as you referenced, what I do.  I told them

17   what I do, that it was a sample for the police.  So we had a

18   conversation before they called the supervisor.

19   Q    They were asking you what you were doing with it?

20   A    Yes.  They asked me what I was doing with it, where I was

21   traveling to, just the routine questions.

22   Q    What did you tell them?

23   A    I told them it was a sample for the police in Guinea.  I

24   explained to them that I did all the research, I have all the

25   documentations, and I don't remember exactly verbatim what we

Toure - Cross - Ms. Miller                          119

1   exactly discussed, but I was explaining to them what the

2   Phazzer was for.

3   Q    It was for the police to control riots in Conakry, right?

4   A    Yes.

5   Q    And then you said a supervisor, who was a black male in

6   uniform with a mohawk haircut, arrived, correct?

7   A    Correct.  They called him, yes.

8   Q    He also was in uniform, correct?

9   A    I believe so.

10  Q    And what did you tell him about why you had the taser?

11  A    The same thing I was telling the officers.  He was more

12  engaged with them than me, and I was still talking to him but

13  he was looking at them and talking to them.  But I told him

14  the same thing, what the taser was for, it was a sample for

15  the military.  I showed him all the documentations and

16  everything else.

17  Q    Is that everything you said to him and he said to you?

18  A    I mean it was a conversation.  I don't remember exactly

19  everything.  If you refresh my memory of something, I can

20  confirm.

21  Q    Did you show him anything?

22  A    Yes.  I showed him all the paperwork.  And I remember

23  the, if that's the thing, I remember feeling like these guys

24  think I'm a criminal or something.  So I'm just showing them

25  all my credentials and everything, yes.

Toure - Cross - Ms. Miller                    120

1          THE COURT:  When you say credentials, what do you

2     mean by that?

3          THE WITNESS:  I helped the First Lady in Guinea, who

4     passed away.  She has a foundation where she helps children

5     that were premature.  So in that capacity, I help her get like

6     medical equipment and things like that.  So I try to show good

7     faith that I wasn't the criminal.  They give me an honorary

8     badge that I showed them, yes.

9     BY MS. MILLER:

10    Q     So you showed them some badge that the First Lady gave

11    you?

12    A     Yes.

13    Q     Did you have a license to carry a weapon in New York?

14    A     No.

15    Q     How long was your meeting with the police from the time

16    they arrived until the time you were placed in handcuffs and

17    taken from JFK airport?

18    A     I don't remember the exact time frame.  It wasn't a very

19    short meeting.  It wasn't short, but it wasn't a long meeting

20    either.

21    Q     Would you say 15 minutes?

22          THE COURT:  Just let him finish.

23    A     All I remember at that time, you know, I was just

24    explaining.  So I couldn't really give you a time frame.  I

25    don't want you to hold me to that.  It wasn't extremely long

Toure - Cross - Ms. Miller                    121

1    but it wasn't short.  They didn't arrive and just arrest me,

2    but we also didn't spend a lot of time there.

3    Q    Would it be fair to say that it was less than 30 minutes

4    from the time the police arrived until the time you were taken

5    away in handcuffs?

6    A    I couldn't tell you the time frame of that.  Probably

7    definitely less than 30 minutes.

8    Q    You talked about a telephone call with your then fiancee,

9    Kelli?

10   A    Yes, ma'am.

11   Q    And when did you make that phone call?

12   A    I don't remember specifically because I was talking to

13   her almost the whole ride to the airport.  So at some point I

14   think when I was checking in I probably hung up the phone and

15   then when the whole commotion -- not the commotion, but the

16   whole issue came up, I called her to tell her that there was

17   an issue with Air France.

18            Then we kept texting and calling back and forth.  So

19   I couldn't give you a specific time frame.  But within the

20   time I arrived until the time I was arrested, we were on and

21   off the phone texting or talking.

22   Q    So when the police arrived, you were on the phone?

23   A    I probably was on the phone.  I'm not sure.

24   Q    They didn't tell you to put the phone down?

25   A    I'm not sure if I was on the phone when they arrived or I

1  called her when they arrived and I was talking to them.

2          THE COURT:  Ms. Miller, we're just about at the

3  lunch break.  Let me know when a good stopping point would be.

4  If you want to finish this area, but let's stop in the next

5  couple of minutes.

6  Q    I'm trying to understand what you were doing here, Mr.

7  Toure.  So you were talking to your wife on the phone, the

8  police are there asking you questions, and you continue to

9  talk and text to your wife while the police are there asking

10 you questions about why you were at JFK with an electronic

11 stun gun?

12 A    Yeah.  Like I said, I don't know if she was on the phone

13 when they arrived at that point, but I do remember calling her

14 within interaction with the police and they didn't tell me to

15 put the phone down.  They didn't tell me to get off the phone

16 or anything like that.  They knew I was talking to my wife.

17 Q    Did there come a time, Mr. Toure, when you were asked --

18 when you were told that you were going to be arrested?

19 A    Yes, that's when I hung up.

20 Q    Did you ask to make a phone call to your wife?

21 A    Say that again.  I don't understand the question.

22 Q    After you were told that you were going to be arrested,

23 did you ask to make a phone call to your wife or fiancee?

24 A    I was on the phone with her and they told me I was

25 getting arrested.  I said okay, babe, I'm going to call you

1    from the jail.  I hung up.  When they transported me to the

2    Port Authority jail she's the first person I called.  Correct.

3            THE COURT:  We're going to break for lunch now.

4    We'll resume with cross-examination after lunch.  Ladies and

5    gentlemen, let me tell you about the logistics for lunch.  A

6    couple of things.

7            First, before I get to that, you may have noticed it

8    got a little warmer in here.  My apologies.  We have a bit of

9    a Goldilocks problem with the temperature in the courtroom

10   sometimes.  The other day it was freezing cold.  We asked them

11   to make it a little warmer.  They said it wasn't corrected.

12   We didn't want to interrupt the trial for that, but we're

13   going to try and work on that at lunch and hopefully make it a

14   little more comfortable.

15           Second, security is working still on this continued

16   investigation on one area of the lobby.  You're going to be

17   able to leave the building for lunch.  There's going to be a

18   designated entrance and exit.

19           Freddy is going to take you back to the jury room to

20   get your things, if you need them.  You'll be able to leave

21   the building and there will be an area.  Freddy will walk you

22   down there.  When you're coming back in, if there's any issue

23   just say that you're jurors on Judge Morrison's trial.

24           You should have your juror badges and they'll let

25   you back in and make sure you get back up here.  We'll make

Toure - Cross - Ms. Miller                      124

1    our lunch a little longer in case there's delays getting in

2    and out.

3              So it will be an hour and ten minutes, but we will

4    aim to start promptly at 2:10.  Enjoy your lunch and don't

5    discuss the case, don't talk about the case.

6              That includes even impressions of anybody in this

7    courtroom, thoughts, feelings, anything like that.  Just wait

8    until all the evidence is in and arguments have been given.

9    Thank you.

10             (Jury not present.)

11             THE COURT:  Let me let you all know, there is no

12   reason to be alarmed.  There was a suspicious package

13   delivered this morning.  No one has any information that it

14   was anything nefarious, but they're investigating it.  We'll

15   be able to leave the building for lunch if you'd like to.

16             The cafeteria is closed right now.  So when you go

17   downstairs, let's give the jurors ten minutes or so to get out

18   there.  If you all want to leave the building, you can let the

19   CSOs know that you're on trial with me.

20             I said you could leave the building and come back,

21   and they'll show you where the designated entrance and exit is

22   so you can go outside and get something to eat and get some

23   fresh air.

24             Mr. Toure, that goes for you, as well.  You're

25   welcome to stay with your lawyers.  Just don't discuss your

Toure - Cross - Ms. Miller                125

1    testimony.  Again, if there was any security concern at all,

2    we would not be continuing with the trial, but they told me

3    it's fine.  They need time to figure out what's going on.

4    I'll see see you back at five after two and bring the jurors

5    in at 2:10.

6              (Lunch recess taken; continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

251

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - - - X
3
                                   :
4   ABDOULAYE TOURE,               : 21-CV-01645-NRM
                                   :
5              Plaintiff,          :
                                   : United States Courthouse
6        -against-                 : Brooklyn, New York
                                   :
7                                  :
                                   : Friday, June 13, 2025
8                                  : 10:00 a.m.
    PORT AUTHORITY, et al,         :
9                                  :
               Defendant.          :
10                                 :
                                   :
11                                 :
    - - - - - - - - - - - - - - - X
12
            TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
13           BEFORE THE HONORABLE NINA R. MORRISON
               UNITED STATES DISTRICT COURT JUDGE
14

15                      A P P E A R A N C E S:

16  For the Plaintiff:    THOMPSON LAW, P.C.
                          565 Fifth Avenue, Suite 721
17                        New York, New York 10017
                          BY: WALTER J. THOMPSON, ESQ.
18
    For the Defendant:    PORT AUTHORITY LAW DEPARTMENT
19                        4 World Trade Center
                          150 Greenwich Street, 24th Floor
20                        New York, New York 10007
                          BY:  KATHLEEN G. MILLER, ESQ.
21                        BRIAN P. HODGKINSON, ESQ.

22
    Court Reporter:  Nicole J. Sesta, RMR, CRR
23                   Official Court Reporter
                     E-mail:  NSestaRMR@gmail.com
24
    Proceedings recorded by computerized stenography.  Transcript
25  produced by Computer-aided Transcription.
```

*NJS  OCR  RPR  RMR  CRR*

Exhibit 2

1    you had to pay for that attorney.

2              Do you now recollect how much you had to pay for

3    that attorney?

4    A    It was between 2 and $3,000.

5    Q    Okay.  Thank you.

6              MR. THOMPSON:  No further questions, Your Honor.

7    Thank you very much.

8              THE COURT:  Okay.  Thank you.

9              Cross?

10             MS. MILLER:  May I see the exhibit?

11             THE COURT:  You absolutely may.  It's not an

12   exhibit.  It was a document to refresh his recollection.

13             MS. MILLER:  May I see a copy of your document?

14             THE WITNESS:  Yes.

15   CROSS-EXAMINATION

16   BY MS. MILLER:

17   Q    Mr. Toure, you were shown an exhibit by your attorney --

18             MR. THOMPSON:  Objection.

19             THE COURT:  Let's make it clear that it's a

20   document, not an exhibit.  It's not evidence.

21             MS. MILLER:  I'm sorry.

22   Q    -- a document to refresh your recollection this morning.

23             You were shown that same document yesterday morning

24   on your direct testimony, correct?

25             MR. THOMPSON:  Objection, Your Honor.

