UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Abdoulaye Toure, | |
| Plaintiff, | |
| v. | **MEMORANDUM AND ORDER** |
| | 21-CV-01645 (NRM) (ST) |
| Port Authority of New York and New Jersey, Port Authority of New York and New Jersey Police Department, and Police Officer Chelsea Cassino, | |
| Defendants. | |

NINA R. MORRISON, United States District Judge:

Now before the Court are post-trial motions in this civil rights action, in which Plaintiff Abdoulaye Toure filed suit under 42 U.S.C. § 1983 for false arrest against Defendants the City of New York, Air France, Port Authority of New York and New Jersey ("PANYNJ"), Port Authority of New York and New Jersey Police Department ("PAPD"), and Chelsea Cassino, a PAPD officer stationed at John F. Kennedy Airport in New York City.

At the time of his arrest in November 2019, Toure was a small business owner traveling to Guinea for a meeting with government officials, where he planned to finalize an agreement to sell certain non-lethal weapons to local Guinean police. He claims that Officer Cassino falsely arrested him without probable cause for traveling through John F. Kennedy Airport with a PhaZZer electronic stun gun, even though it was legal for him to possess and travel with such a device under New York law at

1

the time.  He was released from custody the following day, and all criminal charges against him were dismissed.  In this action, Plaintiff argues that his arrest was unlawful because the New York statute he was charged with violating, Penal Law § 265.01(1), had been found unconstitutional by a federal district court approximately eight months before his arrest, and its enforcement was enjoined.

Plaintiff proceeded to trial on a single claim of false arrest against Officer Cassino.[1]  The Court held a jury trial from June 11 to 17, 2025, after which the jury returned a verdict in Plaintiff's favor on the false arrest claim.  The jury awarded Plaintiff (1) $90,000 in emotional distress damages and (2) $110,000 in economic damages, based on his projected lost profits from the business deal that fell through when his arrest prevented him from traveling to Guinea as scheduled.

Now before the Court is Officer Cassino's motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 or, in the alternative, a new trial pursuant to Fed. R. Civ. P. 59 or remittitur of the damages award.  For the reasons that follow, the Court denies Defendant's motions in their entirety, except insofar as the Court agrees that the jury's award of economic damages should be reduced from $110,000 to $86,845.80.

---

[1] All other defendants and claims were dismissed.  Plaintiff voluntarily dismissed his claims against the City of New York.  Pl. Notice of Voluntary Dismissal, ECF No. 15 (July 13, 2021).  The Honorable Judge Gary R. Brown granted Air France's motion to dismiss.  Order dated Sep. 6, 2022, ECF No. 52.  The Court found that Plaintiff's claims involving all other defendants were abandoned and granted summary judgment thereto.  Order dated Sep. 30, 2024, ECF No. 73.

## FACTUAL BACKGROUND

The following facts are drawn from the trial record and construed in the light most favorable to the non-moving party, "disregard[ing] all evidence favorable to the moving party that the jury is not required to believe." *Kerman v. City of New York*, 374 F.3d 93, 114 (2d Cir. 2004) (citation omitted).

On November 12, 2019, Plaintiff Abdoulaye Toure was scheduled to fly from John F. Kennedy airport in New York City to Paris, France, and then to Conakry, Guinea. Plaintiff was traveling in his capacity as owner and employee of Safe Bet Express, a broker of equipment for different governments, including non-lethal weapons used by police for crowd control. Tr. at 14. In Plaintiff's suitcase was a single electronic stun gun, the PhaZZer.

Plaintiff was bringing the PhaZZer to Guinea as an exemplar device for sale in an anticipated business deal. Plaintiff, and Safe Bet Express, had done business with the government of Guinea for years. Tr. at 20. Four or five months prior to the events in this case, Colonel Keita, the Guinean director of police for the rioting department, reached out to Plaintiff in anticipation of upcoming elections and potential political unrest, seeking a non-lethal method of crowd control. Tr. at 19–20. Plaintiff proposed the PhaZZer as one solution. Tr. at 21.

Over the next several months, Plaintiff had more than ten conversations with Guinean government officials about the sale of the PhaZZer, concluding in a verbal agreement as to price, quantity, delivery logistics, and an anticipated delivery within sixty days. Tr. at 21–23, 339. By the time of his travel, Plaintiff had sent the Guinean

government an invoice; all that remained was to demonstrate the use of the stun gun and sign a written contract.  Tr. at 23–24.

Plaintiff planned to bring the PhaZZer sample in his checked bag.  Tr. at 25. Prior to his travel, Plaintiff took numerous steps to ensure that his transport of the PhaZZer was lawful.  Tr. at 24.  First, from the supplier of the PhaZZer, he obtained a letter from the Bureau of Alcohol, Tobacco, and Firearms (the "ATF letter") stating that the PhaZZer is not classified as a firearm.  Tr. at 35; Pl. Ex. 6.  Also from the supplier, he obtained a classification letter from the U.S. Department of Transportation (the "DOT letter").  Tr. at 31; Pl. Ex. 11.  Plaintiff also consulted the website of the Transportation Security Administration ("TSA"), which stated that it was lawful to carry stun guns in checked luggage, and the website of Air France, which stated the same.  Tr. at 29–30; Pl. Ex. 9, 10.  Plaintiff also called Air France to confirm that the airline had no prohibition on traveling with the PhaZZer.  Tr. at 29. Finally, Plaintiff conducted a Google search, which revealed an article that he recalled came from a reputable law journal, stating that a recent federal district court case, *Avitabile v. Beach*, 368 F. Supp. 3d 404, 407 (N.D.N.Y. 2019) ("the *Avitabile* ruling"), had made clear that it was lawful to carry a taser in New York.  Tr. at 24– 25, 110–13.

When Plaintiff arrived at the Air France check-in desk, he informed the staff — unprompted — that his suitcase contained a taser.  Tr. at 45.  After he did so, the staff called the police.  Tr. at 46.  Chelsea Cassino, a Port Authority Police Department officer, responded, and was joined by Officer Francis Florio.  Tr. at 47.

4

Plaintiff calmly and respectfully informed the responding officers that transporting the PhaZZer was lawful. Tr. at 49–50. He asked them to call the TSA to confirm, but they did not do so. Tr. at 50. He also presented the responding officers with the ATF and DOT letters. Tr. at 49. Finally, he informed the responding officers of the federal ruling in *Avitabile* that had struck down New York Penal Law § 265.01(1) as it relates to tasers, and showed them a preview of an AP news article discussing the *Avitable* ruling that his wife had texted and that he had pulled up on his phone. Tr. at 51, 53, 57, 139–40. The preview showed the headline of the article: "Judge says New York stun gun ban is unconstitutional." Tr. at 139; Pl. Ex. 12.