```
                         Sidebar                          331

1          THE COURT:  Let me see the parties at sidebar.  Hang

2    on one second.  I just want to make clear where we're going.

3          (The following occurred at sidebar.)

4          THE COURT:  So your request -- I very specifically

5    told the jurors to disregard this document and so now we're

6    asking them to go back in time to a time when he was looking

7    at the document and I just am unclear why it is that -- it's a

8    little like having you're having your cake and eating it too

9    by not having it come to evidence which, of course, is right

10   because I granted your motion to preclude it, but referencing

11   the fact that he saw it and we curtailed his questioning

12   yesterday.  So he didn't have a chance to have his

13   recollection refreshed on that document because we took it

14   down to make sure we didn't have more taint than necessary

15   from that document.  We moved on.

16         So where is this line going?

17         MS. MILLER:  Well, we didn't take it down quite

18   quickly enough, Judge.

19         THE COURT:  Wait a second.  Wait a second.

20         You sat there and didn't make an objection while

21   counsel for the plaintiff asked ten separate questions about

22   the document.  As soon as you made an objection and asked for

23   a sidebar, I granted it and then we took the document down and

24   we moved on.

25         So just for present purposes, tell me where we're
```

Sidebar                                          332

1    going right now.

2          MS. MILLER:  Okay.  I'm going to ask him -- I asked

3    him already if he saw the document yesterday morning and then

4    I asked him questions about price and quantity on

5    cross-examination which he couldn't answer.

6          I think I'm entitled to go back to the fact that

7    he's seeing a document and now he's now saying it refreshes

8    his recollection.  He saw it yesterday and it apparently

9    didn't refresh his recollection.

10         THE COURT:  Yesterday, it was on the screen and he

11   was in the middle testifying.  He wasn't asked any questions

12   about the document.  It was in front of him.  He identified

13   what it was and that was it.

14         MS. MILLER:  I asked questions about price and

15   quantity.

16         THE COURT:  Understood.

17         Okay.  So given that this document has been excluded

18   and I told the jury to disregard it, there will not be any

19   questions on cross about how he looked at the document

20   yesterday.  You can't just have it both ways here.

21         On the other hand, you can certainly say to him

22   anything you'd like and ask him any questions you like about

23   the fact that he didn't remember yesterday when he was sitting

24   here --

25         MS. MILLER:  Yes.

Sidebar                                                          333

1          THE COURT:  -- what the price was, but I don't want

2    any references to the document being on screen because at your

3    request, I told the jury to disregard it.

4          MS. MILLER:  Yes.  All right.

5          THE COURT:  The other thing you can do, of course,

6    is ask him about his deposition which I presume you are going

7    to do and how he didn't have any recollection at that time.

8          MS. MILLER:  I'd rather stick with just what the

9    jury -- I don't want to go over the deposition again.

10          THE COURT:  I just want to make sure that you are

11    free to impeach him with the deposition if you want to.  If

12    you don't want to, that's entirely up to you and a matter of

13    trial strategy, but I'm not precluding you.

14          MS. MILLER:  Thank you.

15          THE COURT:  Thank you.

16          (Sidebar conference ends.)

17          (Continued on next page.)

18

19

20

21

22

23

24

25

Toure - cross - Miller                              334

1          (In open court.)

2          THE COURT:  Go ahead, Ms. Miller.

3          MS. MILLER:  Thank you.

4    BY MS. MILLER:

5    Q    Yesterday when I cross-examined you, I asked you if you

6    had a written contract for the sale of the PhaZZer Taser

7    electronic stun gun.  Do you remember that question?  And your

8    answer was no.

9          MR. THOMPSON:  Objection.

10         THE COURT:  Just ask him if he remembers the

11   question for clarity.  Go ahead.

12         Do you remember being asked about that yesterday?

13         THE WITNESS:  Yes.

14   Q    And you told me you did not have a written contract,

15   correct?

16   A    Yes.

17   Q    And now you're telling this jury you did have a contract

18   in effect for the sale of 100 of PhaZZer Taser electronic stun

19   guns, correct?

20   A    Not correct.  I'm not telling the jury that I now have a

21   contract.  I still didn't have a contract.

22   Q    You didn't have a contract?

23   A    I didn't have -- I had a verbal agreement but I didn't

24   have a contract and that's the position I'm still on.

25   Q    So the contract is an agreement from the buyer and the

1  seller that there's going to be a sale.  Correct?

2           THE COURT:  I'm going to have you withdraw that

3  question because of the legal definition of a contract.  You

4  can just ask him what his understanding was of what his

5  business transaction was at that time.

6           MS. MILLER:  May I put it a little differently,

7  Your Honor?

8           THE COURT:  You absolutely may.

9  Q    Was it your understanding that in order to have a

10 contract, the buyer and the seller had to come to an

11 agreement?

12 A    Yes, verbal, right.

13 Q    And you didn't have a contract for the sale of the

14 PhaZZer Taser, did you?

15 A    I had a verbal agreement.  I didn't have a written

16 contract, correct.

17 Q    And yesterday, when I asked you the question very

18 specifically about how many of the PhaZZer Tasers you had

19 agreed your verbal agreement was that the police department in

20 Conakry would buy, you told me you didn't remember, correct?

21 A    The specific number, correct.

22 Q    And I told when I asked you yesterday about how, what the

23 price was that had been agreed upon between the seller and the

24 buyer, you and the Conakry Police Department, you told me you

25 didn't remember, correct?

1   A    Yesterday, correct.

2   Q    And when I asked you whether there was an agreement

3   between you and the Conakry Police Department for any delivery

4   date, you didn't remember, correct?

5   A    Not correct.  I don't remember that question, what the

6   delivery date specifically, no.

7   Q    You don't remember the question?

8   A    I don't remember me saying that we didn't know about when

9   the logistic of it because I do remember the logistic.

10  Q    All right.  Did the document you just looked at to

11  refresh your recollection tell you a delivery date?  Did you

12  get a delivery date from that?

13  A    No, there's no delivery date on that document.

14  Q    So there was no delivery date agreed upon, correct?

15  A    Not a specific -- there's a delivery time.  Not a

16  specific date.

17  Q    And when I asked you whether you had calculated your

18  profit on this sale yesterday, just yesterday, you told me you

19  didn't recall that.  Do you remember that?

20  A    I don't remember the wording of calculating, calculating

21  the --

22  Q    Well, in words or substance --

23       THE COURT:  Just, hold on one second.  Hold on one

24  second.  Let him finish his answer.

25       Go ahead, sir.

1    A    From my understanding, yesterday was a general number.

2    So I didn't know specifically.  I always know we charge 25 to

3    30 percent.  So once I saw the invoice, I know that my profit

4    margin for that specific invoice is always 25 to 30 percent,

5    and the lead time for the specific project was 60 days lead

6    time, maximum, they had given us.  So I kind of know a time

7    frame.  You could go above or below that time frame.

8          So I had a general idea, but as far as, like, it's

9    been six years, I don't remember unit prices.  It's been a

10   long, long time.  So once I saw the document, it refreshed my

11   memory.

12   Q    But you had an opportunity to meet with counsel to

13   prepare for your testimony on direct, correct?

14   A    Yes.

15   Q    And when I asked you the question about whether --

16   whether I used the word "calculate" or "determined," I asked

17   you about whether you knew how much your profit was and you

18   told me you didn't recall.

19   A    Yes.

20   Q    That was just yesterday in front of this jury, correct?

21   A    Can I elaborate a little bit?

22          THE COURT:  If you can answer it, whether you said

23   it or not.  Your lawyer will have a chance to ask you to

24   explain.

25   A    Yes.  Yes.

1    Q    And when you were refreshing your recollection, I

2    couldn't help but notice that your eyes were looking down.

3    Were you reading?

4    A    Yes, I was.

5    Q    So you didn't really have an independent recollection;

6    you were reading something?

7    A    I mean when you read stuff, that's how you remember it.

8    It's, it's my document.  I read it to remember the numbers.

9    It's been six years.  I don't remember specific amounts.  I've

10   done a lot of deals since then so it's not something I

11   specifically remember unit prices.

12              MS. MILLER:  I have no further questions.

13              THE COURT:  Okay.  Thank you.

14              Anything on redirect?

15              MR. THOMPSON:  Yes, just very quickly.

16              THE COURT:  Sure.

17   REDIRECT EXAMINATION

18   BY MR. THOMPSON:

19   Q    Mr. Toure, I just want to ask you a couple of questions

20   to be clear because I know you were maybe under a little

21   pressure.

22              THE COURT:  Just proceed with the questions.

23              MR. THOMPSON:  Okay.

24   Q    So you just said "I don't remember," but once you had

25   your recollection refreshed, you did remember, correct?

251

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
    - - - - - - - - - - - - - - - X
 3                                      :
 4  ABDOULAYE TOURE,                    : 21-CV-01645-NRM
                                        :
 5            Plaintiff,                :
                                        : United States Courthouse
 6                                      : Brooklyn, New York
      -against-                         :
 7                                      :
                                        : Friday, June 13, 2025
 8                                      : 10:00 a.m.
    PORT AUTHORITY, et al,              :
 9                                      :
              Defendant.                :
10                                      :
                                        :
11                                      :
    - - - - - - - - - - - - - - - X
12
             TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
13           BEFORE THE HONORABLE NINA R. MORRISON
                 UNITED STATES DISTRICT COURT JUDGE
14

15                       A P P E A R A N C E S:

16  For the Plaintiff:     THOMPSON LAW, P.C.
                           565 Fifth Avenue, Suite 721
17                         New York, New York 10017
                           BY: WALTER J. THOMPSON, ESQ.
18
    For the Defendant:     PORT AUTHORITY LAW DEPARTMENT
19                         4 World Trade Center
                            150 Greenwich Street, 24th Floor
20                         New York, New York 10007
                           BY:  KATHLEEN G. MILLER, ESQ.
21                              BRIAN P. HODGKINSON, ESQ.

22
    Court Reporter:  Nicole J. Sesta, RMR, CRR
23                   Official Court Reporter
                     E-mail:  NSestaRMR@gmail.com
24
    Proceedings recorded by computerized stenography.  Transcript
25  produced by Computer-aided Transcription.
```

*NJS  OCR  RPR  RMR  CRR*

Exhibit  3

1    (Proceedings continue in open court; jury present.)