The responding officers disregarded all this information and made no further inquiries. Tr. at 49–53, 59–60. Instead, Officer Cassino determined that there was probable cause to arrest Plaintiff for violating New York Penal Law § 265.01(1), called supervising officer Sergeant Bernard Buckner to confirm, and placed Plaintiff under arrest. Tr. at 271, 287–88.

By the time Plaintiff was arrested, other passengers had arrived at the check-in counter, and he testified that it was "very embarrassing" to be handcuffed "in front of all these people." Tr. at 53, 61. Plaintiff was brought to the Port Authority jail, where officers took his sports coat and scarf, leaving him in a T-shirt and "really cold." Tr. at 70. Later that night, PAPD gave Plaintiff back his sports coat and put him in the back of a police vehicle for transport to Queens Central Booking, where he sat for "quite a while" waiting and was again "really cold." Tr. at 72. When the vehicle

eventually drove Plaintiff to Central Booking, he was not secured with a seatbelt.  Tr. at 72.

Plaintiff was held in Central Booking until his release the following day.  Tr. at 75.  He secured another flight to Conakry, but he could not bring his PhaZZer exemplar with him because it had been seized at the airport upon his arrest.  Tr. at 76.  He arrived in Conakry two days late, missed his scheduled meeting with the Guinean police, and Safe Bet Express' deal with its prospective Guinean buyers fell through.  Tr. at 78–80.  Plaintiff testified in detail as to the value and quantity of the goods he would have sold had he closed his earlier oral agreement with Guinean police officials at the meeting.  Tr. at 321–27.  Specifically, he testified that his lost sales amounted to $289,000, which would have yielded him a profit margin of approximately thirty percent.  Tr. at 321–27.

## PROCEDURAL HISTORY

The Court held a jury trial from June 11 to June 17, 2025.  At trial, the jury heard from Plaintiff, his wife, Officer Cassino, and two other officers present at the time of the arrest, Officer Florio and Sergeant Buckner.  The jury also heard the parties' stipulation about the earlier federal court ruling striking down New York's ban on the possession of stun guns, as follows: "On March 22, 2019, approximately eight months before Mr. Toure was arrested, a federal judge in the Northen District of New York issued a written ruling in a case called *Avitabile v. Beach*.  In that ruling, the federal court found that New York Penal Law § 265.01(1), which had made it a crime for any person to possess an electronic dart gun or an electronic stun gun in the

State of New York violated the Second Amendment to the United States Constitution and was, therefore, unconstitutional." Tr. at 82–83.[2]

At the conclusion of the trial, the jury deliberated on Plaintiff's sole claim of false arrest under 42 U.S.C. § 1983. It found in Plaintiff's favor, and awarded him a total of $200,000 in compensatory damages: $90,000 in non-economic damages and $110,000 in economic damages/lost profits. Verdict Sheet, ECF No. 114. On July 14, 2025, Officer Cassino filed a post-trial motion for judgment as a matter of law, a new trial, and remittitur under Fed. R. Civ. P. 50, 59(a), and 59(e).

## DISCUSSION

Officer Cassino seeks judgment as a matter of law under Fed. R. Civ. P. 50, arguing that notwithstanding the jury's verdict, (1) she had probable cause to arrest Plaintiff for violating New York City Administrative Code § 10-135, and (2) even if probable cause for Plaintiff's arrest was lacking, she is entitled to qualified immunity because she reasonably believed she had probable cause to arrest Plaintiff under both New York City Administrative Code § 10-135 and New York Penal Law § 265.01(1). Officer Cassino also moves to set aside or remit the jury's award for both economic

---

[2] Defendant asserts, as she did pretrial, that the *Avitabile* ruling is of limited relevance because, more than five years later, its reasoning was rejected by a different judge in the Southern District of New York in *Calce v. City of New York*, 21-CV-8208 (ER), 2025 WL 895414, at *10 (S.D.N.Y. Mar. 24, 2025). Because that decision postdates Plaintiff's arrest by several years, however, it is irrelevant to whether Officer Cassino had probable cause to arrest Plaintiff in November 2019, nor to whether she is entitled to qualified immunity for her actions at that time. Prior to trial, the Court gave Defendant leave to submit any authority supporting her claim that the Court (or the jury) could properly rely on *Calce* for either proposition given that it postdates Plaintiff's arrest, *see* Min. Entry dated May 30, 2025, but defense counsel provided none, *see* Letter dated June 3, 2025, ECF No. 95.

and non-economic damages under Fed. R. Civ. P. 59(e) or, in the alternative, for a new trial under Fed. R. Civ. P. 59(a). The Court addresses each argument in turn.

## I.    <u>Judgment as a Matter of Law</u>

At trial, Officer Cassino argued that she had probable cause to arrest Plaintiff under the Administrative Code, and that she was entitled to qualified immunity because her decision to arrest Plaintiff was reasonable under both the Administrative Code and New York Penal Law § 265.01(1). The jury was instructed on both the Administrative Code and the Penal Law and instructed that Officer Cassino would not be liable for false arrest if she had probable cause to arrest Plaintiff under either provision. Jury Instructions, ECF No. 110 at 15–19. The jury found for Plaintiff on his false arrest claim. Officer Cassino now moves to set aside the verdict, arguing that, as a matter of law, she had probable cause to arrest Plaintiff for violating the Administrative Code and that she was entitled to qualified immunity under either or both provisions.

### a.    <u>Standard of Review</u>

A district court may grant a motion for judgment as a matter of law in a jury trial if it finds "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" opposing the request. Fed. R. Civ. P. 50(a)(1). The Second Circuit has held that a district court may grant a Rule 50 motion only if:

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.

*Ortiz v. Stambach*, 137 F.4th 48, 61 (2d Cir. 2025) (citation omitted).  The standard for judgment as a matter of law is "the same as for summary judgment."  *Cobb v. Pozzi*, 363 F.3d 89, 101 (2d Cir. 2004).  Moreover, "[i]n ruling on a motion for judgment as a matter of law, the court may not itself weigh credibility or otherwise consider the weight of the evidence; rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury."  *Williams v. Cnty. of Westchester*, 171 F.3d 98, 101 (2d Cir. 1999).  Thus, the court "must draw all reasonable inferences in favor of the nonmoving party . . . [and] disregard all evidence favorable to the moving party that the jury is not required to believe."  *Zellner v. Summerlin*, 494 F.3d 344, 370 (2d Cir. 2007) (quotation modified).

b. Probable Cause and Qualified Immunity

To prevail on his false arrest claim at trial, Plaintiff had to show, by a preponderance of the evidence, that Officer Cassino "intentionally confined him without his consent and without justification."  *See Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016) (reciting elements of false arrest under New York law) (citation omitted).  "[T]he existence of probable cause" for an arrest "is an absolute defense to a false arrest claim."  *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006).  To have probable cause for an arrest, a police officer must "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *Zalaski v. City of Hartford*, 723 F.3d 382, 389–

90 (2d Cir. 2013) (citation omitted).  Probable cause demands only the "kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Florida v. Harris*, 568 U.S. 237, 244 (2013) (citation modified).