2              THE COURT:  Have a seat, everyone.

3              All right.  Mr. Thompson, please call your next

4    witness.

5              MR. THOMPSON:  Yes.

6              Plaintiff calls Officer Chelsea Cassino to the

7    stand, please.

8              THE COURT:  Officer Cassino, you can come right up

9    here.

10             THE COURTROOM DEPUTY:  Please raise your right hand.

11             (Witness duly sworn.)

12             THE COURTROOM DEPUTY:  Please state and spell your

13   name for the record.

14             THE WITNESS:  My current legal name is Chelsea

15   Wellhausen, but at the time of the arrest and for the purpose

16   of this trial, Chelsea Cassino.

17             THE COURT:  Thank you.

18             THE WITNESS:  Do you need the spelling?

19             THE COURT:  That's okay, I think we've got it.

20             THE WITNESS:  Okay.

21             THE COURT:  You don't have it?  Okay.  Please go

22   ahead.

23             THE WITNESS:  My current legal name,

24   W-e-l-l-h-a-u-s-e-n.  And then Cassino is C-a-s-s-i-n-o.

25             THE COURT:  All right.  You may proceed.

1              OFFICER CHELSEA CASSINO,

2    called as a witness herein by the Plaintiff, having been first

3    duly sworn, was examined and testified as follows:

4    DIRECT EXAMINATION

5    BY MR. THOMPSON:

6    Q    Good afternoon --

7    A    Good afternoon.

8    Q    -- Officer Cassino.

9              It is still Officer Cassino, correct?

10   A    For the purpose of this trial.

11   Q    For the purpose of this trial.

12   A    Yes.

13   Q    Well, first off, it is still "officer," correct?

14   A    It is still "officer," yes.

15   Q    Okay.  So you are still currently employed at the Port

16   Authority of New York and New Jersey?

17   A    Yes, I am.

18   Q    And in what role are you employed there?

19   A    Police officer.

20   Q    Capacity, yes?

21             And what is your current duty assignment?

22   A    Right now I am medically restricted, obviously, because

23   of my condition, but I am a police officer.

24   Q    Okay.  And aside from the medical restriction, before the

25   medical restriction where were you assigned?

1    A    Currently I am still assigned to JFK Airport.

2    Q    And still as an officer, correct?  Yes?

3    A    That's correct.

4    Q    So when you -- how long have you been an officer for the

5    Port Authority of New York and New Jersey?

6    A    Now approximately seven and a half years.

7    Q    So you were hired in what year?

8    A    2018.

9    Q    Okay.  And in 2018, what had you done prior to becoming

10   an officer?

11   A    Directly prior?

12   Q    Yes.

13   A    I was a New York state court officer.

14   Q    Okay.  And for how long were you a New York state court

15   officer?

16   A    Just under two years.

17   Q    And then was there any employment before then?

18   A    Yes.

19   Q    What was that?

20   A    I worked in advertising for a couple of years before

21   that, and prior to that I was a paralegal at the Queens

22   District Attorney's Office.

23   Q    Okay.  And how long were you a paralegal at District

24   Attorney's Office?

25   A    From July of 2011 to March of 2014, I believe.  I was a

1  paralegal.

2  Q    Full-time paralegal?

3  A    Yes.

4  Q    Were you assigned any specific area of law at the

5  District Attorney's Office?

6  A    I worked in the narcotics trials bureau.

7  Q    Okay.  And then can you tell us a little bit about what

8  your duties were there?

9  A    I was basically an assistant to the Assistant District

10  Attorneys.  Whatever they had asked me to do for their cases

11  and stuff.  They have a high case load, so they just have

12  assistants, essentially.

13  Q    Okay.  And as an assistant, there's some work that goes

14  to the lawyer and some that goes to the assistant; is that

15  correct?

16  A    It would be dependent on what the lawyer would ask for

17  help with.  So dependent on the case, dependent on what they

18  needed help with at the time.  Sometimes you would schedule

19  witnesses for court.  It really was dependent on what they

20  needed help with.  Some lawyers would do everything

21  themselves, some would ask for more help.  It was very varied.

22  Q    Okay.  And did you do any writing in that position?

23  A    No, I did not.

24  Q    Did you fill out any forms in that position?

25  A    Forms?

1  Q    Yes.

2  A    Not that I -- I mean, there were different types of like

3  an order to produce maybe for a defendant.  I would fill that

4  form out.  It was a quite a long time ago.  I don't remember

5  the exact forms, but there was some sort of form writing.

6  Q    Okay.

7  A    But everything I would do would be given to the Assistant

8  District Attorney.

9  Q    Okay.  And was there any one specific District Attorney

10  in the group or that you worked with a bunch of them?

11  A    I worked with a bunch.

12  Q    Okay.  And so is that what got your interest in law

13  enforcement?

14  A    Not particularly, but --

15  Q    No?

16       Okay.  Did you receive training for that job?

17  A    Once I was hired, yes.

18  Q    And what kind of training did you receive?

19  A    I don't recall.  It was a very long time ago.

20  Q    Do you recall if you went to a school for any kind of

21  training, or it was on the job?

22  A    I did not go to school for paralegal.

23  Q    Where do you currently reside?

24  A    I'm sorry?

25  Q    Where do you currently reside?

1    A    On Long Island.

2    Q    Okay.  And you're married?

3    A    I am.

4    Q    Is this your first child?

5    A    This is.

6    Q    Congratulations.

7    A    Thank you.

8    Q    So and then prior to the District Attorney's Office, any

9    prior work before that?

10   A    I was a waitress at a local steakhouse through college

11   and before, but nothing -- no substantial employment.

12   Q    And where did you go to college?

13   A    At SUNY Cortland.

14   Q    Okay.  So in 2018, what prompted you to apply to the Port

15   Authority of New York and New Jersey?

16   A    I didn't apply in 2018.

17   Q    Okay.  Thank you.

18        When did you apply?

19   A    I took the test.  For police jobs you take a test, and

20   then they call you off the list.  I took the test in 2013.

21   Q    2013?  So it took five years to get called?

22   A    Correct.

23   Q    So those other jobs were interim jobs?

24   A    Sure.

25   Q    Okay.  When you took the test, do you recall how high you

1  placed?

2  A    It is not a -- it is not a graded test.  It is a

3  pass/fail.

4  Q    Okay.  So it's not like other departments where you would

5  like number, 1, 2, 3, 787, whatever, on the list?

6  A    That's correct.  I believe I was one of 22,000 that

7  passed.

8  Q    Okay.  And at that time, did you do any interviewing for

9  the position?

10 A    I don't recall if there was an interview at that time.

11 Q    Okay.  Do you recall the process once that you had been

12 selected or notified that you were going to be selected as an

13 applicant?

14 A    Years further?

15 Q    Yes.

16 A    I do.

17 Q    Okay.  And how were you notified?

18 A    I don't recall if it was an e-mail or a letter, but it

19 was one of those two.

20 Q    In writing?

21 A    It was in writing of some sort.  It was either an e-mail

22 or a letter in the mail.  I just don't recall which one.

23 Q    And then after that you went through some sort of

24 application process, I assume?

25 A    Yes.

1  Q    And can you describe that process to us.

2  A    The process starts with there's a -- it's not like an

3  application, obviously, but it is a form of -- it gives you

4  things you need to provide to them.  So they need to look into

5  your background.  So you need to provide your schooling

6  transcripts, you have to provide if you have any -- I don't

7  really recall exactly.  It was very -- it was a very lengthy

8  booklet of things that we had to provide to the investigator

9  when we started, but, basically, you start a background

10 investigation with an investigator with the department.

11 Q    And is that before you move forward into an interview

12 process?

13 A    That is the beginning of the interview process.

14 Q    Is the background investigation?

15 A    Yes.

16 Q    And do you recall approximately how long that took?

17 A    I don't recall when I first got notified.  I don't.  I

18 don't recall about how long.

19 Q    Months, or longer than a year?

20 A    It was not longer than a year, but I don't recall about

21 how long it was.

22 Q    Okay.

23 A    It was a few months maybe.  But I don't recall.

24 Q    And do you recall when you were actually given the job

25 offer from Port Authority?

1    A    It was at the end of 2017, but, again, I don't recall

2    exactly when I was notified.

3    Q    Is it correct if I use the shorthand and call it Port

4    Authority, is that --

5    A    Sure.

6    Q    You'll understand what I mean?

7    A    Yes.

8    Q    Okay.  So at the end of 2017 you were notified that you

9    were going to start employment for the Port Authority?

10   A    They offer you the position, yes.

11   Q    As a -- is it as an officer at that point or is that --

12   A    It is a police recruit.

13   Q    Police recruit.

14        Okay.  And then after that you start training?

15   A    I started training in January.

16   Q    In January.

17        And where was that training conducted?

18   A    Jersey City.

19   Q    Okay.  Was it at the police academy?

20   A    It was.

21   Q    Is it a separate Port Authority police academy?

22   A    The Port Authority has its own police academy.  Yes.

23   That's correct.

24   Q    And how long was that training?

25   A    Six months.

1    Q    Six months.

2            And can you describe the types of training that you

3    received at that time?

4    A    We are trained on the law, both states, because Port

5    Authority police officers are police officers in both New York

6    and New Jersey.  So we are trained on the law in New York, the

7    law in New Jersey.  We're trained on tactics, we're trained

8    on -- we have firearms training, we have physical training

9    every day.  We do -- we learn how to do -- write tickets and

10   you know, do aided's, and we just learn basically what our job

11   is going to entail in the academy.

12   Q    Tell me a little bit more about the legal training you

13   received.

14   A    What do you want to know?  What about it?

15   Q    I know nothing about it so --

16           THE COURT:  Why don't you -- rather than get into

17   something that's not relevant to this case, why don't you ask

18   a more focused question about areas of training.

19           MR. THOMPSON:  Okay.

20   Q    The legal training, it was on the penal law and on the

21   law of New Jersey, you said, correct?

22   A    Those were part of it.

23   Q    Okay.  What other parts of it were there?

24   A    We learned vehicle and traffic law in both states, we

25   learned about local laws in both states, and it's a very

1    intensive training.

2    Q    Okay.  When you say you learned about local laws in both

3    states, does that mean every community within each state you

4    learned their laws?