Plaintiff is also barred from recovering against Officer Cassino if she can demonstrate that she was entitled to qualified immunity.  *See Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018) ("Qualified immunity is an affirmative defense on which the defendant has the burden of proof.").  Qualified immunity protects a police officer from civil damages if she can show that "(a) [her] action did not violate clearly established law, or (b) it was objectively reasonable for [her] to believe that [her] action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (citation omitted).

The right to be free from arrest without probable cause "is a long established constitutional right." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997); *Jaegly*, 439 F.3d at 151 (The "Fourth Amendment right to remain free from unreasonable seizures . . . includes the right to remain free from arrest absent probable cause.").  However, even if probable cause was lacking, Officer Cassino may be entitled to qualified immunity if her decision to arrest Plaintiff was objectively reasonable based on the information available to her at the time.  "Qualified immunity protects an officer so long as [s]he had 'arguable probable cause' to arrest, which 'exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on

10

whether the probable cause test was met.'" *Dancy*, 843 F.3d at 107 (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (further quotations omitted)).

It is also well established that in some circumstances, officers have a duty to further investigate whether probable cause exists before making an arrest. As relevant here, when an officer becomes aware of factual or legal matters that may undermine probable cause, she must conduct a limited but nonetheless reasonable investigation of those matters prior to taking a suspect into custody. "Reasonable avenues of investigation must be pursued to establish probable cause especially when . . . it is unclear whether a crime had even taken place." *Oliveira v. Mayer*, 23 F.3d 642, 647 (2d Cir. 1994) (citation modified); *see also Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) ("[T]he failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause." (citation omitted)) (denying judgment as a matter of law). In particular, while an officer need not investigate every "arrestee's protestations of innocence," *Panetta v. Crowley*, 460 F.3d 388, 395–96 (2d Cir. 2006), she also may not "turn a deaf ear" to evidence that would exculpate the arrestee, *Tretola v. Cnty. of Nassau*, 14 F. Supp. 3d 58, 74 (E.D.N.Y. 2014) (denying judgment as a matter of law to police officer who arrested plaintiff for maintaining an unsafe heater despite foregoing multiple opportunities to confirm that the heater was not operational); *see also Breton v. City of New York*, 404 F. Supp. 3d 799, 811 (S.D.N.Y. 2019) (finding neither probable cause nor qualified immunity for arrest where defendants "turned a blind eye to evidence that was known to them" that exculpated the plaintiff, including multiple eyewitness

reports).  "[A]n officer may not disregard plainly exculpatory evidence." *Panetta*, 460 F.3d at 395; *see also Figueroa v. Mazza*, 825 F.3d 89, 102 (2d Cir. 2016) ("[A]n officer making a probable-cause determination is not at liberty to ignore evidence tending to exculpate the suspect.").  An officer also may not turn a blind eye or deaf ear to evidence that may negate probable cause prior to making an arrest.  For instance, probable cause was found lacking where an officer "admitted that he had harbored serious doubts" about the identification of the plaintiff, but still "failed to conduct an independent investigation" before making an arrest.  *Roundtree v. City of New York*, 617 N.Y.S.2d 170, 171 (N.Y. App. Div. 1st Dep't 1994).  Similarly, the Second Circuit found that an officer's refusal to accept a phone call from a treating psychiatrist who may have had relevant information about the plaintiff's mental state before involuntarily hospitalizing the plaintiff was objectively unreasonable and not shielded by qualified immunity.  *Kerman v. City of New York*, 261 F.3d 229, 241 (2d Cir. 2001) (reversing district court's grant of summary judgment on Fourth Amendment claim, and finding no qualified immunity, where plaintiff argued that officer "failed to reasonably investigate his mental state" before taking him into custody and involuntarily transporting him to a psychiatric facility).

     c.  Administrative Code § 10-135

Officer Cassino makes two arguments as to why New York City Administrative Code § 10-135 shields her from liability for Plaintiff's false arrest as a matter of law.  First, she argues that she had actual probable cause to arrest Plaintiff under the code, a complete defense to the action for false arrest.  *See Weyant v. Okst*, 101 F.3d 845,

852 (2d Cir. 1996).  Second, she argues that she had at least "arguable probable cause" to arrest Plaintiff under the code, giving her qualified immunity for her actions.  *See Zellner*, 723 F.3d at 369 (citation modified).

Officer Cassino raised her Section 10-135 defense for the first time at trial, having failed to raise it at summary judgment.  *See* Mot. Summary J., ECF No. 65 (Oct. 31, 2023).  Although Officer Cassino did not charge Plaintiff with violating the Administrative Code, a claim for false arrest "turns only on whether probable cause existed to arrest a defendant," and it is irrelevant whether probable cause existed with respect to the charge "actually invoked by the arresting officer at the time of arrest." *Jaegly*, 439 F.3d at 154.  Thus, the Court allowed Officer Cassino to argue at trial that she had probable cause to arrest Plaintiff under Section 10-135 and now considers whether, as a matter of law, the trial record shows that she had either probable cause or (for purposes of qualified immunity) at least "arguable probable cause" to arrest Plaintiff on that basis.

The Administrative Code makes it a misdemeanor to possess an electronic stun gun in New York City, with two exceptions.  N.Y.C. Admin. Code § 10-135.  The second exception, relevant here, applies to "manufacturers of electronic stun guns or importers and exporters or merchants of electronic stun guns, when such stun guns are scheduled to travel in the course of international, interstate, or intrastate commerce to a point outside the city."  N.Y.C. Admin. Code § 10-135(e).  The code further provides that "[s]uch bulk shipments shall remain in their original shipping

package, unopened, except for inspection and possible subdivision for further movement in interstate or intrastate commerce to a point outside the city." *Id.*

    i.  *Actual Probable Cause Under Administrative Code § 10-135*

Probable cause determinations are fact-specific and turn on "those facts available to the officer at the time of the arrest and immediately before it." *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (citation omitted). Here, numerous facts presented at trial — taken in the light most favorable to Plaintiff — support the jury's determination that Officer Cassino lacked probable cause to arrest Plaintiff under Administrative Code § 10-135.