5    A    No, not necessarily.  They just touch on things -- so the

6    Port Authority police department focuses -- polices facilities

7    instead of neighborhoods, like a typical police department.

8    So where our facilities are, those are what they focus on

9    more, I would say.

10   Q    Do you receive any training in federal law?

11   A    I don't recall.

12   Q    Okay.  You were also trained in arrest procedures?

13   A    Yes.

14   Q    Okay.  And in terms of arrest procedures, you were

15   trained in the physical arrest, of course, correct?

16   A    What do you mean by physical arrest?

17   Q    In conducting an arrest of a person?

18   A    Like what we would physically do?

19   Q    Yes.

20   A    Yes.

21   Q    And procedures to follow when you do that?

22   A    Absolutely.

23   Q    Okay.  And then you were also trained on the paperwork

24   that was required for an arrest?

25   A    Yes.

1   Q    Okay.  And how much of that training did you receive?

2   A    I couldn't say.  I wouldn't -- I don't know how to

3   quantify that.

4   Q    Would you say weeks or months of the training?

5   A    We were training on legal stuff the entire academy.  So I

6   just wouldn't be able to say how much of it was specifically

7   on arrest processing.

8   Q    And were you graded?

9   A    I'm sorry?

10  Q    Were you graded?

11  A    We were.

12  Q    Okay.  And you passed, obviously?

13  A    I did.

14  Q    Did you do well?

15  A    Yeah.  I ranked 18 in a class of about 110.

16  Q    Congratulations.  That's great.

17  A    Thank you.

18  Q    After you completed the training, you graduate, and then

19  you receive a duty assignment?

20  A    Yes.

21  Q    And what duty assignment did you receive at that time?

22  A    JFK.

23  Q    JFK.

24       So has your whole career for Port Authority of New

25  York and New Jersey been at JFK?

1    A    Yes.

2    Q    Okay.  And tell us about when you first got to JFK, what

3    were you assigned to do, what was your training.

4         THE COURT:  From the beginning of her tenure there?

5    Let's move on to something a little more directly relevant to

6    this case.

7         MR. THOMPSON:  Your Honor, I am kind of like I've

8    got two minutes, and I don't what to dive into something that

9    I can't finish, you know.

10         THE COURT:  That's fine.  You don't have to fill the

11    time for that.  If you're not ready to proceed to another new

12    area, we can --

13         MR. THOMPSON:  I can ask one more question on this

14    area, and then we can wrap up, if you want, Your Honor.

15         THE COURT:  That's fine.

16         MR. THOMPSON:  Thank you.

17    Q    So did you receive additional training when you arrived

18    at JFK?

19    A    I did.

20    Q    Can you describe that additional training that you

21    received for us?

22    A    It's basically like a facility training.

23    Q    Okay.

24    A    JFK Airport is a very large airport.  It encompasses all

25    the cargo areas and the terminals.  So we spent I want to say

1    it was two weeks, but I'm not a hundred percent sure if it

2    was, about two weeks familiarizing with the facility.

3    Q    Okay.  And then after familiarizing yourself with the

4    facility, is there any additional police work training or are

5    you assigned to a training officer for your initial period of

6    time?

7    A    During that on-the-job training, they do have you shadow

8    other police officers.

9    Q    Okay.  And are those police officers or of higher rank?

10   A    Police officers.

11   Q    Okay.  Very good.

12           MR. THOMPSON:  Your Honor, I think that's where I am

13   going to go with this for now.

14           THE COURT:  Okay.  That's fine.  We can conclude for

15   the day now.

16           All right.  Jurors, we are going to excuse you for

17   the day.  We'll start tomorrow at 10:00.  Please try to be

18   here by 9:45.  Thank you for your patience today and have a

19   good evening.  Remember, don't discuss the case, don't look up

20   anything about the case.

21           Thank you.

22           (Jury exits the courtroom.)

23           THE COURT:  Officer Cassino, you're welcome to leave

24   the stand.  Just remember now that you're in the middle of

25   your testimony.  You can't discuss your testimony with anyone,

1          THE COURT:  You can all be seated.

2          Good morning, jurors.  We are going to now resume

3    with testimony of Officer Cassino.

4          Mr. Thompson, when you're ready.

5          MR. THOMPSON:  Thank you.

6          (The witness, CHELSEA CASSINO, having been

7    previously sworn, resumed the stand.)

8    DIRECT EXAMINATION (Continued)

9    BY MR. THOMPSON:

10   Q    Good morning, Officer Cassino.

11   A    Good morning.

12   Q    So yesterday we went through your background and a lot of

13   stuff so we're going to get straight through it today, we're

14   going to go down to it, we're going to get to the events in

15   question.

16        So let's speak about it.  It was November 12, 2019.

17   You recall?

18   A    Yes.

19   Q    And you were on duty that night?

20   A    Yes.

21   Q    The shift you were working was what?

22   A    2 to 10 p.m.

23   Q    Were you assigned to a particular area that night?

24   A    I was assigned to Terminal 1.

25   Q    And did there come a time that night when you encountered

Cassino - direct - Thompson                                          255

1   the plaintiff, Mr. Toure?

2   A    Yes.

3   Q    Okay.  At some time, you received a communication for, to

4   go, that led to the encounter with Mr. Toure?

5   A    Yes.

6   Q    Okay.  Do you recall how you were notified?

7   A    Via the police radio.

8   Q    Do you recall what the call was?

9   A    It was what we call an 811-Charlie.

10  Q    So, and do you frequently get calls for 811-Charlies?

11  A    Yes.

12  Q    And 811-Charlie is specifically what?

13  A    It's when a passenger is attempting to travel with a

14  weapon.

15  Q    Okay.  Attempting to travel with it; is it specific to

16  check-in or any other area?

17  A    The only way you can travel with a firearm unless -- is

18  checking the firearm in the luggage or weapon in the luggage.

19  So they declare their weapon to the airline.

20  Q    So, routinely, when somebody is declaring a weapon, the

21  airline notifies the Port Authority Police and then you go and

22  check it out?

23  A    Yes.

24  Q    And so and routinely when you go to check it out, you do

25  an investigation, you check to see if they have proper

1  paperwork, all that, et cetera?

2  A    Correct.

3  Q    So this night, it started out as a regular routine call

4  then with Mr. Toure, would you say that's correct?

5  A    That's correct.

6  Q    Did you respond alone to the 811-Charlie?

7  A    Initially, yes, but I wasn't dispatched alone.

8  Q    Okay.  What do you mean by that?

9  A    They dispatched two officers to those calls.

10  Q    And that's routine and regular procedure?

11  A    Yes.

12  Q    Okay.  But you arrived as the first officer on the scene?

13  A    That's correct.

14  Q    Okay.  That was at the Air France check-in counter that

15  we talked about?

16  A    Yes.

17  Q    Okay.  And when you arrived, did you speak to any

18  Air France employee?

19  A    The Air France employee is the one that initially flagged

20  me over.  So when the airlines call the police, they usually,

21  like, wave their hand to get your attention so you know

22  which -- because, obviously, there's a lot of counters at JFK,

23  so you know which counter called for you.

24  Q    Okay.  So somebody caught your attention and then you

25  went over to that counter?

Cassino - direct - Thompson                          257

1   A    Correct.

2   Q    Okay.  Did you ask who made the call?

3   A    I did not.

4   Q    Okay.  Did you ask why you had been called?

5   A    I did not.

6   Q    Did you ask the Air France employee any other questions?

7   A    Not that I recall.

8   Q    Okay.  And so when you arrived, that's when you first met

9   Mr. Toure, correct?

10  A    That's correct.

11  Q    Okay.  Please tell us what you spoke to him about.

12  A    I asked him for his identification.

13  Q    Okay.  Did you question him beyond that?

14  A    When he provided me with his identification, all he

15  provided me with was a driver's license.

16  Q    Okay.  Did you ask him anything further?

17  A    If he was checking a weapon.

18  Q    And at that point, he told you he was?

19  A    He did.

20  Q    Okay.  And at that point, did he seem nervous?

21  A    No.

22  Q    Upset?

23  A    Not that I recall.

24  Q    Okay.  For him, it just seemed like -- could you tell if

25  for him, he was just calm in telling you that he's just

Cassino - direct - Thompson                                    258

1    checking his weapon?

2    A    From my recollection, everyone was calm at that time.

3    Q    So from your recollection, you didn't get a sense that

4    somebody was trying to do something that would cause you

5    alert, correct?

6    A    No.

7    Q    So -- okay.  Do you recall if he was on the phone when

8    you arrived at the counter?

9    A    I do not recall him being on the phone.

10   Q    When you arrived, did he attempt to explain to you why he

11   was checking the weapon?

12   A    He did say that he was bringing it to Guinea.

13   Q    Okay.

14   A    From my recollection.

15   Q    And did he say anything about any research he had done

16   regarding checking -- I'm going to stop calling it the

17   weapon -- the taser?

18   A    Did he -- I'm sorry.  Can you repeat the question?

19   Q    Did he explain to you anything about the actions he had

20   taken to ensure that he was operating correctly when he tried

21   to check his taser?

22   A    He did provide me with some documents.

23   Q    Okay.  And I know we've been calling it a weapon, but

24   it's no longer classified as a weapon under penal law 265.01,

25   is that correct?

1    A    To my knowledge.

2    Q    So, I'm sorry, I'm going to ask this again.

3         So did he attempt to explain to you that he had

4    taken any action to ensure that he was correctly checking in

5    the taser?

6    A    He did provide me with some documents.

7    Q    Okay.  Do you recall what those documents looked like?

8    A    I do.

9    Q    Can you briefly describe them?  And I'll put them up here

10   in a second?

11   A    I've seen them in the exhibits.

12   Q    Okay.  First step, Exhibit 6, this was previously talked

13   about, right?  This is the one that you said you saw earlier,

14   right?

15   A    Correct.

16   Q    And is this the document that you said that you saw that

17   night that Mr. Toure presented to you?

18   A    To my recollection, yes.

19   Q    And do you recall that this is from the Bureau of

20   Alcohol, Tobacco and Firearms?

21   A    Yes.

22   Q    Did you read the body of the letter when he presented it

23   to you?

24   A    I did.

25   Q    And did you see that it was about the classification that

1    they were not a weapon?  Do you recall that?

2    A    I don't --

3    Q    A firearm.  I'm sorry.

4    A    I don't think it was ever in question if it was a

5    firearm.