First, a jury could have reasonably found that Plaintiff was a merchant of electronic stun guns and thus not in violation of the code. N.Y.C. Admin. Code § 10-135(e). Plaintiff testified that he told the responding officers that he was bringing the PhaZZer to Guinea in connection with a planned sale of the stun guns, and that he was doing so lawfully. Tr. at 50 (Plaintiff "explained to [the officers that] it was a business trip" and that he had the required documentation), 118 (Plaintiff "told [the officers that the PhaZZer] was a sample for the police in Guinea").[3] Plaintiff's testimony was corroborated in part by Officer Cassino, who recalled that Plaintiff informed her that he was traveling with the PhaZZer for business purposes. Tr. 262; *see also id.* at 282 (testifying that Plaintiff told her "he was trying to bring [the PhaZZer] to Guinea to sell to the police"). While Officer Cassino's supervisor,

---

   [3] Under the collective knowledge doctrine, the information Plaintiff shared with Officer Florio and Sergeant Buckner may be imputed to Officer Cassino, as another officer participating in the same investigation. *See Zellner*, 494 F.3d at 369.

14

Sergeant Buckner, claimed that he ascertained that Plaintiff lacked a merchant's license before authorizing the arrest, Tr. at 192, his account was contradicted by Plaintiff's testimony that the responding officers never responded to his assertions that he was lawfully transporting the PhaZZer for a business deal, Tr. at 50–51, 59–60. The jury also could have reasonably declined to credit Buckner's claim that prior to Plaintiff's arrest, he considered whether Plaintiff was legally authorized to carry a PhaZZer as a "merchant," after Buckner was impeached by prior deposition testimony that he believed carrying such a device would be legal only if "the person was a law enforcement officer or a certified security guard." Tr. at 214–15; *see Ortiz*, 137 F.4th at 64 (finding that jury "could have rationally rejected [defendant's] testimony as not credible based on . . . [defendant's] prior inconsistent statements admitted at trial").

Defendant's reliance upon a portion of Plaintiff's trial testimony in which he stated that he "wasn't manufacturing or selling" stun guns is misplaced. Def. Mem. in Support of Mot. for J. as a Matter of Law ("Def. Mem."), ECF No. 121 at 9 (July 14, 2025); Tr. at 109. In that excerpt, Plaintiff was responding to questions posed by defense counsel about the ATF letter, which "advise[d] that you consult with local law enforcement authorities to make certain there are no restrictions based on State laws or local ordinances that could impact your manufacturing and sales activities." Pl. Ex. 6. Asked why he didn't consult the police before traveling to New York, Plaintiff explained, "I didn't because I wasn't manufacturing or selling." Tr. at 109. Taken in context, a jury could have quite reasonably found that Plaintiff did not consult local law enforcement before traveling because he was not manufacturing or selling stun

guns *in New York City*.  The Administrative Code exception, however, applies to merchants engaged in the sale of stun guns to buyers located outside New York City. Plaintiff's out-of-context response to cross-examination concerning the ATF letter, therefore, is not probative of whether Officer Cassino had probable cause to believe that he did not otherwise qualify as a "merchant" under the Administrative Code.  In any case, there was no testimony that Plaintiff ever stated to Officer Cassino or anyone else at the time of his arrest that he "wasn't manufacturing or selling" these devices.  It goes without saying that Plaintiff's testimony at trial in 2025 was not a "fact[] available to [Officer Cassino] at the time of the arrest." *Caldarola*, 298 F.3d at 162.  Plaintiff's trial statement cannot be imputed to give Officer Cassino probable cause.

Defendant also argues that Plaintiff was not a "merchant" permitted to possess a stun gun for commercial travel purposes under Section 10-135 because he was only in possession of a single PhaZZer.  Def. Mem. at 7.  The jury was entitled to reject this interpretation of the Administrative Code, which Defendant pressed at summation.  Tr. at 408–9.  Defendant presents no case law to support her novel interpretation of Section 10-135, and the Court finds no basis to adopt it.

As an initial matter, the Court is guided by the plain text of the statute.  *See City of New York v. Golden Feather Smoke Shop, Inc.*, No. 08-CV-3966 (CBA), 2009 WL 2612345, at *29 (E.D.N.Y. Aug. 25, 2009) ("The [New York] Court of Appeals has held 'repeatedly' that 'where the language of a statute is clear and unambiguous, courts must give effect to its plain meaning.'" (quoting *Samiento v. World Yacht Inc.*,

16

10 N.Y.3d 70, 78 (N.Y. 2008)) (collecting cases)); *Matter of Raritan Dev. Corp. v. Silva*, 91 N.Y.2d 98, 106 (N.Y. 1997) ("This Court has long applied the well-respected plain meaning doctrine" of statutory construction.).  On its face, the Administrative Code exception extends to all "merchants of electronic stun guns" engaged in the commercial transport of "such stun guns" in and out of New York City.  N.Y.C. Admin. Code § 10-135(e).  The jury had ample grounds to find that Plaintiff fell within that exception.

The remaining language upon which Defendant relies — "Such bulk shipments shall remain in their original shipping package, unopened, except for inspection and possible subdivision" — does not support Defendant's narrow reading of the code. Def. Mem. at 8.  Instead, the Code's use of the word "such" is merely a description of certain (bulk) shipments that may fall within the exception — but nothing in the Code suggests that bulk shipments are the *only* circumstance in which the exception will apply.

Defendant's interpretation also invites contradictions.  The code explicitly contemplates the "subdivision" of bulk shipments.  N.Y.C. Admin. Code § 10-135(e). But a bulk shipment, once subdivided, may no longer be in bulk.  Defendant's interpretation of the code would lead to the absurd result that a merchant of electronic stun guns could possess a bulk quantity of goods for shipment, and could subdivide that shipment, but not into individual units. *See People v. Pabon*, 28 NY3d 147, 156 (N.Y. 2016) ("[W]e must interpret a statute so as to avoid an unreasonable or absurd application of the law.") (citation omitted).  Nor does the Administrative

Code provide any definition of how many stun guns constitute a "bulk shipment," such that law enforcement officers and reviewing courts might determine whether the exception does or does not apply. Accordingly, the Court declines to adopt Defendant's novel claim that the "merchant" exception in the Administrative Code only applies when a merchant sells the listed devices in a "bulk" shipment.

Lastly, Defendant argues, relying on the Uniform Commercial Code, that Plaintiff was not a merchant because he lacked the requisite "knowledge or skill peculiar to the practice or goods involved in the transaction." Def. Mem. at 8 (citing N.Y. U.C.C. § 2-104(1)). But Defendant's assertion that the Administrative Code integrates the definitions of the Uniform Commercial Code is entirely unsupported. In any case, the record is replete with evidence from which a jury could have concluded that Plaintiff was a merchant. Plaintiff owned a company specializing in sales of "non-lethal weapon[s] for crowd control" such as the PhaZZer. Tr. at 14; *see* N.Y. U.C.C. § 2-104, Cmt. 2 ("[A]lmost every person in business would . . . be deemed to be a 'merchant.'").