6    Q    Okay.  Very good.

7          So this was the first document he showed you,

8    correct, or one of the two?  You don't know which order I

9    assume?

10   A    I don't remember what order, no.

11         MR. THOMPSON:  Okay.  I'm now putting up what has

12   previously been identified as Exhibit 11.

13         Can everybody see it clearly?

14   Q    Do you recall seeing this document?

15   A    I do.

16   Q    From the U.S. Department of Transportation.

17         Is this part of the documentation that he showed

18   you?

19   A    It was.

20   Q    Okay.  Do you recall if he showed you any other

21   documentation?

22   A    It was just these two documents.

23   Q    Just these two documents?  And they're on letterhead,

24   correct?

25   A    Correct.

Cassino - direct - Thompson                    261

Q    And they looked official from official government
agencies, correct?

A    Sure.

Q    Okay.  Did he show you anything that was handwritten?

A    I don't believe so.

Q    Okay.  You heard Officer Buckner yesterday testify that
Mr. Toure gave him a handwritten document.

          Did you see that document?

A    I only recall these two documents personally.

Q    Did you ever witness him handing anything else to
Officer Buckner?

A    I don't recall.

Q    Okay.  So is it possible Mr. Buckner's memory is not
correct?

          MS. MILLER:  Objection.

A    It's possible he handed him --

          THE COURT:  Hold on.  One second.  Just don't answer
when there's an objection.

          Overruled.

          You can answer.

A    I don't know if he handed Sergeant Buckner anything.  I
couldn't testify to that.

Q    Okay.  Thank you.

          Is it true to say that you have a duty to
investigate prior to making an arrest?

Cassino - direct - Thompson                    262

1    A    Yes.

2    Q    What did that duty entail?

3    A    In this case?

4    Q    Yes.

5    A    In this case, I was investigating whether or not he had

6    the proper documentation to possess the stun gun in the State

7    and City of New York.

8    Q    So when you say "the proper documentation," what

9    documentation are you looking for?

10   A    If he was an active law enforcement officer or security

11   guard.  He didn't have any permits or licenses to my knowledge

12   at that time.

13   Q    Do you recall him telling you that it was a family or

14   business trip?

15   A    I don't recall him using those exact words, but I do

16   remember him explaining to some extent why he had it.

17   Q    And when he was explaining why he had it, do you recall

18   that he was explaining it was for business and he was

19   traveling for that reason?

20   A    Something along those lines.  I just don't recall exactly

21   what he had said.

22   Q    So it's correct to say that he did inform you that it was

23   related to his business?

24   A    Sure.

25   Q    Did you place him under arrest at that time?

Cassino - direct - Thompson                    263

1    A    I did not.

2    Q    So you know, Sergeant Buckner -- I'm going to call him

3    "Sergeant Buckner" because he was your sergeant at the time.

4    Is that clear who we're speaking about?

5    A    Sure.

6    Q    Before that -- withdrawn.

7         Do you have an independent duty to make a good

8    arrest?

9         THE COURT:  Can you repeat that?  Sorry.

10   Q    Do you have an independent duty --

11        MS. MILLER:  Objection.

12        THE COURT:  Hold on one second.

13   Q    Did you have an independent duty to make a good arrest?

14        THE COURT:  That's sustained as to form.

15   Q    Do you have an independent -- okay.

16        So you called your superior officer?

17   A    I don't recall if it was me or Officer Florio, but one of

18   us requested over the radio for a supervisor to respond, yes.

19   Q    So at the time that you requested over the radio, you had

20   not made any decision to arrest Mr. Toure?

21   A    He was not placed under arrest at that point in time.

22   Q    Because you had not decided to arrest him?

23   A    He was not -- at that time, he was not placed under

24   arrest.

25   Q    So when the sergeant arrived, did you tell him anything

1   about the situation?

2   A    I told him what we had.

3   Q    Okay.  And what do you mean by "what we had"?

4   A    The facts of what I had discovered in my preliminary

5   investigation.

6   Q    Okay.  And if I recall correctly, from your preliminary

7   investigation, you just discovered that there was a taser?

8   A    Yes.

9   Q    And he was attempting to check it?

10  A    Correct.

11  Q    And he told you that he had a taser?

12  A    Correct.

13  Q    And he was attempting to check it?

14  A    Correct.  And he didn't have proper identification to

15  possess that taser to my knowledge at that point in time.

16  Q    To your knowledge at that time.  Okay.

17          Prior to this event that night, you said you

18  worked -- at that point, how long had you worked for the Port

19  Authority Police?

20  A    Approximately, just under two years.

21  Q    Just under two years?

22  A    Yes.

23  Q    And you testified that, you know, this is a frequent

24  occurrence to get a call for the check-in of a weapon?

25  A    Almost daily.

1   Q    Almost daily, and sometimes multiple times?

2   A    Yes.

3   Q    And in the two years before, can you recall if there was

4   ever a time that you were called specifically for a taser?

5   A    Me, personally?  No.

6   Q    Had you ever been at the scene when someone was

7   attempting to check-in a taser?

8   A    I had not.

9   Q    Did you tell him anything other than that?

10  A    I don't recall.

11  Q    Did you tell him anything about the questions that or the

12  explanation that Mr. Toure was attempting to give you?

13  A    I don't recall exactly what I told him.

14  Q    Okay.  When Sergeant Buckner arrived, what did you see

15  him do?

16  A    I mean he spoke to me so we had a conversation and then I

17  don't recall what he did after that.

18  Q    Okay.  Do you recall if you saw him speak to Mr. Toure?

19  A    He did at some point speak to Mr. Toure.

20  Q    Do you recall seeing -- we already asked that.

21       And then do you recall seeing him taking the taser?

22  A    I don't recall when he tested the taser.

23  Q    Okay.  So you didn't recall seeing him pick it up?

24  A    I don't, I don't recall when he did that, no.

25  Q    So you did not witness any part of the testing of the

Cassino - direct - Thompson                266

1   taser?

2   A    No.

3   Q    Okay.  But it was only after that he tested the taser

4   that he told you to arrest Mr. Toure, correct?

5   A    That's correct.

6   Q    Okay.  Did the sergeant ask you why Mr. Toure had a

7   taser?

8   A    I don't recall if he asked why.

9   Q    Okay.  Did Sergeant Buckner tell you why you should

10  arrest Mr. Toure?

11  A    No.

12  Q    Okay.  Did he tell you the charge to charge him under?

13  A    Not to my recollection.

14  Q    So do you recall what words he did use?

15  A    I don't.  I don't remember what words he used, no.

16  Q    A simple "Arrest him"?

17  A    I don't recall.

18  Q    "Good to go"?

19  A    It was a long time ago.

20  Q    Okay.  You would agree that an officer has a duty to know

21  the law, correct?

22  A    I would agree.

23  Q    What do you do to ensure that you know the law?

24  A    We do in-service training twice a year and we get updates

25  throughout the year at roll call.

Cassino - direct - Thompson                267

1   Q    Twice a year, do you do any other additional training
2   throughout the year?
3   A    Well, we do firearms twice a year and we do classroom
4   training twice a year, so four times a year in some sort of
5   training.
6   Q    Okay.  So of the four times a year, how much of that is
7   dedicated to updates on legal changes?
8   A    It varies every year.  If there's a lot of changes, it
9   would be a lot.  If there were not a lot of changes, it
10  wouldn't be often.
11  Q    Okay.  And can you recall the trainings that you had that
12  year?
13  A    I do not recall the trainings we had that year.
14  Q    Do you recall how many times you were given a buck slip
15  during the year?
16  A    I do not recall how many times we were given buck slips.
17  Q    Do you save your buck slips?
18  A    I do not.
19  Q    When you go to in-person trainings -- when you go to
20  in-person trainings and the trainings are conducted, do they
21  give you handouts?
22  A    Not that I believe.
23  Q    Okay.  Do they use PowerPoint presentations?
24  A    Yes.
25  Q    Always?

Cassino - direct - Thompson                                   268

1    A    Yes.

2    Q    Okay.  And then in addition to that, does somebody teach

3    you a class; is that what's going on?

4    A    Yes.

5    Q    Okay.  And that person is verbally telling you what any

6    changes in the law might have been?

7    A    That's correct.

8    Q    Okay.  And do you take notes at that time?

9    A    No.

10   Q    Okay.  So you just rely on your memory that you

11   understood and know the changes in the law?

12   A    For the most part.

13   Q    Possibly you forget?

14   A    I don't think so.

15   Q    So after you, after you were told to arrest Mr. Toure,

16   can you tell us what you did next?

17   A    After, after he was told he was being placed under arrest

18   is when we let him make -- he asked if he could call his wife.

19   Q    Okay.  And you saw him call his wife?

20   A    We allowed him to make the phone call after we told him

21   he was being placed under arrest.

22   Q    And prior to this, were you aware of him being on the

23   phone with his wife during the course of your investigation?

24   A    He was not on the phone.

25   Q    At no point?

Cassino - direct - Thompson                           269

1   A    No.

2   Q    So when the sergeant told you to place him under arrest,

3   was it you who actually handcuffed him?

4   A    I don't recall who handcuffed him.

5   Q    Was it you who told him he was under arrest?

6   A    I don't recall who communicated that to him.

7   Q    Do you recall at any point anybody discussing the change

8   in the law that Mr. Toure discussed earlier?

9   A    I do not.

10  Q    Okay.  Do you recall anybody telling you --

11           THE COURT:  Just to clarify, when you say "discussed

12  earlier," do you mean at the trial or at some other point?

13           MR. THOMPSON:  At the trial.

14           THE COURT:  Okay.  So why don't you just reask that

15  for clarity.

16           MR. THOMPSON:  I'll reask it.

17           THE COURT:  And then maybe instead of referencing

18  Mr. Toure's prior testimony, make it about the specific fact

19  you want to ask her about.

20           MR. THOMPSON:  Okay.  Thank you.

21  Q    At any point, did you hear Mr. Toure that night tell you

22  that he had found there had been a change in the law?

23  A    He did not.

24  Q    And at any point that night, did you hear him tell

25  Officer Florio?

Cassino - direct - Thompson                    270

1    A    I did not hear him say that.

2    Q    Did you hear him tell that to Sergeant Buckner?

3    A    I did not.

4    Q    And did you hear anybody reply to him?

5    A    I did not hear anything to begin with.

6    Q    So once you placed him under arrest, did you -- is the

7    normal procedure that he's then taken somewhere else?