Thus, it was reasonable for the jury to find that Officer Cassino lacked probable cause for Plaintiff's arrest under N.Y.C. Admin. Code § 10-135 because, prior to arresting him, she was alerted to facts establishing that the Code's exception applied to Plaintiff, a merchant transporting a single stun gun for business purposes.

  ii. *Arguable Probable Cause Under Administrative Code § 10-135*

Officer Cassino also argues that she is entitled to judgment as a matter of law because she has qualified immunity under the Administrative Code. An officer is not

entitled to qualified immunity if "no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller*, 66 F.3d 416, 420–21 (2d Cir. 1995). "Arguable probable cause should not be misunderstood to mean almost probable cause." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (citation modified). "If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Id.* The relevant question is not whether Officer Cassino should have conducted additional investigation after the arrest, but "whether, given the totality of circumstances, [she] should have investigated further *before* concluding that [s]he had probable cause to arrest." *Tretola*, 14 F. Supp. 3d at 74. Here, Officer Cassino's Administrative Code defense, which emerged for the first time at trial, does not provide qualified immunity for Plaintiff's arrest.

Even Officer Cassino's own testimony supports a finding that she lacked arguable probable cause to arrest Plaintiff under the Administrative Code. Officer Cassino testified that while she was aware at the time of Plaintiff's arrest that the Administrative Code barring possession of stun guns had exceptions, she was not aware what the exceptions actually were, and was specifically unaware of the exception for merchants of stun guns. Tr. at 273, 306; *see also id.* at 262, 264 (testifying that she believed Plaintiff lacked the "proper documentation" to possess a stun gun because he was not "an active law enforcement officer or security guard"). Officer Cassino could not rely on her experience of the law; she had never previously

19

made an arrest for unlawful possession of a stun gun. Tr. at 265.  Indeed, she testified at length that because she was not aware of the exceptions to Section 10-135, she would have had to conduct additional independent research on the scene to determine whether she had probable cause to arrest Plaintiff under that portion of the Administrative Code.  Tr. at 306–08 ("If I was charging [Plaintiff] with the admin code I would have independently researched that on the scene.").  Officer Cassino conducted no such investigation.  Tr. at 308.  As such, no reasonable officer in Defendant's position could have determined, based on the facts available to her "at the time of arrest," *Jenkins*, 478 F.3d at 87, that she had probable cause to arrest Plaintiff.  *See, e.g.*, *Spruill v. Levy*, No. 04 CIV 7316 (KMW) (JCF), 2008 WL 2413899, at *4 (S.D.N.Y. June 12, 2008), *report and recommendation adopted*, 2008 WL 3884358 (S.D.N.Y. Aug. 21, 2008) ("The police may not rely on information gained after-the-fact to show that probable cause existed at the time of arrest"); *see also United States v. Thevis*, 469 F. Supp. 490, 503 (D. Conn. 1979), *aff'd*, 614 F.2d 1293 (2d Cir. 1979) ("[O]fficers may not use facts which were learned only after the arrest to establish probable cause.").

Officer Cassino argues that she could have checked the language of the Administrative Code at the stationhouse after effecting the arrest and learned that Plaintiff was not (allegedly) covered by any exceptions in the Code.  Def. Mem. at 6. Yet such a post-hoc determination likewise could not have created probable cause for an arrest.  And while the other responding officer at the scene claimed that he was aware of the prohibitions in Section 10-135, he, too, testified that his understanding

of the law was that "basically, you're not allowed to have a stun gun in the New York City area," and gave no indication that he was aware of the exceptions expressly set forth in the Code.  Tr. at 365.  In short, the evidence showed that Plaintiff informed Officer Cassino that he was carrying the PhaZZer for purposes of an international business transaction; that Officer Cassino knew there were exceptions to the Administrative Code but did not know (or consider) at the time of Plaintiff's arrest what those exceptions were; and that Officer Cassino failed to further investigate whether any of the Code's exceptions applied to Plaintiff before placing him under arrest.  Under these circumstances, a reasonable officer had an affirmative duty to consider whether Plaintiff fell within one of the exceptions set forth in the text of the Administrative Code prior to effecting his arrest.  Because Officer Cassino did not do so, she lacked an objectively reasonable belief that she had the lawful authority to arrest Plaintiff.  *See Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433 & n.11 (2d Cir. 2009).  Officer Cassino's motion for a judgment as a matter of law by reason of qualified immunity under the Administrative Code is therefore denied.

### d. New York Penal Law § 265.01(1)

Officer Cassino does not argue that she had actual probable cause to arrest Plaintiff under New York State Penal Law § 265.01(1), which had been ruled unconstitutional and its enforcement enjoined statewide months before she placed Plaintiff under arrest for violating that law.  *Avitabile*, 368 F. Supp. 3d at 421.[4]

---

[4] The *Avitabile* injunction extends to "all persons in active concert or participation with the New York State Police."  368 F. Supp. 3d at 421.  Officer

Instead, she asserts that she is entitled to qualified immunity because she had "arguable probable cause" to arrest Plaintiff — specifically, because she was unaware of the federal court's decision enjoining the enforcement of the statute and reasonably believed that it remained in force. Def. Mem. at 10. This argument is unavailing.

The Court considered and rejected Defendant's qualified immunity argument under Penal Law § 265.01(1) at summary judgment. Mem. Op., ECF No. 73 at 12–19. There, the Court analyzed Officer Cassino's arguments under *Amore v. Novarro*, in which the Second Circuit applied its narrow exception to the general rule that a "police officer's enforcement of an unconstitutional statute will [not] be immune." 624 F.3d 522, 535 (2d Cir. 2010) (noting that courts "ordinarily impute knowledge of the case law to public officials" absent "extraordinary circumstances" (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)). In particular, "where the defendant acted deliberately and rationally in seeking to determine the then-valid, applicable and enforceable law" — in that case, by consulting a copy of the New York Penal Law that included the unconstitutional statute — immunity stands. *Id.* at 527, 535. However, as the Court noted, *Amore* was an "unusual case" and a "limited exception" to the general rule that courts "impute knowledge of case law to public officials." Mem. Op. at 16–17 (citing *Zalaski*, 723 F.3d at 391); *see also Deferio v. City of Syracuse*, 306 F. Supp. 3d 492, 517 (N.D.N.Y. 2018), *aff'd*, 770 F. App'x 587 (2d Cir. 2019) (officer's reliance on "arguably incorrect" interpretation of permit did not fall within *Amore*

---

Cassino does not argue that, while acting in her capacity as a law enforcement officer with the PAPD, she fell outside the scope of that injunction.

exception); *United States v. Stroke*, No. 14-CR-45S, 2019 WL 1960207, at *21 (W.D.N.Y. May 2, 2019) (finding that *Amore* "does not help" establish probable cause for search under statute subject to permanent injunction).