8    A    Once you're placed under arrest, yes, you're transported

9    back to the police station.

10   Q    And is that building 269 or 269, is that what it's

11   called?

12   A    That's correct.

13   Q    And is that, like I would imagine, a police station

14   house?

15   A    It's a police station house, yes.

16   Q    So is there an desk and an office and desks for the

17   officers and a holding cell?

18   A    Correct.

19   Q    So he was brought there.  Did you accompany him?

20   A    I don't recall who accompanied him in the car.

21   Q    So once the, once the suspect is arrested and then taken

22   away to 269, what is your next responsibility?

23   A    As the arresting officer?

24   Q    Yes.

25   A    I would start the arrest paperwork.

Cassino - direct - Thompson                    271

1    Q    Okay.  And would you be in 269 when you do the arresting
2    paperwork?
3    A    Yes.
4    Q    Do you have your own desk there?
5    A    There's multiple desks right in front of the holding
6    cells.
7    Q    Okay.  But was any one specifically assigned to you at
8    that time?
9    A    What do you mean, assigned to me?
10   Q    Well, is this your desk and then the other one belongs to
11   another officer and another one belongs to another officer or
12   are they just desks for anybody to use?
13   A    They're just desks for anybody to use.  They're not
14   assigned to any one particular police officer.
15   Q    And is there a desk that has any -- never mind.  I'll
16   come back to this.
17        So when you say you did the arrest paperwork for
18   Mr. Toure, you filled out a form, correct?
19   A    I filled out many forms.
20   Q    Many forms?  Okay.
21        And in those many forms, did you enter the charge
22   for Mr. Toure?
23   A    I did.
24   Q    And can you tell what charge you entered for Mr. Toure?
25   A    265.01 penal law.

Cassino - direct - Thompson                                    272

1   Q     A violation of 265.01?

2   A     Yes.

3   Q     Did you put any other charges?

4   A     Not to my recollection.

5   Q     Violations of any other law?

6   A     Not to my recollection.

7   Q     At the time that you arrested him, were you aware of any

8   other law that regarded possession of a taser in New York?

9   A     There's an Administrative Code.

10  Q     I understand that.  The question is were you aware of

11  that at the time?

12  A     Yes.

13  Q     Okay.  And what's the difference between Administrative

14  Code and penal law?

15  A     A New York City Administrative Code is more of like a

16  local enforcement law.

17  Q     Does that mean it's only enforceable within New York

18  City?

19  A     That's correct.

20  Q     So we're all clear, JFK is within New York City, right?

21  A     That's correct.  It's in Queens.

22  Q     So the Administrative Code would apply in New York City?

23  A     That's correct.

24  Q     Okay.  So the section under the Administrative Code

25  regarding tasers would have applied in this instance at that

Cassino - direct - Thompson                    273

1    moment, right?

2    A    Yes.

3    Q    Okay.  Are there any exceptions in the Administrative

4    Code regarding the possession of a taser?

5    A    I believe so but I'm not sure what they are off the top

6    of my head right now.

7    Q    Would you be aware that there are exceptions for a

8    broker?

9    A    I'm not sure.

10   Q    Would you be aware that there are exceptions for

11   business, for the use of them for business?

12   A    I'm not sure of any of the exceptions off the top of my

13   head.  I would have to check the Administrative Code and the

14   language.

15   Q    Did you check the Administrative Code that night?

16   A    I did not charge that code.

17   Q    Okay.  So you didn't need to check?

18   A    I did not check it because I was not charging it,

19   correct.

20   Q    So if you had checked it and saw that there were

21   exceptions for business, would that have given you pause

22   regarding charging Mr. Toure?

23   A    No, because I wasn't charging it to begin with.

24   Q    You heard the testimony of Mr. Buckner yesterday, right?

25   A    I did.

1  Q    And you heard him say that officers have a duty to make

2  an independent determination when making an arrest?

3  A    That's correct.

4  Q    Okay.  Regarding the probable cause for an arrest, you

5  have a duty to make an independent determination?

6  A    That's correct.

7  Q    Okay.  And if you thought that there was not probable

8  cause for an arrest even though your sergeant had said arrest

9  him, you would have a duty to say something about that?

10 A    That's correct.

11 Q    After you, after you processed the paperwork, what do you

12 do then?

13 A    Well, processing the paperwork, the first form I would

14 fill out would be the Omni form which would be sent over to

15 the Queens District Attorney's Office and that's where an

16 arrest number would be generated.

17 Q    Okay.

18 A    Once an arrest number is generated, the Queens District

19 Attorney or the Assistant District Attorney would call me and

20 I would explain the facts of the case and that's when they

21 develop the charge that they're going to be charging.

22 Q    Okay.  And so -- and is there a written communication

23 between you and the District Attorney at that time?

24 A    The Omni form would be the written communication to them

25 and then it would be a phone call.

Cassino - direct - Thompson                    275

1   Q    And then a phone call, and then there's a verbal

2   conversation about what the charge is?

3   A    Correct.  And then they would draft up a complaint report

4   and send it back to me.

5   Q    And the -- do you explain the circumstances of the arrest

6   or do you just tell them what the arrest is?

7   A    You explain the circumstances.  They are the ones who

8   develop the charge.

9   Q    Okay.  At that point, you're speaking to a District

10  Attorney?

11  A    An Assistant District Attorney.

12  Q    An Assistant District Attorney?

13       So at that point, did you explain to him that there

14  was a question about the law?

15  A    There was no question --

16       MS. MILLER:  Objection.

17  A    About the law.

18       THE COURT:  Let me just see the parties at sidebar

19  before we get into this phase of the events.  I just want to

20  clarify where we're going before we go any further.

21       (Continued on next page.)

22

23

24

25

Sidebar                                                           276

1        (THE following occurred at sidebar.)

2        THE COURT:  So given that there's no malicious

3   prosecution claim, there's no abuse of process claim, the

4   constitutional violation at issue begins and ends with the

5   alleged false arrest.

6        I don't know when the relevance is of any the

7   proceedings that happened thereafter, that is, the jury is

8   going to hear through the certificate of disposition and

9   potentially something in my jury instructions that the charges

10  were eventually dismissed so that it was a favorable

11  termination.

12        I don't want them speculating about what the Queens

13  DA did or didn't do, what advice was or wasn't given.

14  Mr. Toure was already arrested at that point and the alleged

15  constitutional violation has already happened.

16        So is there some other reason why this area of

17  inquiry is relevant?

18        MR. THOMPSON:  Yes.  I think at this point, that if

19  she had consulted with a lawyer about, that somebody said this

20  lawyer is no longer valid, she consulted with the District

21  Attorney, she could have reversed the arrest at that point.

22        THE COURT:  In terms of mitigating his damages at

23  the time he was in custody?

24        MR. THOMPSON:  And also the duty to check.

25        THE COURT:  So let's focus on the duty to inquire.

Sidebar                                              277

1   I understand that.

2           MR. THOMPSON:  That's where I'm going.  I'm not

3   trying to get into the law.

4           THE COURT:  Your point is since the damages flow

5   from the arrest to arraignment and you're in the period where

6   he has not yet been arraigned.  Is that correct?

7           MR. THOMPSON:  That's correct.

8           THE COURT:  Okay.  So in that case, let's just keep

9   it narrowly focused on anything that goes to what you maintain

10  and inquire as it may relate to the probable cause and argued

11  probable cause for purposes of qualified immunity as to the

12  state of the law.

13          MR. THOMPSON:  I understand, Your Honor.

14          THE COURT:  But, again, I don't want there to be any

15  discussion of the District Attorney's decision to charge, what

16  was going on, any of that.  So I may stop you because I don't

17  want the jury speculating, just because a charge was brought

18  or dismissed, that there was something to it or not something

19  to it because that's, of course, not the degree of false

20  arrest.

21          MR. THOMPSON:  All right.  Thank you.

22          THE COURT:  Okay.

23          (Sidebar conference ends.)

24          (Continue on next page.)

25

1          (In open court.)

2          THE COURT:  Okay.  Thanks, ladies and gentlemen.  We

3    just needed to clarify one area and we've got that squared

4    away.

5          Mr. Thompson, you may proceed now.

6          MR. THOMPSON:  Okay.  Thank you.

7    BY MR. THOMPSON:

8    Q    I was just asking you a couple of questions about when

9    you spoke to the District Attorney, you verified that you were

10   arresting Mr. Toure under penal law 265.01(1)?

11   A    That's the charge they came back with as well, correct.

12   Q    So I just have a few follow-up questions at this time.

13         So at this point, you're aware that 265.01 was

14   declared unconstitutional, correct?

15   A    Today?  At this point?

16   Q    Yes, at this point, you're aware?

17   A    Yes.

18   Q    And at some point, you became aware that that decision

19   had been rendered by a judge?

20   A    Yes.

21   Q    And that's the reason why 265.01 no longer applies to

22   stun guns?

23   A    To my knowledge.

24   Q    And you're aware that that decision came down eight

25   months before you arrested Mr. Toure?

Cassino - cross - Miller                                279

1    A    Today?

2    Q    Yes, today, are you aware of that?

3    A    Today I am, yes.

4    Q    So knowing that now, do you ever wonder if you did the

5    right thing arresting Mr. Toure?

6              MS. MILLER:  Objection.

7              THE COURT:  Sustained.

8              MR. THOMPSON:  Okay.  Thank you.

9              No further questions right now.  Thank you very

10   much.

11             THE COURT:  Okay.  Thank you.

12   CROSS-EXAMINATION

13   BY MS. MILLER:

14   Q    Okay.  Good morning, Officer Cassino.

15             THE COURT:  Ms. Miller, you may want to lower the

16   mic so it catches the sound from the bottom.

17             MS. MILLER:  Is that all right?

18             THE COURT:  That's perfect.

19   Q    I just want to go over a couple of things about your

20   training.