Assessing this case under the *Amore* standard at summary judgment, the Court determined that Officer Cassino's actions did not fall within that limited exception.  Mem. Op. at 17–19.  In particular, the record at summary judgment precluded Officer Cassino from establishing, as a matter of law, that she had not been trained on the *Avitabile* ruling and therefore acted in good faith when she arrested Plaintiff under a statute that had been declared unconstitutional.  *Id.*  Moreover, unlike the officer in *Amore* who made efforts to determine whether the law was then in effect, there was no evidence at summary judgment that Officer Cassino made any such attempts.  *Id.*

Officer Cassino's claim fares no better after trial.  Instead, the post-trial record makes even more clear that her actions do not fall within the "limited exception" of *Amore* and that — drawing all reasonable inferences in Plaintiff's favor — Officer Cassino is not entitled to qualified immunity for her false arrest of Plaintiff.

First, Plaintiff testified that he presented an array of information to the responding officers, including directly to Officer Cassino, that a reasonable jury could have found triggered a well-established duty to investigate.  Plaintiff told the officers that he had researched New York law on carrying stun guns prior to his travel and confirmed that possession was legal.  Tr. at 51.  He also informed the officers that the New York state penal law that had made it illegal to possess stun guns had been

struck down by a federal judge.  Tr. at 51.  The officers responded, incorrectly, "[T]hat's not going to take effect until next year."  Tr. at 51.  Plaintiff's wife was on the phone with him while he discussed these matters with the officers prior to his arrest.  During that call, his wife texted him a link to an article about the *Avitabile* ruling which stated that the stun gun ban had been found unconstitutional.  Tr. at 53.  A screenshot of this text message, including an article preview and the headline "Judge says New York stun gun ban is unconstitutional," was admitted as an exhibit. Tr. at 139–40, Pl. Ex. 12.  Plaintiff showed this text message to the responding officers and informed them that the decision "specifically . . . says starting immediately."  Tr. at 53.  At that point, the arresting officers told Plaintiff that "yes, that's federal, that's not New York City, we operate differently."  Tr. at 59.  The officers also told Plaintiff, without supplying any reason, that they suspected he was "making up" the federal court decision.  Tr. at 60.[5]

Crediting Plaintiff's testimony, the article stating the stun gun ban had been found unconstitutional triggered a limited duty to investigate whether Penal Law § 265.01(1) remained in effect.  In fact, Sergeant Buckner testified that if he had been provided with a court decision stating that Plaintiff could legally possess a stun gun,

---

[5] Defendant contested whether Plaintiff ever mentioned the change in the law or showed the officers his phone.  Tr. at 269–70.  Considering such conflicting testimony in a motion for judgment as a matter of law, the Court "must defer to the credibility assessments that may have been made by the jury."  *Williams*, 171 F.3d at 101.  The jury was well within its rights to credit Plaintiff's testimony that he did in fact tell the responding officers about the federal court injunction and showed the article to the responding officers.  That is particularly so since the jury had the benefit of additional corroborating evidence, *i.e.*, a contemporaneous text message from Plaintiff's wife with the article preview and headline.  Pl. Ex. 12.

he would have "called the lieutenant who was my supervisor" to seek advice on the situation.  Tr. at 191; *see also* Tr. at 220 ("[If made aware there had been a court decision,] I would have conferred with [my lieutenant].").  Officer Cassino likewise testified that "if there's a question on the law I'm absolutely going to do further investigation."  Tr. at 308.  She also confirmed that if she needed to detain someone while she checked whether there was a lawful basis for their arrest, she had the ability to do so.  Tr. at 382.  None of the responding officers, however, did any further investigation after Plaintiff showed them the article about the *Avitabile* ruling.  The Court finds that a reasonable officer under the circumstances would have further investigated whether Penal Law § 265.01(1) remained in force before putting Plaintiff under arrest for violating its terms.  *Cf. Amore*, 624 F.3d at 533–35 (officer entitled to qualified immunity after consulting a copy of New York's Penal Law prior to effecting arrest).

Second, Officers Cassino and Florio and Sergeant Buckner all testified about extensive legal training provided by PAPD, from which a jury could have found that Officer Cassino had been trained about the change in the law following the *Avitabile* ruling, or that a reasonable officer in her position would have known about the ruling.  Officer Cassino testified that she was trained four times a year on changes in the law, and that other important updates were provided through "buck slips" at roll call and emails.  Tr. at 266–68.  This testimony was corroborated by Officer Florio and Sergeant Buckner.  Tr. at 185–87, 359–60.  Officer Cassino further testified that she relied on her memory during legal trainings and did not take notes.  Tr. at 268.

Unsurprisingly, she could not remember how many trainings or buck slips she received during the year of Plaintiff's arrest, nor what they were about.  Tr. at 302–03.  Based on these facts, a reasonable jury could have discredited Officer Cassino's testimony that the PAPD never provided her with any information about the *Avitabile* ruling, and concluded instead that she merely forgot about or failed to attend to the training where it was presented.[6]

The Court also notes that, based upon a survey of relevant cases, it appears that only one district court in the Second Circuit has ever relied on the *Amore* exception to find that a defendant officer is entitled to qualified immunity.  *Barboza v. D'Agata*, 151 F. Supp. 3d 363 (S.D.N.Y. 2015).  And even that case is readily distinguishable from this one.  In *Barboza*, the defendant police officers were ordered to make the arrest by an assistant district attorney, and relied on his interpretation of the legality of the statute under which they made the arrest.  *Id.* at 372.  Here, Officer Cassino argues she was entitled to qualified immunity because she consulted *after* the arrest with an assistant district attorney, who charged Plaintiff under Section 265.01(1), and who was also apparently unaware of the *Avitabile* ruling.  Def. Mem. at 13.  But Officer Cassino could not have relied (and did not rely) on the assistant district attorney's own ignorance of the law at the time of the arrest.

---

[6] Sergeant Buckner also testified that he was never trained on the legality of possessing a stun gun in New York following the *Avitabile* ruling.  Tr. at 193.  A jury could easily have discredited this testimony as well, however, given that Sergeant Buckner was unable to recall much about the trainings he received, and could not say for sure whether or not he ever received a buck slip regarding Penal Law § 265.  Tr. at 199–204.

Qualified immunity turns on "whether an officer's conduct was objectively reasonable" in light of the "information possessed by the officer at the time of the arrest." *Garcia*, 779 F.3d at 92 (citation omitted); *see also Zalaski*, 723 F.3d at 389 ("[T]he inquiry is not how courts or lawyers might have understood the state of the law at the time of the challenged conduct," but what a "reasonable officer" would have understood).  Unlike the consultation in *Barboza*, which occurred prior to the arrest, Officer Cassino's consultation with the prosecutor's office only after arresting Plaintiff does not entitle her to qualified immunity.