21             You mentioned that you go for periodic training.

22   How often is that?

23   A    We go for training approximately four times a year.

24   Q    And how long -- prior to November 12, 2019, in the two

25   years that you were working, how often did you go for training

251

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - X
3                                        :
                                         :
4    ABDOULAYE TOURE,                     : 21-CV-01645-NRM
                                         :
5              Plaintiff,                 :
                                         : United States Courthouse
6         -against-                       : Brooklyn, New York
                                         :
7                                        :
                                         : Friday, June 13, 2025
8                                        : 10:00 a.m.
     PORT AUTHORITY, et al,               :
9                                        :
               Defendant.                 :
10                                       :
                                         :
11
- - - - - - - - - - - - - - - X
12
              TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
13              BEFORE THE HONORABLE NINA R. MORRISON
                 UNITED STATES DISTRICT COURT JUDGE
14

15                      A P P E A R A N C E S :

16   For the Plaintiff:     THOMPSON LAW, P.C.
                            565 Fifth Avenue, Suite 721
17                           New York, New York 10017
                            BY: WALTER J. THOMPSON, ESQ.
18
     For the Defendant:    PORT AUTHORITY LAW DEPARTMENT
19                          4 World Trade Center
                            150 Greenwich Street, 24th Floor
20                           New York, New York 10007
                            BY:  KATHLEEN G. MILLER, ESQ.
21                               BRIAN P. HODGKINSON, ESQ.

22
     Court Reporter:  Nicole J. Sesta, RMR, CRR
23                     Official Court Reporter
                      E-mail:  NSestaRMR@gmail.com
24
     Proceedings recorded by computerized stenography.  Transcript
25   produced by Computer-aided Transcription.

Exhibit 5                    NJS  OCR  RPR  RMR  CRR

1    A    Today?

2    Q    Yes, today, are you aware of that?

3    A    Today I am, yes.

4    Q    So knowing that now, do you ever wonder if you did the

5    right thing arresting Mr. Toure?

6              MS. MILLER:  Objection.

7              THE COURT:  Sustained.

8              MR. THOMPSON:  Okay.  Thank you.

9              No further questions right now.  Thank you very

10   much.

11             THE COURT:  Okay.  Thank you.

12   CROSS-EXAMINATION

13   BY MS. MILLER:

14   Q    Okay.  Good morning, Officer Cassino.

15             THE COURT:  Ms. Miller, you may want to lower the

16   mic so it catches the sound from the bottom.

17             MS. MILLER:  Is that all right?

18             THE COURT:  That's perfect.

19   Q    I just want to go over a couple of things about your

20   training.

21             You mentioned that you go for periodic training.

22   How often is that?

23   A    We go for training approximately four times a year.

24   Q    And how long -- prior to November 12, 2019, in the two

25   years that you were working, how often did you go for training

Cassino - cross - Miller                                    280

1    then?

2    A    Every six months.

3    Q    And how long was each training session?

4    A    A full eight-hour day.

5    Q    And that was a classroom, PowerPoint session?

6    A    Or firearms but yes.

7    Q    I see.  And that included the law, did it?

8    A    It did.

9    Q    And that included updates in the law?

10   A    It did.

11   Q    Okay.  In addition to that, did the Port Authority Police

12   Department give the officers updates on the law through

13   different means?

14   A    Yes, they did.

15   Q    And what were the means that you got updates between the

16   training sessions?

17   A    We would get updates at roll call, sometimes in an e-mail

18   and in the form of a buck slip usually.

19   Q    And the updates at roll call, were those in the form of

20   memos or orders?  How did they come to you?

21   A    The sergeant or lieutenant would read them while we were

22   standing roll call.

23   Q    And prior to November 12, 2019, had you ever received an

24   update or any training in a change in the law with respect to

25   penal law 265.01(1)?

1    A    I did not.

2    Q    Now, you, when you became a police officer, what was the

3    scope of your jurisdiction to enforce the laws?

4    A    I'm a police officer in the states of New York and New

5    Jersey, so statewide, and we have local jurisdiction as well

6    where we work.

7    Q    And could you also enforce the laws of local

8    jurisdictions?

9    A    Yes.

10    Q    And that included the City of New York?

11    A    Yes.

12    Q    Had you ever had an occasion prior to November 12, 2019

13    to arrest somebody for violating the New York City

14    Administrative Code?

15    A    I have charged Administrative Code before.

16    Q    At the time you arrested plaintiff and you charged him

17    under penal law 265.01(1), to your knowledge, was there a

18    local law in the City of New York that also made the

19    possession of a stun gun illegal?

20    A    Yes.

21    Q    And to your knowledge, at the time you arrested the

22    plaintiff, Mr. Toure, for possession of an electronic stun

23    gun, could you also have charged him with a violation of the

24    Administrative Code?

25    A    Yes.

Cassino - cross - Miller                    282

1    Q    Now, what did Mr. Toure tell you when you encountered him

2    at the Air France counter about what he was doing in New York

3    City with a stun gun?

4    A    He said that he was trying to bring it to Guinea to sell

5    to the police.

6    Q    Did he tell you that he was a merchant?

7    A    He didn't say that he was a merchant that I recall.

8    Q    Did he tell you he was an importer/exporter?

9    A    Not to my knowledge.

10   Q    Did he tell you he was a distributor?

11   A    No, not to my knowledge, I don't believe he used that

12   word.

13   Q    Okay.

14   A    I don't recall what he exactly said.

15            THE COURT:  Sitting here today, do you recall any of

16   the words he used?

17            THE WITNESS:  I don't recall.  I don't recall the

18   exact verbiage when he was explaining it.  He was just

19   explaining that he was bringing it to them.

20            THE COURT:  To them, do you remember what he said by

21   "them"?

22            THE WITNESS:  I believe he said the police for crowd

23   control, but I don't remember how he said it.

24            THE COURT:  Okay.  Thank you.

25            THE WITNESS:  It was a long time ago.

Cassino - cross - Miller                          283

1          THE COURT:  Okay.  Thank you.

2    Q    Going to the night of the arrest, what was your

3    assignment that night?

4    A    I was assigned to Terminal 1.

5    Q    And Terminal 1 is where Air France is located?

6    A    At the time, it was, yes.

7    Q    Okay.  And what duties were you supposed to be performing

8    that night?

9    A    Our general duties are vast.  I mean most of the time,

10   we're helping travelers with the facility, directions, aided

11   calls, and then if we're called on the radio for something

12   specific, and just general patrol and counterterrorism.

13   Q    And how did you learn that there was a situation at the

14   Air France check-in counter with somebody's luggage?

15   A    I was dispatched on the radio.

16   Q    And at the time, did you get that information through the

17   radio, through a phone call?  How did you get that

18   information?

19   A    Through my police radio.

20   Q    Did you have a Port Authority-issued cell phone at that

21   time?

22   A    No.

23   Q    And when you arrived at the luggage counter, who was

24   there?  Who was present?

25   A    The plaintiff was present and the Air France, that's the

1   only people I recall.

2   Q    And what was the first thing you did when you got there?

3   A    I asked him if he was attempting to check a weapon and

4   for his identification.

5   Q    And what did he respond to you?

6   A    He, he said he was attempting to check a taser and he

7   gave me his identification.

8   Q    And did you ask to see the weapon?

9   A    At some point but not immediately.

10  Q    Did he show you any documentation?

11  A    Yes.

12  Q    And the document he showed you were the two documents

13  that plaintiff's counsel put up a few minutes ago?

14  A    Yes.

15  Q    The letter from Alcohol, Tobacco and Firearms?

16  A    Yes.

17  Q    And the letter on the Department of Justice stationery

18  about hazardous material?

19  A    Yes.

20  Q    And did you accept that documentation as establishing

21  whether or not he lawfully possessed an electronic taser gun

22  in the City of New York and the State of New York?

23  A    I did not.

24  Q    Why not?  Why didn't you accept that?

25  A    Because it didn't say that he legally possessed the taser

Cassino - cross - Miller                                        285

1    in the City or State of New York.

2    Q    Did you ask him for any other documents?

3    A    I did ask him for credentials that would say that he

4    legally possessed it.

5    Q    And did you did he provide anything else?

6    A    He did not.

7    Q    And you said that when you got there, he was not on the

8    phone, he was not on his cell phone?

9    A    Not to my recollection, no.

10   Q    How long did this encounter between you and Mr. Toure

11   last?

12   A    The entire encounter?

13   Q    Yes.

14   A    I would say approximately 30 minutes.  It was not -- I

15   can't be exact but approximately 30 minutes maybe.

16   Q    And at any time during that entire 30 minutes, did you

17   see Mr. Toure with his cell phone?

18   A    I did.

19   Q    When?

20   A    After he was told he was being placed under arrest and he

21   wasn't going to be able to fly, he asked if he could tell his

22   wife.

23   Q    And did you allow him to make that phone call?

24   A    We did.

25   Q    Do you know who he was on the phone with?

Cassino - cross - Miller                          286

1  A    I, I don't.  He said he was calling his fiancee.  I do

2  not know who he actually called.  I did not hear who he

3  called.

4  Q    Was he on speakerphone?

5  A    No, he was not.

6  Q    Did you see him take out his phone at any time prior to

7  the time you told him he was under arrest and he asked you to

8  make a phone call, to do a text or anything else with it?

9  A    I do not recall him taking his phone out, no.

10 Q    If Mr. Toure had taken out his phone during your

11 investigation and tried to make a phone call, would you have

12 told him he couldn't do that?

13 A    I would have told him he couldn't be on his cell phone at

14 the time.  We were actively investigating the situation.  I

15 don't typically allow people to be on their cell phone at that

16 time.

17 Q    And who was the other officer who was with you?

18      You mentioned there were two officers responded.

19 Who was the other officer who was with you?

20 A    Officer Florio.

21 Q    And is Officer Florio senior to you or was he at the

22 time?

23 A    Yes, he is senior to me, yes.

24 Q    And why were you doing the investigation as opposed to

25 Officer Florio?

Cassino - cross - Miller                    287

1  A    I was dispatched to the job as the main officer and I

2  arrived first.  So that's kind of how -- if you arrive, it's

3  your job and he's the backup essentially.  That's the best way

4  I can explain it to you.

5  Q    And did you -- did there come a time when you summoned

6  Sergeant Buckner to come to the scene?

7  A    Yes.  I don't recall if it was me or Officer Florio but

8  one of us requested a supervisor on the radio, yes.

9  Q    And why did you do that?

10  A    Because we believed we had probable cause for an arrest

11  at that point.

12  Q    And why did you bring a sergeant if you both believed you

13  had probable cause?

14  A    That's our protocol.  When you have probable cause for an

15  arrest, our protocol is to have the supervisor on the scene

16  and verify the arrest.

17  Q    So Sergeant Buckner was there to verify that you had

18  probable cause?