Thus, because Plaintiff presented evidence that he repeatedly alerted Officer Cassino to the fact that a federal court had declared Penal Law § 265.01(1) unconstitutional as it relates to stun guns, she had a clearly established duty to investigate that information before placing him under arrest, and was not entitled to simply rely on her subjective belief that the statute remained in effect.  Because Officer Cassino does not fall within the narrow *Amore* exception to the general rule that knowledge of a statute's invalidity can be imputed to an officer in the field, her decision to arrest Plaintiff was not covered by qualified immunity.

## II.    <u>Remittitur</u>

Officer Cassino also seeks reduction of the award of $90,000 for emotional pain and suffering and to set aside the award of $110,000 for lost income or, in the alternative, a new trial.  Defendant's motion as to damages is granted in part and denied in part.

a. <u>Standard of Review</u>

Unlike a motion for judgment as a matter of law, "a new trial may be granted even if there is substantial evidence supporting the jury's verdict." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998). Nevertheless, when considering a motion for a new trial or for remittitur, a "high degree of deference" is afforded to the jury's credibility determinations. *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418–19 (2d Cir. 2012). Thus, where "a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice." *Id.*

b. <u>Emotional Damages</u>

The calculation of damages is "the province of the jury." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014) (citation omitted). In determining whether the jury awarded excessive damages, a district court must "view the evidence and draw all factual inferences in favor of [Plaintiff]," and "accord substantial deference to the jury's determination of factual issues." *Dancy*, 843 F.3d at 99 (citation modified). A district court may reduce a damages award only when it is "so high as to shock the judicial conscience and constitute a denial of justice." *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003). For guidance, district courts look to "amounts awarded in other, comparable cases." *Id.* (citation omitted). As the Second Circuit emphasized, however, courts "need not average the high and low awards," but only assess whether the verdict "lies within the reasonable range." *Dancy*, 843 F.3d

at 113 (citation modified); *see also Ortiz*, 137 F.4th at 73 (reviewing motion for remittitur for "whether the award is so high as to shock the judicial conscience and constitute a denial of justice").

In an action for false arrest, "[s]ince the injury is in large part a mental one, the plaintiff is entitled to damages for mental suffering, humiliation, and the like." *Jaegly*, 439 F.3d at 154 (citing W. Keeton et al., Prosser and Keeton on the Law of Torts § 11, at 48 (5th ed.1984)). The Second Circuit has repeatedly affirmed significantly greater amounts of emotional damages than Plaintiff was awarded for similar false arrests. *See Martinez v. The Port Auth. of N.Y. & N.J.*, 445 F.3d 158, 160 (2d Cir. 2006) (emotional damages of $200,000 for false arrest on public lewdness, although Plaintiff was never physically injured); *Gardner v. Federated Dep't Stores, Inc.*, 907 F.2d 1348, 1353 (2d Cir. 1990) (pain and suffering award of $150,000 for false arrest by department store); *Dancy*, 843 F.3d at 115 (emotional damages of $115,000 for false arrest). Other district courts in this Circuit have awarded damages of hundreds of thousands of dollars for emotional suffering following false arrest. *See, e.g.*, *Sulkowska v. City of New York*, 129 F. Supp. 2d 274, 309 (S.D.N.Y. 2001) (awarding $275,000 in emotional damages for false arrest); *id.* at 308 n.52 (collecting cases); *Thomas v. Kelly*, 903 F. Supp. 2d 237, 264 (S.D.N.Y. 2012) (compensatory damages of $125,000 for false arrest); *Martinez v. Gayson*, No. 95-CV-3788 (ILG), 1998 WL 564385, at *6 (E.D.N.Y. June 30, 1998) (remitting to $160,000 a compensatory damages award for plaintiff who was falsely arrested by Port Authority police and held in Port Authority jail for five hours); *see also Bert v. Port Auth. of N.Y.*

29

& *N.J.*, 561 N.Y.S.2d 416, 416 (N.Y. App. Div. 1st Dep't 1990) (affirming compensatory damages award of $100,000 to plaintiff who was detained for three-and-one-half hours by Port Authority police, and noting "racial overtones" of the incident). Particularly taking into consideration the inflation that has taken place since the above-referenced judgments were entered, *see Martinez v. City of New York*, No. 16-CV-79 (NRM) (CLP), 2023 WL 4627739, at *18 (E.D.N.Y. July 19, 2023), it is clear that $90,000 is well within the "reasonable range" for false arrest. *Dancy*, 843 F.3d at 113.

Here, the jury's award for emotional damages was not excessive. Plaintiff, a Black man who had never previously been arrested, was handcuffed and marched out of the airport and his belongings confiscated. Tr. at 61–62, 74. Other travelers were checking in at the time, and Plaintiff testified that it was "very embarrassing" to be arrested "in front of all of these people." Tr. at 59, 61–62. He was driven to the Port Authority jail, where officers removed his sports coat and scarf, leaving him "really cold" in the jail. Tr. at 69–70. He was then placed in the back of a police car, also in the cold, where he waited for "quite a while" before being transported to Queens Central Booking. Tr. at 72. While in transit, Plaintiff was not secured with a seatbelt, and was forced to brace himself against bumps in the road while handcuffed. Tr. at 72. He then stayed in jail overnight. Tr. at 74. Plaintiff has "nerve-racking" anxiety about travel to this day. Tr. at 81. Plaintiff's wife testified that after the arrest, Plaintiff was "very on edge," had trouble sleeping, and still became nervous

whenever he traveled.  Tr. at 170.  More than five years later, Plaintiff continued to suffer the effects of his arrest.  Tr. at 170.

Having observed Plaintiff's demeanor and testimony over a three-day trial, the Court finds no basis to conclude that his description of his own emotional damages was the product of hyperbole or overstatement.  The jury had ample grounds to find that Plaintiff was deeply humiliated and profoundly disturbed by his experience of being falsely arrested in front of a crowd of fellow air travelers while embarking on an international business trip.  Accordingly, the jury's award of $90,000 for emotional suffering is not excessive.

### c.  Lost Profits

In a false arrest action, economic damages are available for injuries inflicted during the period of time between a plaintiff's arrest and arraignment.  *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995) ("If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more") (citing W. Keeton et al., Prosser and Keeton on the Law of Torts § 119, at 888 (5th ed. 1984)).  To prove damages under New York law, a plaintiff must show "(1) the fact or existence of damages to a reasonable certainty," and "(2) a stable foundation for a reasonable estimate of damages incurred."  *Holland Loader Co. LLC v. FLSmidth A/S*, 769 F. App'x 40, 42 (2d Cir. 2019) (citation modified); *see also Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004) (looking to the law of the state in which the arrest occurred to determine damages).