19  A    That's correct.

20  Q    And what did Sergeant Buckner tell you?

21  A    He verified that we had probable cause for an arrest.

22  Q    And who made the decision to make the arrest?

23  A    The supervisor on scene would make that decision at that

24  point.

25  Q    So Sergeant Buckner made the decision to make the arrest

Cassino - cross - Miller                                    288

1    and who made the arrest?

2    A    That's correct.  Sergeant Buckner made the decision and

3    then I was the arresting officer.

4    Q    Can you describe to me what the demeanor of all the

5    parties was like that night when this was happening?

6    A    Everyone was calm.

7    Q    And after you made the arrest, do you know, is it

8    protocol to put the person being arrested in handcuffs?

9    A    It is our protocol, yes.

10   Q    And why is that?

11   A    For our safety and their safety.

12   Q    And was the -- when you got back to building 269 to

13   process the arrest paperwork, was plaintiff, Mr. Toure, there

14   also?

15   A    He was.

16   Q    Did you travel with him back to building 269?

17   A    I don't recall who accompanied him back to the building.

18   Q    And is building 269 at JFK Airport?

19   A    Yes, it is.

20   Q    And that's the police command building, right?

21   A    Yes, it is.

22   Q    So you mentioned that the first document that you prepare

23   is an online booking form?

24   A    It's called an Omni form.

25   Q    I'm going to show you a document.

Proceedings                                        289

1          MS. MILLER:  Counsel, it's Defendants' Exhibit P-1,

2     P-2 and P-3.  There's no objection to it.

3          THE COURT:  Just one second before you put it up.

4     Just one second.

5          You said D-1, D-2, D-3?

6          MS. MILLER:  "P."

7          THE COURT:  "P", like plaintiff.

8          MS. MILLER:  "P" as in "Port Authority."

9          THE COURT:  I'm sorry.  Which defendants' exhibit

10    letter is it?

11         MS. MILLER:  "P" as in "Peter."

12         THE COURT:  I understand but I'm asking you for the

13    premarked exhibit letters.  Is it a defendant's Exhibit A or

14    B?  Is it a plaintiff's exhibit?  I might not have heard you

15    when you said it.

16         MS. MILLER:  I have it as Defendants' Exhibit P1, P2

17    and P3.

18         THE COURT:  That is not something that I have

19    because in the JTPO, they're listed as A, B, C, D, et cetera.

20    The "P" letters are Plaintiff's exhibits with numbers.

21         Why don't we take a short break while we sort this

22    out, ladies and gentlemen, rather than do it in realtime.

23    This won't be your full morning break but I'm going to excuse

24    you for, five minutes.  You can stretch, get some coffee, and

25    we'll come and get you.

Cassino - Cross - Ms. Miller                    294

1    CROSS-EXAMINATION BY MS. MILLER:  (Continued.)

2                (Jury present.)

3                THE COURT:  Thank you for your patience, jurors.

4    There was an honest misunderstanding.  We got it sorted out

5    and we're now ready to proceed.  Ms. Miller, whenever you're

6    ready.  I believe you were going to show Defendant's Exhibit

7    P.

8                MS. MILLER:  Yes.  Thank you, Your Honor.

9                THE COURT:  We can put that up on the screen.

10   Jurors, this is Exhibit P, which is pages 1, 2 and 3 from that

11   exhibit is in evidence.

12               Would you like some help with that?  Freddie can

13   help you, if you would like.

14               MS. MILLER:  I would like it to be readable.

15               THE COURT:  I can't do anything about your glasses

16   prescription or mine, but I think we can zoom in.

17   BY MS. MILLER:

18   Q    Officer Cassino, is this the online booking form that you

19   prepared?

20   A    This is the typed version, yes.  I did the handwritten

21   and the stationhouse officer types it.

22   Q    I see.  So you write something down and the station

23   officer actually types this up?

24   A    That's correct.

25   Q    Did you write the description here at above TPO,

Cassino - Cross - Ms. Miller                                    295

1    defendant was in possession of a black stun gun when he

2    attempted to declare it in his checked luggage.  Subject did

3    not have permission or authority to have said item?

4    A    I would have written that with my handwritten, yes.

5    Q    And then he would have typed it?

6    A    He would have typed it.

7    Q    Underneath law code it says PL.  Do you see that, PL,

8    265.01, sub one, and then it's class type, A; one criminal

9    possession weapon, fourth firearm, WEP.  Do you see that

10   language there?

11   A    I do see that.

12   Q    Did you write down that language for the station officer?

13   A    I would have, yes, put the charge.

14   Q    When this form is typed up, where does it go?

15   A    This generates an arrest number.  So it goes to the City

16   of New York because we go through their -- the NYPD, we go

17   through their system, and then it would go to the district

18   attorney.

19   Q    And before you prepared this form, did you take any steps

20   to check Penal Law Section 265.01 sub one?

21   A    Yes.  I would have gotten the actual physical law book

22   and checked the statute.

23   Q    Do you remember doing that on the night in question?

24   A    Yes.

25   Q    And when you say you got the physical law book, what are

1   you talking about?

2   A    We process arrests in the arrest processing room.

3   There's a New York Penal Law book.

4   Q    And that's kept at the command where the stationhouse

5   officer has his desk?

6   A    That's correct.

7   Q    Was it your practice to always check that Penal Law book

8   before you wrote up the omniform?

9   A    Yes, it was.

10  Q    BUT you could have written up the same omniform that

11  night charging --

12          THE COURT:  Let me JUST ask you to rephrase the form

13  given that this is your witness.

14          MS. MILLER:  I'll rephrase it.

15  Q    Would you have written this form with a different charge

16  based on the same statement of facts?

17  A    A local charge?

18  Q    Yes.

19  A    Yes.

20  Q    So this goes to THE New York City Police Department and

21  you get a number that's assigned to the case; is that correct?

22  A    Yes.  It's called an arrest number.

23  Q    And at some point you testified that you spoke to the

24  assistant district attorney for Queens about this case?

25  A    Yes.

Cassino - Cross - Ms. Miller                    297

1    Q    Did the assistant district attorney for Queens get a copy

2    of this document, the online?

3    A    This would have been sent over to the district attorney's

4    office through the system that they use.

5    Q    And at that point is that when the district attorney of

6    Queens called you about this case?

7    A    Yes.  They would call you to write it up, yes.

8    Q    And what did you tell the Queens district attorney about

9    what happened?

10   A    I explained the same thing that I've explained before

11   here, that he was trying to check a weapon, he didn't have any

12   paperwork or documentation stating that he had legal authority

13   to possess that weapon in the city or State of New York.  And

14   then we went over those facts, and they verified that 265.01

15   would be the charge that we would be charging.

16   Q    I'm going to show you what's been marked as Defendant's

17   Exhibit R.  This is in evidence, along with P.  Is this a

18   criminal complaint form?

19   A    Yes, this is.

20   Q    Did you prepare this?

21   A    I did not.

22   Q    Who prepared this?

23   A    The assistant district attorney.

24   Q    And it had the charges Penal Law Section 265.01 sub one;

25   is that right?

Cassino - Cross - Ms. Miller                               298

1   A    That's correct.

2   Q    Was this a charge that you discussed with the assistant

3   district attorney?

4   A    Yes, it is.

5   Q    Did the assistant district attorney tell you anything

6   about a change in the law that made that penal statute

7   unenforceable?

8   A    No, they did not.

9   Q    Has the district attorney in prior occasions when you

10  sent over an online omniform system booking sheet, has the

11  district attorney ever changed the charge that you put in the

12  omniform?

13  A    Yes, they have.

14  Q    So the district attorney can add charges --

15       THE COURT:  Let me correct you on the form there.

16  Q    Can the district attorney add charges?

17  A    Yes, they can.

18       MR. THOMPSON:  Objection.

19       THE COURT:  Overruled.

20  Q    Can the district attorney omit charges, take them out?

21  A    Yes, they can.

22  Q    Is it your understanding when you got this criminal

23  complaint form from the district attorney that the district

24  attorney had approved the charge as you've prepared it?

25  A    Yes, they can 343 a case at this stage.  What that means

Cassino - Redirect - Mr. Thompson                    299

1   is basically they say it's -- you don't have sufficient

2   evidence to charge the charge, and that didn't happen in this

3   case.

4   Q    After you finished -- after you got the criminal charge,

5   this document, R1, I want to show you page R2.  Did you sign

6   the document, the criminal charge?

7   A    That's my signature, yes.

8   Q    It was on this date, 11-12-2019?

9   A    That's correct.

10  Q    What did you do with the criminal charge?

11  A    You then upload it back to them.

12  Q    To the district attorney?

13  A    To the district attorney, yes.

14  Q    And after that, after you finished completing the

15  paperwork that night, did you ever see plaintiff again until

16  this trial?

17  A    No, I did not ever see him again, no.

18         MS. MILLER:  Thank you very much.  I have no further

19  questions.

20         THE COURT:  Any redirect?

21         MR. THOMPSON:  Yes.  Thank you, Your Honor.

22  REDIRECT EXAMINATION

23  BY MR. THOMPSON:

24  Q    Officer Cassino, I'm going to start with the exhibit we

25  were just talking about, Defendant's Exhibit R.  This is the

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Abdoulaye Toure,

        Plaintiff,

    v.

Air France, The City of New York, Port
Authority of New York and New Jersey,
Port Authority of New York and New
Jersey Police Department, Port
Authority of New York and New Jersey
Police Officer Chelsea Cassino, and Port
Authority Police Officers John/Jane Doe
#1 through #5,

        Defendants.

21-cv-1645 (NRM) (ST)

**VERDICT SHEET**

### False Arrest (§ 1983/Federal)

1. Did the plaintiff prove by a preponderance of the evidence that Chelsea Cassino falsely arrested him on November 12, 2019?

    Yes __X__    No _____

*If you answered "No" to Question 1, your deliberations are complete.*

*If you answered "Yes" to Question 1, then please proceed to Question 2.*

### DAMAGES

2. <u>Compensatory Damages</u>: Please state the total amount, if any, of compensatory damages that the plaintiff is entitled to recover.

    a. Non-economic damages:    $ __90K__

    b. Economic damages (lost profits): $ __110K__

1

You have finished your deliberations.  Please have your foreperson sign and date this verdict form and inform the Court, with a written note, that you have reached a verdict.

_____, *Foreperson*

Dated: June ⎮7, 2025