To begin, Plaintiff established the existence of his lost profits to a reasonable certainty.  Plaintiff testified that he had negotiated the PhaZZer deal over several months, which included numerous phone calls with his Guinean counterparts; that the parties had negotiated price, quantity, shipping logistics, and a timeframe for delivery within 60 days; that there was an oral agreement for the sale; and that all that remained was for Plaintiff to travel to Guinea and demonstrate the use of the PhaZZer.  Tr. at 20–24, 339–40.  The jury's determination that Plaintiff's arrest was the proximate cause of his failure to close the PhaZZer deal was well supported by the evidence, and the Court defers to its finding.  *See Raedle*, 670 F.3d at 418–19.

That leaves Plaintiff's estimation of his lost profits from the PhaZZer deal. "The general rule governing the recovery of lost profits in tort cases is that damages proximately caused by the wrongful conduct of the defendant may be recovered if plaintiff proves them with reasonable certainty and without speculation." *Wolf St. Supermarkets v. McPartland*, 487 N.Y.S.2d 442, 449 (N.Y. App. Div. 4th Dep't. 1985) (finding plaintiff's proof, including a decade of sales records and sales projections, showed lost profits by a reasonable certainty).  "Although lost profits need not be proven with mathematical precision, they must be capable of measurement based upon known reliable factors without undue speculation." *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (citation omitted).

It is true that, under New York law, "evidence of lost profits from a new business venture receives greater scrutiny." *Holland Loader*, 769 F. App'x at 43 (citation omitted).  The so-called "new business rule" is an evidentiary rule that

"creates a higher level of proof needed to achieve reasonable certainty as to the amount of damages" in a new business where "there is no track record upon which to base an estimate." *Id.* (citation modified); *see also Schonfeld*, 218 F.3d at 172. The rule does not apply to a business that, while new in some respects, is "actually a continuation" of the business from which proof of lost profits is drawn. *Wolf St. Supermarkets*, 487 N.Y.S.2d at 449.

Here, the new business rule does not apply to Plaintiff's approximation of lost profits. Plaintiff testified that his company, Safe Bet Express, had been in business with the Guinean government for years. Tr. at 20. Accordingly, while Plaintiff had never previously sold electronic stun guns to the government of Guinea, his history of similar sales made this transaction far from speculative. Plaintiff testified that in his business experience, his profit margin typically amounted to 30 percent of gross sales. Tr. at 326. He also supplied an invoice from a prior deal conducted with the same buyer and supplier that showed his company earned a 33% sales commission. Pl. Ex. 7 at 6. Plaintiff's years-long "track record" of doing similar business in Guinea means that, as an evidentiary matter, his proof of lost profits is not subject to the new business rule. *Holland Loader*, 769 F. App'x at 43.

Defendant also objects to the admissibility and reliability of Plaintiff's testimony on the amount of his lost profits. When first questioned at trial about the price and quantity of the PhaZZer deal, Plaintiff did not recall the exact amounts. Tr. at 130–32. After reviewing an invoice that refreshed his recollection, Plaintiff then testified that he had an independent recollection of the details of the anticipated

PhaZZer sale, and answered his counsel's specific questions about the quantity and pricing of the stun guns and accessories that were the subject of the parties' oral agreement.  Tr. at 321–27.  Plaintiff testified that the total value of the sales would have been $289,000, and that his profit margin from such transactions was typically 30 percent of gross sales.  Tr. at 326.  Plaintiff also testified that he paid an additional $145.80 for one night in a hotel after the false arrest caused him to miss his flight to Guinea.[7]  Tr. at 328–29; Pl. Ex. 4

The Court finds no basis to revisit its earlier decision on the admissibility of Plaintiff's refreshed recollection testimony.  *Cf. Morse v. Fusto*, No. 07-CV-4793 (CBA) (RML), 2013 WL 4647603, at *26 (E.D.N.Y. Aug. 29, 2013), *aff'd*, 804 F.3d 538 (2d Cir. 2015) (noting that defendants "had ample opportunity to draw out the perceived weaknesses" in witnesses' testimony).  Defendant had the opportunity to cross-examine Plaintiff on the calculations that appeared on the invoice and challenge the credibility of his claim that he had an independent, refreshed recollection of the details of the deal after he reviewed the invoice in court.  Fed. R. Evid. 612(b); Tr. at 334–38.  The Court also reminded Defendant of the option to impeach Plaintiff with testimony from his deposition, at which he was unable to remember the prices or quantities of the items to be sold to his Guinean counterparts.  Tr. at 333; Pl. Dep., ECF No. 68-1 at 51.  Instead, defense counsel indicated that she preferred to "stick

---

[7] Plaintiff also testified that he incurred additional expenses in hiring an attorney to defend against his criminal charges; however, as those expenses were incurred in the period following his arraignment, they are not recoverable as damages from his false arrest.  *See Singer*, 63 F.3d at 117.

with just what the jury" had heard from Plaintiff the previous day when cross-examined at trial.  Tr. at 333.  Defendant also had the opportunity to argue in summation that Plaintiff's testimony concerning his recollection of the details to which he testified was not credible.  Tr. at 410–11.  Nevertheless, the jury apparently credited Plaintiff's testimony that his false arrest caused him to lose significant profits from an anticipated $289,000 in gross sales.  That determination was not "egregious."  *Raedle*, 670 F.3d at 418.

The jury erred as a matter of law, however, in awarding Plaintiff $110,000 in lost profits.  Plaintiff testified that had he traveled to Guinea as scheduled and closed the anticipated deal, his profits would have likely amounted to 30 percent of $289,000, or $86,700.  Including the cost of the hotel, the maximum amount Plaintiff could have recovered, even if the jury credited his testimony and drew all reasonable inferences from it, is $86,845.80 in economic damages.  Accordingly, the Court finds that any economic damages award above $86,845.80 is excessive.

## CONCLUSION

Defendant's Rule 50 motion for judgment as a matter of law is DENIED.  The Court does not disturb the jury's finding as to Officer Cassino's liability for false arrest and further finds that she is not entitled to qualified immunity.  Defendant's Rule 59 motion for a new trial is denied, on the condition that Plaintiff accept a reduction of his economic damages award from $110,000 to $86,845.80, which, combined with his award of emotional distress damages, would result in a total award of $176,845.80 in compensatory damages.  Plaintiff shall file a letter within thirty

days of the date of this Memorandum and Order indicating whether he accepts the remittitur described above.

      **SO ORDERED.**


                                        */s/ Nina R. Morrison*
                                      NINA R. MORRISON
                                      United States District Judge

Dated:       December 18, 2025
                Brooklyn, New York